## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DRAW ANOTHER CIRCLE, LLC, [1] *et al.,* | ) | Case No. 16-11452 (KJC) |
|  | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |
| CURTIS R. SMITH, LIQUIDATING TRUSTEE, | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Adv. No. 17-51041 (KJC) |
|  | ) |  |
| JOEL WEINSHANKER, ALAN VAN ONGEVALLE, CATHY HERSHCOPF, FRANK MARRS, and JEFFREY SHRADER, | ) | **JURY DEMAND** |
|  | ) |  |
| Defendants. | ) |  |

## AMENDED COMPLAINT

Plaintiff Curtis R. Smith, not individually but solely in his capacity as the Liquidating

Trustee (the "*Trustee*") of the Hastings Creditors' Liquidating Trust (the "*Trust*"), by and

through his undersigned counsel, and for his amended complaint (the "*Complaint*") against

defendants Joel Weinshanker ("*Weinshanker*"), Alan Van Ongevalle ("*Van Ongevalle*"), Cathy

Hershcopf ("*Hershcopf*"), Frank Marrs ("*Marrs*"), and Jeffrey Shrader ("*Shrader*", and

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Draw Another Circle, LLC (2102); Hastings Entertainment, Inc. (6375); MovieStop, LLC (9645); SP Images, Inc. (7773); and Hastings Internet, Inc. (0809). Under the confirmed *First Amended Joint Combined Disclosure Statement and Plan of Liquidation* (the "Plan"), all of the Debtors' bankruptcy cases aside from that of Draw Another Circle, LLC have been closed in the Bankruptcy Court.

collectively with Weinshanker, Van Ongevalle, Hershcopf, and Marrs, the "*Defendants*"),
alleges as follows:

## PRELIMINARY STATEMENT

1.      By this Complaint, the Trustee seeks to redress the significant damage visited
upon the Debtors' estates and creditors by the acts and omissions of Weinshanker – the direct or
indirect owner, chief executive, and director of each of the Debtors – as well as his fellow
Defendants, each of whom were directors and/or officers of Debtor Hastings Entertainment, Inc.
("*Hastings*") during Weinshanker's stewardship.

2.      As detailed below, Weinshanker, after engineering a leveraged buyout of Hastings
in July 2014, carried out a strategy of using Hastings as his personal piggybank by causing it to
pour millions of dollars into investments that not only conferred no benefit on Hastings, but
hastened its demise.  Weinshanker relied upon the fact that as of the Buyout Date (defined
below), Hastings had substantial availability on its revolving line of credit with Bank of
America, N.A. ("*BofA*") that could be drawn upon to fund his vanity projects.  Moreover, he
burdened Hastings – and its borrowing base – from and after the Buyout Date by largely funding
his acquisition through Hastings' issuance of a $15 million second-lien term loan, over the
objections of Hastings' management.

3.      Weinshanker used Draw Another Circle, LLC ("*DAC*") as a holding company for
Hastings.  He then used other special-purpose acquisition vehicles to purchase additional
businesses using Hastings' money, including MovieStop, LLC ("*MovieStop*") and Sports
Images, Inc. ("*SPI*").  These businesses were then brought under the DAC umbrella.  As a result,
all of the potential upside from these acquisitions would flow upward to Weinshanker, yet all of

the risk was borne by Hastings and its stakeholders.   This complete shifting of risk left Weinshanker free to loot Hastings – and by extension, its creditors – for his exclusive benefit.

4.      These acquisitions and transfers were ill-fated from the start, and caused tens of millions of dollars of damages to Hastings and its creditors.   Aside from the fact that these transactions cannot possibly constitute diligent or prudent exercises of business judgment, they were executed with little to no regard for corporate formalities, and essentially forced upon Hastings.   Nonetheless, the members of Hastings' board of directors (the "*Board*"), most of whom were otherwise connected to Weinshanker in their capacities as outside attorneys or senior management, stood idly by while Weinshanker orchestrated this campaign, despite being aware of – and otherwise involved with – the transactions.

5.      Indeed, from the moment that Weinshanker took over the company, Hastings had a "do-nothing" Board, the membership of which initially consisted only of Weinshanker, but subsequently included the other Defendants.   In the less-than two years between the closing of the leveraged buyout and the commencement of these chapter 11 cases, the Board never met – either in person or telephonically – on even a single occasion, did not deliberate on, vote on, or approve the transactions that are the subject of this Complaint, and essentially, looked the other way while Weinshanker looted Hastings for his personal benefit.   The Board thus ignored its duties under applicable law, including the Texas Business Organizations Code ("*TBOC*"), by, among other things, adhering to none of the formalities that are customary of a corporate board.

6.      Making matters worse, the other Board members were not hoodwinked by Weinshanker.   In fact, several of them were completely aware of what Weinshanker was doing, did absolutely nothing to stop him, and in most cases, actively facilitated Weinshanker's strategy in their respective capacities as outside counsel or as officers of Hastings.

7.      All told, the Trustee believes Weinshanker caused at least **$30 million** of Hastings assets to be squandered during his reign (including, but not limited to, approximately $20 million in transfers of cash and inventory to Weinshanker-controlled entities, and another $5 million in an unnecessary and ultimately harmful prepayment to Hastings' second-lien lender), with nothing to show for it but the liquidation of a $400 million business with 50 years of history and over 3,500 employees.

8.      In facilitating Hastings' demise, Weinshanker and the other Defendants committed multiple breaches of their fiduciary duties of obedience, care, loyalty, good faith and fair dealing to Hastings and its creditors.  The Trustee seeks entry of judgment in his favor that will compensate the estate and creditors for their losses resulting from the Board's conduct (or unconscionable lack thereof).

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b).

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

11.      This matter is a core proceeding pursuant to, without limitation, 28 U.S.C. §§157(b)(2)(A), (C), and (O).  This Complaint is filed in relation to the chapter 11 cases of Draw Another Circle, LLC and its affiliated debtors Hastings Entertainment, Inc., MovieStop, LLC, SP Images, Inc. and Hastings Internet, Inc. (jointly administered under Case No. 16-11452 (KJC)) (collectively, the "*Debtors*") pending in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*").

12.    Alternatively, this Court has subject matter jurisdiction under 28 U.S.C. §1332(a)(1) because it is between citizens of different states and the amount in controversy exceeds $75,000.

13.    To the extent this Complaint sets forth causes of action that are not core proceedings, the Trustee consents, pursuant to 28 U.S.C. § 157(c)(2), to this Court hearing and determining such matters.

14.    On December 14, 2016, the Bankruptcy Court entered that certain *Findings of Fact, Conclusions of Law, and Order Approving and Confirming Debtors' and the Creditors' Committee's First Amended Joint Combined Disclosure Statement and Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* (the "*Confirmation Order*"), pursuant to which the *Debtors' and the Creditors' Committee's First Amended Joint Combined Disclosure Statement and Plan of Liquidation under Chapter 11 of the Bankruptcy Code* (the "*Plan*") was confirmed. The Plan became effective on February 20, 2017 (the "*Effective Date*").

## **PARTIES**

15.    Plaintiff, Curtis R. Smith, is the duly-appointed Trustee of the Trust, and a resident of the State of California.  Pursuant to the Plan, the Confirmation Order and the *Hastings Creditors' Liquidating Trust Agreement* dated as of the Effective Date (the "*Trust Agreement*"), all right, title and interest in the claims and causes of action set forth in this Complaint were transferred to the Trust, and the Trustee was granted sole authority to prosecute such claims and causes of action.

16.    Defendant, Joel Weinshanker, was the sole owner of DAC and the indirect owner of each of the other Debtors, and was the CEO of Hastings, from the Buyout Date (defined below) until the Effective Date.  From the Buyout Date through June 13, 2016 (the "*Petition*

*Date*"), Weinshanker was a member, and the Chairperson, of the Board of Hastings. Weinshanker is, upon information and belief, a resident of the State of New Jersey.

17.     Defendant, Cathy Hershcopf, is an attorney in private practice, and at times relevant to this Complaint, was counsel to certain of the Debtors and Weinshanker and was a member of the Board of Hastings from November 2014 until December 2015.  Hershcopf is, upon information and belief, a resident of the State of New York.

18.     Defendant, Alan Van Ongevalle, was the President and Chief Operating Officer of Hastings from the Buyout Date until December 2015, and was a member of the Board of Hastings from November 2014 until December 2015.  Van Ongevalle is, upon information and belief, a resident of the State of Texas.

19.     Defendant, Jeffrey Shrader, is an attorney in private practice, and at times relevant to this Complaint, was outside counsel to Hastings and a member of the Board of Hastings from November 2014 until December 2015.  Shrader is, upon information and belief, a resident of the State of Texas.

20.     Defendant, Frank Marrs, is the Chief Executive Officer of Gupton Marrs International, a management consulting firm, and was a member of the Board of Hastings from November 2014 through July 2015.  Marrs is, upon information and belief, a resident of the State of Texas.

## **BACKGROUND**

### I.     **The Hastings Leveraged Buyout**

21.     Founded in 1968, Hastings, a Texas corporation, was a leading multimedia entertainment and lifestyle retailer. From its corporate headquarters in Amarillo, Texas, Hastings operated entertainment superstores that bought, sold, traded and rented home

entertainment products, including books, music, software, periodicals, movies on DVD and Blu-Ray, video games, video game consoles, hobby, sports and recreation, lifestyle and consumer electronics. Hastings also offered consumables and trends products such as apparel, action figures, posters, greeting cards and seasonal merchandise. As of the Petition Date, Hastings operated through 123 stores in 19 states, as well as a multimedia entertainment e-commerce web site, and had 3,500 employees. Prior to the closing of the leveraged buyout, Hastings stock was publicly traded on the NASDAQ stock exchange.

22.     On July 15, 2014 (the "*Buyout Date*"), a leveraged buyout of Hastings closed. Hendrix Acquisition Corp., a special-purpose entity owned and controlled by Weinshanker, purchased all of the outstanding shares of Hastings for $21,406,824.80, or $3.00 per share. The acquisition was funded primarily with a $15 million second-lien loan taken out by Hastings from Pathlight Capital ("*Pathlight*"); net of the Pathlight loan proceeds, Weinshanker's individual cash contribution was just over $7 million. The fact that the buyout was predominantly financed with $15 million of additional secured indebtedness was troubling to Hastings' management, who were concerned that the additional indebtedness would strangle liquidity and reduce availability under the BofA revolver.

23.     Subsequent to the Buyout Date, Hendrix Acquisition Corp. was merged into DAC, a Delaware limited liability company that was owned 71.1% by Weinshanker and 29.9% by National Entertainment Collectibles Association ("*NECA*") (which is wholly-owned by Weinshanker). Accordingly, DAC became the parent and sole shareholder of Hastings. NECA subsequently transferred its ownership interest of DAC to Weinshanker, and as a result, Weinshanker eventually owned 100% of DAC's membership interests.

## II.    The Hastings Board

15.     The membership of the Board went through several iterations between the Buyout Date and the Petition Date, which are discussed below.  The one consistent theme of each iteration, was Weinshanker's improper dominion and control of the Board.

16.     At all times, the Board and each of its members owed fiduciary duties to Hastings and its stakeholders, including, without limitation, duties of obedience, care, loyalty, good faith and fair dealing.

17.     In addition, The Texas Business Organizations Code (the "*TBOC*")[2] imposes certain obligations upon a Texas corporation's board of directors.  First and foremost, section 21.401 of the TBOC states that a board of directors shall: (1) exercise or authorize the powers of the corporation; and (2) direct the management of the business and affairs of the corporation. Section 21.401 of the TBOC also states that directors have a duty to act in the best interests of the corporation, both long-term and short-term, as well as the interests of its shareholders.

18.     Immediately upon the Buyout Date, and until November 30, 2014, Weinshanker was the sole director of Hastings.

19.     On November 30, 2014, Hershcopf, Shrader, Van Ongevalle and Marrs were elected and appointed directors of Hastings, despite a prohibition in the By-Laws against creating more than one new directorship in a single year.

20.     Hershcopf was, and remains, a partner in the Business Restructuring & Reorganization practice group of Cooley LLP ("*Cooley*"), a law firm.  Both Cooley and Hershcopf have had extensive involvement with Weinshanker, NECA and Hastings through the course of multiple legal engagements.  Cooley represented NECA as outside corporate counsel

---

[2]    Unless otherwise stated, any reference to a section of the TBOC is to a section under Title 2.

both before and after the Buyout Date, and represented NECA, and then Weinshanker, in the leveraged buyout of Hastings.  After the Buyout Date, Cooley and Hershcopf represented Weinshanker, Hastings and the other Debtors in several of the transactions described in this Complaint, as set forth below.  Cooley was also retained as lead bankruptcy counsel to the Debtors prior to, and following, the commencement of their chapter 11 cases (until it had to cede that role once the extent of its conflicts of interest came to light and became "special corporate counsel").

21.    Shrader represented Hastings as outside corporate counsel for years prior to, and following, the Buyout Date, and served as a board member from October 1992 until the Buyout Date.  As alleged below, Shrader's second tenure on the Board coincided with several key transactions relevant to this Complaint.

22.    Van Ongevalle joined Hastings in 1992, holding numerous positions until ultimately becoming the President and Chief Operating Officer in February 2013.  He was one of the few senior management employees of Hastings that remained in his role following Weinshanker's leveraged buyout.  Van Ongevalle also served on the Board of Hastings from November 2014 until December 2015.  Due to his senior position, Van Ongevalle was heavily involved in the transactions giving rise to this Complaint, as alleged in detail below.

23.    Marrs is the Chief Executive Officer of Gupton Marrs International ("*Gupton Marrs*"), a management consulting firm that specializes in consulting with corporations on internal compliance and operational issues.  Prior to founding Gupton Marrs, Marrs was an audit partner with KPMG, one of the largest accounting firms in the world.  Marrs served on the Board of Hastings from April 2003 until the Buyout Date, and was re-appointed to the Board in November 2014.  Marrs resigned from the Board in July 2015.

24.     Shrader, Hershcopf and Van Ongevalle resigned from the Board on December 9, 2015.  Hershcopf's resignation, upon information and belief, was prompted by her retention as restructuring counsel to Hastings, in anticipation of these chapter 11 filings and, because she indicated in an interview with the Committee, that she was not doing much as a Board member anyway.  The reasons for Shrader's resignation are not known.  Van Ongevalle's resignation from the Board coincided with his resignation as President and COO of Hastings.

25.     Upon information and belief, Ken Simon, a tenured retail executive previously unaffiliated with Hastings, was appointed to the Board on or about December 9, 2015.

26.     As of the Petition Date, the only members of the Board were Weinshanker and Simon.

### III.     Weinshanker Engages in Extensive Improper Behavior After the Buyout Date

27.     After the Buyout Date, Weinshanker negotiated and closed several acquisitions that while, according to him, would provide Hastings leverage to demand better terms and pricing from its suppliers, in fact only exacerbated Hastings' financial problems.

28.     The transactions appear to be motivated exclusively by self-interest.  Rather than provide *any* tangible benefit to Hastings, Hastings was simply a source of interest-free financing for Weinshanker, who ultimately placed these acquisitions under ownership of DAC (and therefore, outside of Hastings' reach).  Despite serious misgivings by Hastings senior management, including Van Ongevalle, and certain of its Board members, including Shrader and Van Ongevalle, none of the other Defendants did anything to stop Weinshanker from forcing these transactions through, and therefore binding Hastings to millions of dollars in financial commitments for which it received no benefit.

29.     In addition to these acquisitions, Weinshanker – both directly and through his surrogates at NECA, an entity wholly owned and controlled by Weinshanker – repeatedly looted Hastings' bank accounts, and improperly accessed Hastings' credit facility with BofA, to fund several companies under his control and ownership, and to repay debts for which Hastings was not obligated, with no promise or prospect of repayment, and for no apparent benefit to Hastings.  Like the ill-fated acquisitions, these outlays ran into the millions of dollars.

30.     As discussed elsewhere in this Complaint, *none* of these acquisitions or material transfers was accompanied with appropriate documentation that would have provided a reasonable prospect of repayment for Hastings.  None of these transactions appear to have received Board approval, despite the fact that they were non-ordinary and material in dollar amount.  In fact, it does not appear that there was *any* Board deliberation, discussion, or consultation regarding any of these transactions, despite the fact that certain Board members were both aware of and directly involved in them while wearing other hats and acting in other capacities.

31.     The acquisitions and transfers that form the basis for the Trustee's claims are described in more detail below.

A.     **The MovieStop Acquisition**

32.     MovieStop LLC ("*MovieStop*") was a retailer of new and used movies and related merchandise.  It was founded in 2004 as a division of GameStop, Inc. ("*GameStop*"), a national retailer of new and used video games and video game consoles.  GameStop, a public company, spun off MovieStop to private owners in 2012.

33.     In the years following the spin-off, MovieStop, which operated out of 44 locations, suffered from dismal performance, declining margins, persistent losses, and mounting

liabilities, and risked having its line of credit canceled.  Indeed, at the time it was approached by Weinshanker as an acquisition target, MovieStop internally determined that if the acquisition did not close, it would be forced to liquidate or file for bankruptcy within a short period of time.

34.     Even if MovieStop itself was not suffering from crippling distress in early 2015 – which it was – its acquisition made no business sense, given that the market for DVDs had been – and continues to be – in irreversible decline for years as a result of internet-based streaming and download services, as well as video-on-demand services offered by every major cable and satellite television provider.  *See* "Why 2015 Home Entertainment Figures Should Worry Studios," Variety, January 6, 2016 (accessed May 22, 2017) (noting 12% decline in DVD sales from 2014 to 2015 and 10.9% decline from 2013 to 2014, while digital revenues rose 18% in 2015); "Home Entertainment 2016 Figures:  Streaming Eclipses Disc Sales for the First Time," Variety, January 6, 2017 (accessed May 22, 2017) (DVD sales declined another 10% in from 2015 to 2016, and streaming revenue exceeded DVD sales revenue for the first time).

35.     These less than optimistic prospects notwithstanding, Weinshanker aggressively pursued an acquisition of MovieStop, bringing in employees of both NECA and Hastings to lead the negotiations and financial planning for the transaction.

36.     On October 31, 2014, MovieStop Acquisition LLC (a special purpose vehicle created by Weinshanker) entered into a Membership Interest Purchase Agreement with Jeffrey Wilson and Russell Howard, the members of MovieStop, pursuant to which MovieStop Acquisition LLC "purchased" the membership interests of MovieStop.  The sole consideration for MovieStop's common membership interests was the assumption of MovieStop's liabilities.

37.     On the same date, MovieStop also entered into a LLC Preferred Interest Redemption Agreement with GameStop, pursuant to which MovieStop purchased GameStop's preferred equity interest in MovieStop for $627,000.

38.     Upon information and belief, Hastings funded the purchase of GameStop's preferred equity interest through the BofA revolver, even though Hastings received no ownership interest in MovieStop, and despite the absence any written documentation (or even an oral agreement) evidencing an obligation by MovieStop Acquisition LLC to repay Hastings.

39.     Originally, Weinshanker wanted to have DAC act as the purchaser of MovieStop's membership interests, but was discouraged from doing so by Hastings' management, because it would trigger a default of the BofA loan and security agreements, which prohibited DAC from "engaging in any business other than business incidental to its existence and ownership of the capital stock of [Hastings]."

40.     Regardless of whom the purchaser was, it was Weinshanker's intention to have Hastings foot the bill.  According to an e-mail conversation between Board member and outside counsel Shrader and Jeff Twait ("*Twait*"),[3] Twait stated "Alan [presumably, Van Ongevalle] and I are guessing that Hastings is going to be funding this in some capacity, be it another inventory purchase of sorts or some other avenue."  *See* Exhibit A.

41.     Hershcopf and her firm, Cooley, represented Weinshanker in connection with the MovieStop acquisition.  She was able to convince Weinshanker to create MovieStop Acquisition LLC as a purchase vehicle to avoid this scrutiny.  But despite the fact that DAC was not initially used to purchase MovieStop, the purchase was essentially treated as a business combination with Hastings.  Indeed, this was the plan all along.

---

[3]     Jeff Twait was the chief financial officer of Hastings following the Buyout Date.

42.     Hastings' management devoted considerable attention to a host of matters related to the MovieStop transaction, including its impact on Hastings' borrowing base and availability under the BofA revolver, conducting itself as if the two entities had actually merged.  However, no merger had actually occurred, meaning that the investment made by Hastings in MovieStop accorded it no value whatsoever, yet drained it of both financial and operational resources.

43.     Ultimately, on or about July 22, 2015, and despite the express prohibition in the BofA loan documents, MovieStop was brought into the DAC organizational structure when the membership interests of MovieStop were sold to DAC.

44.     From the outset, the MovieStop transaction was disastrous *vis a vis* Hastings (despite Hastings having no direct relationship to MovieStop other than its common ownership of Weinshanker and DAC).

45.     First, the acquisition had an immediate – and negative – impact on Hastings' borrowing availability under its BofA revolver.  Between the transfer of $627,000 for MovieStop Acquisition LLC's purchase of GameStop's preferred equity, and being forced to extend letters of credit for the benefit of MovieStop's suppliers, Hastings' availability was projected to fall to $15 million in December 2014.  By contrast, on the Buyout Date (a mere five months earlier), Hastings' availability under the BofA revolver was in excess of $60 million.

46.     In addition, Hastings advanced approximately $12 million in cash and inventory to MovieStop that it should have had little expectation of being repaid, given MovieStop's dismal performance, combined with the complete absence of definitive documentation evidencing a repayment commitment on the part of MovieStop.

47.     Hastings, at the direction of Weinshanker, also provided significant back-office services to MovieStop (pursuant to a Shared Services Agreement) for which it was not

14

compensated, and for which Weinshanker knew or should have known that MovieStop could never pay back.

48.     In total, based on MovieStop's Schedules of Assets and Liabilities (Case No. 16-11452, Dkt. No. 628), MovieStop was indebted to Hastings as of the Petition Date in an amount exceeding $12.6 million.

49.     Hastings could have avoided these substantial losses had the MovieStop acquisition never happened, or if Hastings had at least stopped throwing good money after bad by transferring millions of dollars to MovieStop after the acquisition.  Moreover, these losses could have been avoided (or at least staunched) if an active, engaged Board, or Hastings' officers, had intervened and directed that steps be taken to cut ties with MovieStop far sooner.

50.     The Board, however, did nothing to protect Hastings from losing millions of dollars after the transaction closed.  While at the time the MovieStop acquisition closed, Weinshanker was the sole director of Hastings, a significant percentage of the transfers made by Hastings to MovieStop occurred while Hershcopf, Marrs, Shrader and Van Ongevalle were on the Board.  At a minimum, Hershcopf, Van Ongevalle and Shrader would, or should, have been aware of the nature and extent of these transfers, since Hershcopf represented Weinshanker in the acquisition in her capacity as outside counsel, Van Ongevalle was an officer of Hastings during the deal negotiations and after the acquisition, and was extensively involved in its negotiation and funding, and Shrader was consulted on the structuring of the acquisition in his capacity as outside counsel.  Despite the extensive knowledge of and involvement in this transaction by individual Board members in their other capacities, the Board did not engage in any discussions, conduct any meetings, or take any action or view whatsoever regarding the acquisition or its aftermath.

51.     The fact that Hastings management and Board members were extensively involved in the transaction, and the fact that substantial resources of Hastings were used to fund MovieStop's inventory purchases, should have triggered a Board review.  Moreover, the Board, consisting solely of Weinshanker at the time, should have taken formal action to approve the funding for the initial purchase of the preferred equity interest from GameStop and the subsequent funding of MovieStop's inventory purchases and back office functions, since these transactions were material, non-ordinary, and accorded no benefit to Hastings.  Indeed, what Weinshanker, as the CEO and sole Board member at the time, *should* have done is review and *refuse* to approve the purchase, or any cash infusions by Hastings with respect thereto, due to the fact that they accorded no benefit to Hastings.  But even after the Board was expanded to five members, it took absolutely no action with respect to the millions of dollars squandered by Hastings on MovieStop.

### B.     The SP Images Acquisition

52.     Sports Images, Inc. ("*Sports Images*"), a Massachusetts corporation, was a licensed distributor of sports and entertainment products and apparel, including items licensed by Major League Baseball, the National Football League, the National Hockey League, the National Basketball Association, Marvel Comics, and DC Comics.

53.     Like MovieStop, Sports Images was heavily distressed prior to its acquisition by Weinshanker, operating at a substantial net loss and suffering from liquidity constraints.

54.     Despite Sports Images' considerable issues, Weinshanker was determined to acquire it, again relying upon Hastings as a free financing source.  Weinshanker negotiated the Sports Images acquisition shortly after the Buyout Date, intending to saddle Hastings with the acquisition costs, based on his knowledge of Hastings' availability under the BofA revolver.

16

55.     On July 28, 2014, SI Acquisition LLC ("*SI*"), a special purpose entity owned by Weinshanker, acquired the equity of Sports Images.

56.     The Stock Purchase Agreement between SI and Sports Images provided that the shares of Sports Images would be purchased for fifty percent (50%) of: (a) the amount of cash collected from the sale of inventory and collection of accounts receivable as of the closing date, less amounts necessary to satisfy all indebtedness of Sports Images; and (b) the net profits generated by Sports Images for a three year period following the closing date from its existing vendor base.

57.     Additionally, Weinshanker agreed to pay off, over time, Sports Images' $750,000 bank loan with Eastern Bank.  It is not known at this time where the funding for the equity purchase came from, though, upon information and belief, Hastings funded the bank loan repayment.

58.     Moreover, SPI, a Nevada corporation and a wholly-owned subsidiary of SI (and thereby, indirectly owned by Weinshanker), acquired the assets of Sports Images, Inc. for only an assumption of liabilities.  Subsequently, on May 19, 2015, DAC acquired SPI, and SI was dissolved.

59.     Notwithstanding the fact that Hastings had no direct economic interest in the SPI acquisition, Weinshanker relied heavily upon Hastings' management and professionals, including Shrader, Van Ongevalle, and Twait, as well as his surrogates at NECA, to negotiate the transaction and figure out how SPI would be financed post-acquisition.  Extensive correspondence exists between Shrader, Van Ongevalle, and Twait, and Michael Sosidka and Alexis Mueller of NECA, regarding various issues pertaining to the SPI acquisition and its future business dealings with Hastings.

60.     Almost immediately after the SPI acquisition closed, Weinshanker, acting individually and through Sosidka and Mueller of NECA, caused Hastings to "purchase" inventory from SPI for $3,000,000 in cash.  Upon information and belief, SPI never transferred this inventory to Hastings, and indeed, never intended to do so.

61.     In addition, shortly after the closing of the SPI acquisition, Weinshanker caused Hastings to enter into a sham "consignment" arrangement with SPI, whereby Hastings would consign certain inventory to SPI for sale, and was to receive 85% of the sale proceeds, with 15% retained by SPI as a commission.  Upon information and belief, this arrangement was never memorialized in a signed writing, and was not documented and perfected in the manner prescribed by section 9-102(a)(20) of the Uniform Commercial Code.

62.     Notwithstanding this "consignment" arrangement, it appears that Weinshanker never intended to pay Hastings for the inventory it sold through SPI.  For more than a year, SPI continued to sell this inventory, yet did not remit any payments to Hastings pursuant to the parties' purported consignment arrangement.

63.     In addition, SPI and Hastings were parties to a Shared Services Agreement, pursuant to which Hastings performed substantially all of SPI's back office functions for a fee of $5,000 per month (which was likely completely inadequate, given the significant amount of time invested by senior management of Hastings in SPI-related matters).  Notwithstanding the inadequacy, SPI never paid Hastings under this agreement.

64.     Only in early 2016 (a year and a half after the acquisition closed) did the new management of Hastings (particularly, Duane Heusers, who succeeded Twait as CFO, and Jim Litwak, who succeeded Van Ongevalle as President) discover the extent of the losses Hastings suffered as a result of the SPI acquisition and the forced "consignment" arrangement.  In

documents provided by Hastings to NECA, the amount due to Hastings for the consigned inventory that was sold but unpaid for, plus the $3 million of "purchased" inventory that SPI sold on Hastings behalf, was calculated at $6.5 million.

65.     Finally, Weinshanker, through NECA, caused Hastings to transfer $1,621,500 to NECA on April 16, 2015 (the "*NECA Transfer*").  While this has been described in e-mail communications among Hastings, SPI and NECA as a "purchase" of inventory, there is no evidence that any inventory was transferred to Hastings.

66.     In fact, Weinshanker caused the NECA Transfer to be made in satisfaction of a debt in the same amount SPI owed to NECA (a debt for which Hastings had absolutely no liability).[4]  *See* Exhibit B (e-mail correspondence from Sosidka to Twait on April 15, 2015 with the subject "Intercomany [sic] NECA and SP Images," stating that "[t]he intercompany amount due from SP Images to NECA is $1,621,500 [the exact amount of the NECA Transfer]").  Knowing that SPI lacked the liquidity to satisfy this indebtedness, Weinshanker instead foisted this obligation on Hastings, which had availability on its revolver to make the payment.

67.     This availability, however, was dwindling quickly, largely as a result of Weinshanker's looting of Hastings.  The NECA Transfer left Hastings with only $13 million of availability on its BofA revolver; as of the Buyout Date (only nine months earlier), there was approximately $60 million of availability.  *See* Exhibit D (e-mail correspondence from Twait to Sosidka on April 16, 2015, stating, after making the NECA Transfer, "[h]ope that's it, we only have $13M of availability left.").

---

[4]     Indeed, it may be the case that the debt was not owed by SPI to NECA, but rather, was owed by SPI to *Weinshanker*.  *See* Exhibit C (noting a $1,571,000 debt of SPI to Weinshanker as of February 24, 2015).

68.    In addition, NECA approached Hastings to fund SPI's liquidity shortfalls on several occasions, including on August 3 and August 12, 2015.  *See* Exhibit E (August 3, 2015 e-mail correspondence from Sosidka to Twait and Van Ongevalle, stating "[t]he ledger balance for SP is a negative $155k.  Joel said NECA can't cover this . . . [p]lease let me know what you can do to cover the shortage."); Exhibit F (August 3, 2015 e-mail correspondence from Twait to Sosidka and Van Ongevalle, indicating that Hastings would wire money to cover the shortfall); Exhibit G (August 12, 2015 e-mail correspondence from Sosidka to Van Ongevalle, requesting $225,000 in additional funding to cover SPI shortfalls).  Upon information and belief, there were several other instances in which Hastings was forced to fund SPI's liquidity shortfalls, again, with no prospect of repayment.

69.    Weinshanker, as an officer and sole director of Hastings at the time of the SPI acquisition, failed to adhere to any of the corporate formalities required for the approval of a transaction of this magnitude.  As a director, Weinshanker should have taken formal action to approve the acquisition and the subsequent funding of SPI's working capital and back office functions, since these transactions were material, non-ordinary, and accorded no benefit to Hastings.  Indeed, what Weinshanker, as the CEO and sole Board member at the time, *should* have done is review and *refuse* to approve the purchase, or any cash infusions by Hastings with respect thereto, due to the fact that they accorded no benefit to Hastings.

70.    Once the Board expanded to five members, it continued to do nothing to protect Hastings from losing millions of dollars after the SPI acquisition closed, or to prevent the NECA Transfer from occurring.  At a minimum, Hershcopf, Van Ongevalle and Shrader would, or should, have been aware of the nature and extent of these transfers, since Hershcopf provided legal advice to Weinshanker and Hastings during this period in her capacity as outside counsel,

Van Ongevalle was an officer of Hastings during the deal negotiations and after the acquisition, and was extensively involved in its negotiation and funding, and Shrader was consulted on a host of SPI-related matters in his capacity as outside counsel.  Despite the extensive knowledge of the SPI acquisition and the millions of dollars that Hastings transferred to SPI after the closing by individual Board members in their other capacities, the Board did not engage in any discussions, conduct any meetings, or take any action or view whatsoever regarding the acquisition or its aftermath.

71.     In fact, it was only after Litwak's hiring as the President and COO of Hastings that a small portion of the damage was repaired, in that Litwak demanded that SPI begin turning over proceeds of consignment sales (which it never intended to do before then).

72.     Hastings' dealings with SPI caused, at a minimum, $7.6 million in damages in the period prior to the Petition Date.

**C.     The Las Vegas Elvis Exhibition**

73.     One of Weinshanker's many business interests is his ownership of several entities related to the estate of Elvis Presley ("*Presley*").  Among other things, Weinshanker, through several of his wholly-owned entities, holds significant ownership stakes in Graceland (Presley's former residence in Memphis, Tennessee), as well as exhibitions featuring Presley's personal effects and memorabilia.

74.     Exhibit A Circle ("*EAC*"), one of Weinshanker's entities, produced and operated an exhibition called "Graceland Presents Elvis:  The Exhibition – The Show – The Experience" (the "*Elvis Exhibition*") at the Westgate Las Vegas Resort and Casino in Las Vegas, Nevada ("*Westgate*").

75.    In late 2014, EAC signed a ten year lease with Westgate for a 28,000 square foot exhibition space, and arranged for security services and other related logistical services.

76.    Weinshanker yet again used Hastings as a source of both no-cost capital and inventory for the Elvis Exhibition, without any regard for whether Hastings would be repaid. Over the course of several months in mid- to late 2015 – at a time when it was under severe financial distress – Hastings spent hundreds of thousands of dollars funding Pop Goes the Shop (a retail shop adjacent to the Elvis Exhibition), as well as capital outlays related to the exhibition itself.  Among other things, Hastings was being forced to fund costs having absolutely nothing to do with its business operations, such as exhibit set up and event security.

77.    As with the SP Images and MovieStop transactions, no documentation evidencing a repayment obligation by EAC to Hastings was drafted or signed by the parties.

78.    Hastings estimated that its net cash outlay on the Elvis Exhibition was $1.375 million (the "*Elvis Transfers*").[5]  *See* Exhibit H.

79.    When Hastings eventually demanded repayment of these outlays in May 2016, it was told by Michael Sosidka of NECA (on behalf of Weinshanker) that EAC would not pay anything until its legal situation with the Westgate was resolved (the Elvis Exhibition abruptly closed in March 2016, only months after opening, despite being party to a 10-year lease with Westgate).  While the "legal dispute" between Westgate and EAC is ongoing, Westgate did agree to release certain Hastings-purchased inventory to Hastings as part of a stipulation entered by the Bankruptcy Court in the Debtors' chapter 11 cases.  *See Order Approving Stipulation Between the Debtors and NAV-LVH, LLC d/b/a Westgate Las Vegas Resort & Casino*, Case No. 16-11452 (KJC), Dkt. No. 572 (Bankr. D. Del.).

---

[5]    The NECA Transfer and the Elvis Transfers are collectively defined herein as the "*Fraudulent Transfers*."

80.     As with the SPI and MovieStop transactions, a diligent Board would have determined that a seven-figure outlay on a project for which Hastings had no ownership interest, which benefitted Weinshanker and his entities exclusively, and which was being made at a time during which Hastings was experiencing severe financial distress, was not in the best interests of the corporation or its stakeholders, nor was it a sound exercise of business judgment.

81.     Once again, the Board did nothing to stop Hastings from committing over $1 million to the Elvis Exhibition.  At the time that Hastings committed financial support to the exhibition, the Board consisted of Weinshanker, Hershcopf, Shrader, Van Ongevalle and Marrs. At a minimum, Weinshanker, Hershcopf, Van Ongevalle and Shrader were aware of the nature and extent of the Elvis Transfers, since Weinshanker spearheaded the Elvis Exhibition and devised Hastings' funding of it, Hershcopf provided legal advice to Weinshanker and Hastings during this period in her capacity as outside counsel, Van Ongevalle was an officer of Hastings during this period and was frequently consulted on the Elvis Exhibition, and Shrader was consulted on matters related to the Elvis Exhibition in his capacity as outside counsel.  Despite the extensive knowledge of and involvement in this transaction by individual Board members in their other capacities, the Board did not engage in any discussions, conduct any meetings, or take any action or view whatsoever regarding the Elvis Exhibition or its aftermath.

### D.      Partial Paydown of Pathlight Facility

82.     In connection with the leveraged buyout of Hastings, Pathlight made a second-lien term loan in the principal amount of $15 million (the "*Pathlight Loan*"), pursuant to a Term Loan and Security Agreement (the "*Pathlight Agreement*") dated as of July 15, 2014.

83.     The Pathlight Agreement permitted, but did not require, a prepayment of up to $5,000,000 of the principal balance of the Pathlight Loan without penalty.  The permitted

prepayment was heavily negotiated by Weinshanker and his surrogates prior to entry into the Pathlight Agreement.

84.     In December 2014, Weinshanker directed that $5,000,000 of the principal balance of the Pathlight Loan be repaid (the "*Pathlight Paydown*"), in order to allegedly realize savings on interest costs under the Pathlight Agreement for the remainder of the term.

85.     While Weinshanker's stated reason for the Pathlight Paydown may have been prudent for a solvent company with substantial liquidity, this was not the case with Hastings. With its liquidity, as well as its borrowing capacity on the BofA revolver, already depleted as a result of the SPI and MovieStop transactions, Hastings was ill-suited to absorb a $5 million depletion of its cash balances.  Moreover, there was simply no urgency at the time for the paydown; Hastings, at the time, was in good standing with Pathlight.

86.     Ultimately, the Pathlight Paydown exacerbated the already precarious situation that Hastings was in, and simply compounded the harm that Weinshanker had caused.  The Pathlight Paydown, viewed collectively with previously aforementioned acts, very likely accelerated Hastings' liquidity crisis and its eventual chapter 11 filings.

87.     As with all of the other transactions set forth in this Complaint, Weinshanker neither consulted with, called a meeting of, nor sought approval from the Board for the Pathlight Paydown, which was the type of material, non-ordinary transaction that would warrant intensive Board consideration.  And the other Board members, despite many of them having knowledge of and involvement with the decision to make the Pathlight Paydown – particularly Van Ongevalle, who communicated extensively with Weinshanker and others regarding it – did nothing to protect Hastings from the damage that this transfer caused.  The Board did not engage in any discussions, conduct any meetings, or take any action or view whatsoever regarding the Pathlight

Paydown or its aftermath.  Moreover, Hastings' officers, including Van Ongevalle, took no action to prevent the Pathlight Paydown from occurring.

**IV.    The Board Completely Abdicates its Responsibilities With Respect to the MovieStop Transaction, SP Images Transaction, the Fraudulent Transfers, and the Pathlight Paydown**

88.    After the Buyout Date, the Board completely and utterly failed to satisfy its obligations under the TBOC and the By-Laws of Hastings Entertainment, Inc. dated as of July 15, 2014 (the "*By-Laws*").  During a tumultuous period for Hastings, in which:  (i) Weinshanker caused Hastings to finance, with no mechanism for or prospect of repayment, two significant corporate acquisitions; (ii) Hastings directed millions of dollars of non-ordinary transfers at the direction of Weinshanker; (iii) Hastings' core businesses experienced continuing and deepening financial distress; and (iv) Weinshanker caused Hastings' ability to access its revolving credit facility to dwindle to catastrophic levels, the Board's near-complete absence is startling.  In short, the non-Weinshanker Defendants completely failed to oversee and address Weinshanker's harmful conduct during their tenure as Board members.

89.    At the time of the Buyout, Hastings' corporate formation documents were extensively amended (with Hershcopf's firm, Cooley, taking a lead role in drafting such amendments).  Among other things, Hastings' Third Amended Certificate of Formation, dated as of the Buyout Date, included an exculpation clause (the "*Exculpation Clause*"), which purported to exculpate directors (but not officers) "for monetary damages for an act or omission in such person's capacity as a director of [Hastings], except to the extent such limitation or elimination of liability is not permitted by applicable law."  Exhibit I.

90.    TBOC § 7.001(c)(1) states that an exculpation clause cannot "authorize the elimination or limitation of the liability of a governing person to the extent the person is found

liable under applicable law for (1) a breach of the person's duty of loyalty, if any, to the organization or its owners or members."  Accordingly, breaches of the duty of loyalty cannot be exculpated under the Exculpation Clause.

91.     The Board was a quintessential "do-nothing board," having consistently and repeatedly abdicated any responsibility, and consistently and repeatedly failed to exercise any judgment, with respect to the Debtors, and to Weinshanker's damaging conduct.  Specifically, the Board appears to have taken no formal (or even informal) role in reviewing, contemplating, advising on, or approving any of the material transactions and transfers that occurred under Weinshanker's stewardship and direction.  In violation of TBOC and the By-Laws, the Board in its various iterations, among other things:  (i) did not have a single meeting (despite a requirement in the By-Laws that the Board at least meet as soon as practicable after the adjournment of each annual shareholder meeting, which shareholder meetings were required under the By-Laws); (ii) did not approve any of the transactions discussed in this Complaint, let alone deliberate or consider them; (iii) did not discuss, deliberate, or take any action to prevent millions of dollars in Hastings' cash and other assets from being squandered for the benefit of Weinshanker and his other entities and businesses, with no prospect of repayment; and (iv) did not properly appoint new directors in accordance with the By-Laws.

92.     While technically permitted under the TBOC and By-Laws, the absence of an independent Board member permitted Weinshanker to force through the SPI acquisition (and the corresponding funding of that acquisition by Hastings). Notwithstanding the technical permissibility of Weinshanker serving as the sole director, he nevertheless violated TBOC and the By-Laws by failing to observe corporate formalities related to the SPI acquisition, including: (i) holding a Board meeting and executing a resolution authorizing the funding; or (ii)

alternatively, executing a written consent in lieu of a Board meeting as a prerequisite to the funding.

93.     Indeed, Weinshanker ignored his fiduciary obligations to Hastings and its stakeholders, despite having been actively involved in the business community, and having been a majority shareholder, director, and officer of numerous corporations for several decades.  In a deposition taken by the Official Committee of Unsecured Creditors on December 9, 2016 (of which a true and correct copy is attached hereto as Exhibit J), Weinshanker testified as follows:

- When asked whether Hastings conducted Board meetings:  "I'm not exactly sure." (Ex. J, pg. 26);

- When asked whether the Board had a chairperson:  "I don't know." (Ex. J, pg. 28);

- When asked whether minutes of meetings were taken:  "I'm not sure." (Ex. J, pg. 29);

- When asked whether the Board passed any resolutions:  "I'm not sure." (Ex. J, pg. 30);

- When asked whether it was intended that he be a Board member after the Buyout Date:  "I guess . . . Again, to me, it's semantical.  I was the owner of the company. Major decisions were supposed to go through me."  (Ex. J, pg. 31);

- When asked if he understood what role a chair of a board of directors serves: "Not entirely."  (Ex. J, pg. 34);

- When asked if a Board meeting was held to consider the SPI acquisition:  "I'm not sure."  (Ex. J, pg. 47);

- When asked who was on the Board at the time of the SPI transaction: "I'm not sure.  I'm not sure, again, to the whole concept of the board, I'm unsure."  (Ex. J, pg. 48);

- When asked if the Board was consulted on the MovieStop acquisition:  "I'm not able to answer that question."  (Ex. J, pg. 68);

- When asked if the Board considered or approved the NECA Transfer:  "I'm unable to answer that question."  (Ex. J, pg. 74);

- When asked, "Do you have an understanding yourself as to whether you're a board member, or it goes back to your answer that you have no clue?":  "No."  (Ex. J, pg. 87);

- When asked what a board of directors is supposed to do:  "No."  (Ex. J, pg. 87).

94.    The foregoing indicates that Weinshanker was completely ignorant of his fiduciary duties of obedience, care, loyalty, good faith and fair dealing as a director of Hastings, despite his decades of experience in the corporate world and his access to experienced attorneys and advisors who were well versed in fiduciary duty laws.  More likely, the above deposition testimony shows that Weinshanker knew he had fiduciary duties of obedience, care, loyalty, good faith and fair dealing and knew that he had shirked those duties – for his own benefit and against the interests of Hastings and its creditors.

95.    All told, the Defendants did not engage in any of the practices that are expected of a director of a large corporation and required under the TBOC and the By-Laws.  Their complete and utter failure to satisfy their fiduciary duties of obedience, care, loyalty, good faith and fair dealing in the midst of Weinshanker's plundering of Hastings, as well as Hastings' insolvency, which increased significantly from the Buyout Date to the Petition Date, contributed directly to

the conditions that required Hastings to seek the protections of the Bankruptcy Code, and ultimately, liquidate its assets.

## V.  The Defendants' Acts and Omissions Occurred While Hastings Was Insolvent, and Caused its Insolvency to Become Worse

96.     All or substantially all of the acts and omissions of Weinshanker and the non-Weinshanker Defendants occurred while Hastings was clearly insolvent on a balance sheet basis.

97.      As an initial matter, Hastings' insolvency was propelled by the Weinshanker-led leveraged buyout, which added $15 million of secured debt to the company's books.  As a result, Hastings was insolvent by no later than July 28, 2014 (if not as of the Buyout Date itself).

98.     This insolvency substantially increased as a result of the acts and omissions of Weinshanker and the non-Weinshanker Defendants.  By causing (in the case of Weinshanker) and facilitating or otherwise enabling (in the case of the non-Weinshanker Defendants) a series of disastrous and costly transactions that resulted in tens of millions of dollars of net cash outflows from Hastings, Hastings became progressively more insolvent, ultimately becoming unable to service its mounting secured and unsecured indebtedness, and eventually resulting in its chapter 11 filings.

## COUNT I
### (Breach of Fiduciary Duty)
### (Against Joel Weinshanker)

99.     The Trustee repeats, realleges, and incorporates all allegations contained in Paragraphs 1 through 98 of the Complaint as if fully set forth herein.

100.    At all relevant times to this Complaint – in particular, July 15, 2014 through the Petition Date – Joel Weinshanker was on the Board, and was also the Chief Executive Officer of Hastings.  In fact, until November 30, 2014, Weinshanker was the sole member of the Board.

101.    As a director and an officer of Hastings, Weinshanker owed Hastings a duty of obedience, duty of care, duty of loyalty, duty of good faith, and duty of fair dealing.

102.    In addition, once Hastings entered the zone of insolvency, and subsequently became insolvent, Weinshanker's fiduciary duties of obedience, care, loyalty, good faith and fair dealing ran not only to Hastings, but to its creditors.

103.    Hastings became insolvent no later than July 28, 2014 (if not the Buyout Date), with the magnitude of such insolvency increasing in subsequent periods, through the Petition Date.

104.    Under Texas law, the duty of care required Weinshanker to act and perform his corporate duties in the same manner as an ordinarily prudent person would under similar circumstances.

105.    Moreover, Texas law dictates that a director may not abdicate his or her responsibilities as a director.

106.    Under Texas law, directors are bound by the duty of loyalty, which requires that a director act in good faith, and not allow his personal interests to prevail over the interests of the corporation.

107.    The TBOC also imposes specific obligations on directors intending to engage in transactions with the company that will benefit them, or companies in which they have an interest.

108.    Specifically, TBOC § 21.418 requires that any transaction between a corporation and an interested director is valid and enforceable only if the material facts as to the relationship or interest are disclosed or known to the board of directors, the interested director refrains from

board deliberations concerning the transaction, and the board in good faith authorizes the transaction by approval of the majority of the disinterested directors.

109.    Weinshanker repeatedly breached his fiduciary duties of obedience, care, loyalty, good faith and fair dealing, and violated TBOC § 21.418 in the following ways, among others:

a.    Directing Hastings to fund the acquisition of MovieStop, despite the fact that Hastings had no prospect of repayment, and no debt or equity interest in MovieStop, thereby ensuring that if MovieStop were profitable, those profits would flow exclusively to Weinshanker;

b.    Directing Hastings to "purchase" at least $3,000,000 of inventory from SPI, with no intention that such inventory would actually be delivered to Hastings;

c.    Directing Hastings to enter into a "consignment" relationship with SPI, whereby SPI would sell inventory for Hastings on consignment, but never intended to pay Hastings the amounts to which it was entitled under the purported relationship;

d.    Directing Hastings to handle SPI's and MovieStop's entire back office, as well as a host of other administrative functions on behalf of Weinshanker's other entities, which went unreimbursed;

e.    Directing Hastings to make the NECA Transfer, despite the fact that Hastings had no corresponding obligation to NECA, NECA never intended to repay Hastings, and the payment was for a debt owed by SPI to NECA or potentially directly to Weinshanker;

f.    Directing Hastings to fund $1.375 million in production costs and inventory advances related to the Elvis Exhibition for the benefit of EAC, for which EAC

did not possess the means or intent to repay Hastings, and without a documented

mechanism for repayment;

g.  Directing the Pathlight Paydown, which deprived Hastings of much-needed

liquidity that was critical to its ability to operate as a going-concern, especially

when viewed collectively with the depletion of assets caused by Weinshanker;

h.  Failing to present the terms of the foregoing transactions to the Board for

consideration, and a required majority vote of disinterested directors pursuant to

TBOC § 21.418;

i.  Failing to hold a single Board meeting, in violation of TBOC and the By-Laws;

j.  Failing to consult with other Board members on material matters pertaining to

Hastings, including the SPI and MovieStop acquisitions, the NECA Transfer, the

Elvis Transfers, the liquidity crisis caused by Weinshanker's diversion of funds to

his entities and the depletion of Hastings' availability of the BofA revolver;

k.  Failing to understand or acknowledge the constitution of the Board and the duties

and obligations of the Board, despite his position as Chair, and despite his

decades of corporate experience; and

110.    Failing to understand who was even on the Board at any given time, thereby

making it impossible to comply with his obligations under the TBOC or the By-

Laws.Weinshanker's acts or omissions as an officer of Hastings is outside of the scope of the

Exculpation Clause, because under Texas law, exculpations are limited to directors.  Moreover,

Weinshanker's liability on account of his breaches of the duty of loyalty for acts and omissions

as a director of Hastings is not exculpated under the Exculpation Clause, as expressly provided

for under Texas law.

111.    Weinshanker's breaches of his fiduciary duties of obedience, care, loyalty, good faith and fair dealing to Hastings and its creditors proximately and actually caused damages to the Hastings' estate and creditors, based on the depletion of funds and other assets from Hastings that may otherwise have been available to satisfy the claims of creditors, or otherwise be deployed to support Hastings' business needs.

112.    Accordingly, Weinshanker is subject to liability, in an amount not less than $30 million (consisting of transfers of cash and property related to the SPI and MovieStop acquisitions, the NECA Transfer, the Elvis Transfers and the Pathlight Paydown, among other things), based on his breach of fiduciary duties of obedience, care, loyalty, good faith and fair dealing owed to Hastings and its creditors.

**WHEREFORE**, the Trustee respectfully requests that the Court enter a judgment:

(a)    finding that Weinshanker breached his fiduciary duties of obedience, care, loyalty, good faith and fair dealing to Hastings and, once Hastings was in the zone of insolvency and subsequently insolvent, to creditors;

(b)    entering judgment in favor of the Trustee and against Weinshanker in the amount of all transfers of money or other property of Hastings resulting from his breaches, in an amount to be determined at trial, but believed to exceed $30 million; and

(c)    awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)    granting the Trustee such other and further relief as the Court deems just and proper.

## COUNT II
### (Breach of Fiduciary Duty)
### (Against Cathy Hershcopf, Jeffrey Shrader, and Frank Marrs)

113.    The Trustee repeats, realleges, and incorporates all allegations contained in Paragraphs 1 through 112 of the Complaint as if fully set forth herein.

114.    Hershcopf and Shrader were members of the Board from November 30, 2014 through and including December 9, 2015.

115.    Marrs was a member of the Board from November 30, 2014 through and including July 24, 2015.

116.    As directors of Hastings, Hershcopf, Shrader, and Marrs owed Hastings a duty of care, duty of loyalty, duty of good faith, and duty of fair dealing.

117.    In addition, once Hastings entered the zone of insolvency, and subsequently became insolvent, Hershcopf's, Shrader's and Marrs' fiduciary duties of obedience, care, loyalty, good faith and fair dealing ran not only to Hastings, but to its creditors.

118.    Hastings became insolvent no later than July 28, 2014 (if not the Buyout Date), with the magnitude of such insolvency increasing in subsequent periods, through the Petition Date.

119.    Under Texas law, the duty of care required Hershcopf, Shrader and Marrs to act and perform their corporate duties in the same manner as an ordinarily prudent person would under similar circumstances.

120.    Moreover, Texas law dictates that a director may not abdicate his or her responsibilities as a director.

34

121.    Under Texas law, directors are bound by the duty of loyalty, which requires that a director act in good faith, and not allow his or her personal interests to prevail over the interests of the corporation.

122.    Under Texas law, a breach of the duty of loyalty is committed when a board of directors, or its individual members, completely abdicates its responsibility and fails to exercise any judgment.  Moreover, abdications of responsibility are expressly outside the scope of an exculpation clause under Texas law.

123.    The TBOC also imposes specific obligations on directors intending to engage in transactions with the company that will benefit them, or companies in which they have an interest.

124.    Specifically, TBOC § 21.418 requires that any transaction between a corporation and an interested director is valid and enforceable only if the material facts as to the relationship or interest are disclosed or known to the board of directors, the interested director refrains from board deliberations concerning the transaction, and the board in good faith authorizes the transaction by approval of the majority of the disinterested directors.

125.    Hershcopf, Shrader and Marrs repeatedly breached their fiduciary duty of loyalty to Hastings and its stakeholders, and violated TBOC § 21.418.  Specifically, by failing to take any action with respect to Weinshanker's multiple acts of looting Hastings' assets, they allowed Hastings to commit over $20 million of interest-free, undocumented financing for entities and businesses in which Weinshanker, an interested director, had an interest.  They did not participate in a Board meeting, request a Board meeting, or take any other actions in the face of Weinshanker's looting, which meetings are expected of corporate directors and required by the TBOC.

126.    Hershcopf also breached her duty of loyalty to Hastings and its stakeholders, by placing her personal loyalties to Weinshanker – a longstanding client of her firm – above the interests of Hastings.  Specifically, in the course of her representation of Weinshanker and his entities, Hershcopf assisted and facilitated Weinshanker in using Hastings' cash and borrowing availability to fund transactions that had no benefit to Hastings, but significant personal benefit to Weinshanker.

127.    Hershcopf, Shrader, and Marrs breached their fiduciary duties to Hastings and its creditors by, among other things:

a.  Taking no action while Weinshanker directed Hastings to fund the operations of MovieStop, despite there being no reasonable prospect of repayment given MovieStop's severe financial distress;

b.  Taking no action while Weinshanker directed Hastings to continue operating under a sham "consignment" relationship with SPI, whereby SPI would sell inventory for Hastings on consignment, but never intended to pay Hastings the amounts to which it was entitled;

c.  Taking no action while Weinshanker directed Hastings to handle all of SPI's and MovieStop's back office functions, as well as a host of other administrative functions on behalf of Weinshanker's other entities, which went unreimbursed;

d.  Taking no action while Weinshanker directed Hastings to make the NECA Transfer to NECA, despite the fact that Hastings had no corresponding obligation to NECA, NECA never intended to repay Hastings, and the payment was for a debt owed by SPI to NECA or potentially Weinshanker himself;

e.   Taking no action while Weinshanker directed Hastings to fund $1.375 million in production costs and inventory advances to the Elvis Exhibition for the benefit of EAC, for which EAC did not possess the means or intent to repay Hastings, and without a documented mechanism for repayment;

f.   Taking no action while Weinshanker directed the Pathlight Paydown, which resulted in Hastings losing $5 million of liquidity that it could ill-afford to be without;

g.   Failing to hold, participate in or even request that Weinshanker convene, a single Board meeting, in violation of TBOC and the By-Laws;

h.   In the case of Hershcopf and Shrader, failing to take any action to prevent the foregoing transfers and transactions from occurring, which would have resulted in their respective law firms potentially losing out on legal fee revenues;

i.   Failing to consult with Weinshanker and each other, in their capacities as directors, on material matters pertaining to Hastings, including the SPI and MovieStop acquisitions, the NECA Transfer, the Elvis Transfers, the liquidity crisis caused by Weinshanker's diversion of funds to his other entities, the Pathlight Paydown, and the depletion of Hastings' availability of the BofA revolver; and

j.   Failing to understand or acknowledge the constitution of the Board and the duties and obligations of the Board.

128.   Hershcopf's, Shrader's, and Marrs' liability on account of their breaches of the duty of loyalty is not exculpated under the Exculpation Clause, as expressly provided for under Texas law.

129.    Hershcopf's, Shrader's, and Marrs' breaches of their fiduciary duties to Hastings and its creditors proximately and actually caused damages to Hastings' estate and creditors, based on the depletion of funds and other assets from Hastings that may otherwise have been available to satisfy the claims of creditors, or otherwise be deployed to support Hastings' business needs.

130.    Accordingly, Hershcopf, Shrader, and Marrs are subject to liability, in an amount not less than $30 million (consisting of transfers of cash and property related to the SPI and MovieStop acquisitions, the NECA Transfer, the Elvis Transfers and the Pathlight Paydown, among other things), based on their breaches of fiduciary duties owed to Hastings and its creditors.

**WHEREFORE**, the Trustee respectfully requests that the Court enter a judgment:

(a)    finding that Hershcopf, Marrs, and Shrader breached their fiduciary duties to Hastings and, once Hastings was in the zone of insolvency and subsequently insolvent, to creditors;

(b)    entering judgment in favor of the Trustee and against Hershcopf, Marrs, Van Ongevalle and Shrader, jointly and severally, in the amount of all transfers of money or other property of Hastings resulting from their breaches, and in an amount to be determined at trial, but believed to exceed $30 million; and

(c)    awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)    granting the Trustee such other and further relief as the Court deems just and proper.

## COUNT III
### (Breach of Fiduciary Duty)
### (Against Alan Van Ongevalle)

131.    The Trustee repeats, realleges, and incorporates all allegations contained in Paragraphs 1 through 130 of the Complaint as if fully set forth herein.

132.    Van Ongevalle was a member of the Board from November 30, 2014 through and including December 9, 2015.

133.    Van Ongevalle was the President and Chief Operating Officer of Hastings from the Buyout Date through and including December 9, 2015.

134.    As a director and/or officer of Hastings, Van Ongevalle owed Hastings a duty of care, duty of loyalty, duty of good faith, and duty of fair dealing.

135.    In addition, once Hastings entered the zone of insolvency, and subsequently became insolvent, Van Ongevalle's fiduciary duties of obedience, care, loyalty, good faith and fair dealing ran not only to Hastings, but to its creditors.

136.    Hastings became insolvent no later than July 28, 2014 (if not the Buyout Date), with the magnitude of such insolvency increasing in subsequent periods, through the Petition Date.

137.    Under Texas law, the duty of care required Van Ongevalle to act and perform his corporate duties in the same manner as an ordinarily prudent person would under similar circumstances.

138.    Moreover, Texas law dictates that a director may not abdicate his or her responsibilities as a director.

139.     Under Texas law, directors are bound by the duty of loyalty, which requires that a director act in good faith, and not allow his or her personal interests to prevail over the interests of the corporation.

140.     Under Texas law, a breach of the duty of loyalty is committed when a board of directors, or its individual members, abdicates its responsibility and fails to exercise any judgment.

141.     The TBOC also imposes specific obligations on directors intending to engage in transactions with the company that will benefit them, or companies in which they have an interest.

142.     Specifically, TBOC § 21.418 requires that any transaction between a corporation and an interested director is valid and enforceable only if the material facts as to the relationship or interest are disclosed or known to the board of directors, the interested director refrains from board deliberations concerning the transaction, and the board in good faith authorizes the transaction by approval of the majority of the disinterested directors.

143.     Van Ongevalle repeatedly breached his fiduciary duties of care and loyalty to Hastings and its creditors, and violated TBOC § 21.418.   Specifically, by failing to take any action with respect to Weinshanker's multiple acts of looting of Hastings' assets, he allowed Hastings to commit over $20 million of interest-free, undocumented financing for entities and businesses in which Weinshanker, an interested director, has an interest.   He did not participate in a Board meeting, request a Board meeting, or take any other actions in the face of Weinshanker's looting, which are expected of corporate directors and required by the TBOC.

144.     Van Ongevalle breached his fiduciary duties to Hastings and its creditors in, among others, the following ways:

a.  Taking no action to prevent Hastings' funding of the SPI and MovieStop transactions, despite being extensively involved in the negotiation of both transactions;

b.  Taking no action while Weinshanker directed Hastings to fund the operations of MovieStop, despite there being no reasonable prospect of repayment given MovieStop's severe financial distress;

c.  Taking no action while Weinshanker directed Hastings to continue operating under a sham "consignment" relationship with SPI, whereby SPI would sell inventory for Hastings on consignment, but never intended to pay Hastings the amounts to which it was entitled;

d.  Taking no action while Weinshanker directed Hastings to handle all of SPI's and MovieStop's back office functions, as well as a host of other administrative functions on behalf of Weinshanker's other entities, which went unreimbursed;

e.  Taking no action while Weinshanker directed Hastings to make the NECA Transfer to NECA, despite the fact that Hastings had no corresponding obligation to NECA, NECA never intended to repay Hastings, and the payment was for a debt owed by SPI to NECA or potentially Weinshanker himself;

f.  Taking no action while Weinshanker directed Hastings to fund $1.375 million in production costs and inventory advances to the Elvis Exhibition for the benefit of EAC, for which EAC did not possess the means or intent to repay Hastings, and without a documented mechanism for repayment;

g. Taking no action while Weinshanker directed the Pathlight Paydown, which resulted in Hastings losing $5 million of liquidity that it could ill-afford to be without;

h. Failing to hold, participate in or even request that Weinshanker convene, a single Board meeting, in violation of TBOC and the By-Laws;

i. Failing to consult with Weinshanker and other directors, in their capacities as directors, on material matters pertaining to Hastings, including the SPI and MovieStop acquisitions, the NECA Transfer, the Elvis Transfers, the liquidity crisis caused by Weinshanker's diversion of funds to his other entities, the Pathlight Paydown, and the depletion of Hastings' availability of the BofA revolver; and

j. Failing to understand or acknowledge the constitution of the Board and the duties and obligations of the Board.

145. Van Ongevalle's acts or omissions as an officer of Hastings is outside of the scope of the Exculpation Clause, because under Texas law, exculpations are limited to directors. Moreover, Van Ongevalle's liability on account of his breaches of the duty of loyalty for acts and omissions as a director of Hastings is not exculpated under the Exculpation Clause, as expressly provided for under Texas law.

146. Van Ongevalle's breaches of fiduciary duties owed to Hastings and its creditors proximately and actually caused damages to Hastings' estate and creditors, based on the depletion of funds and other assets from Hastings that may otherwise have been available to satisfy the claims of creditors, or otherwise be deployed to support Hastings' business needs.

147.    Accordingly, Van Ongevalle is subject to liability, in an amount not less than $30 million (consisting of transfers of cash and property related to the SPI and MovieStop acquisitions, the NECA Transfer, the Elvis Transfers and the Pathlight Paydown, among other things), based on his breaches of fiduciary duties of obedience, care, loyalty, good faith and fair dealing owed to Hastings and its creditors.

**WHEREFORE**, the Trustee respectfully requests that the Court enter a judgment:

(a)    finding that Van Ongevalle breached his fiduciary duties of obedience, care, loyalty, good faith and fair dealing to Hastings and, once Hastings was in the zone of insolvency and subsequently insolvent, to creditors;

(b)    entering judgment in favor of the Trustee and against Van Ongevalle, in the amount of all transfers of money or other property of Hastings resulting from their breaches, in an amount to be determined at trial, but is believed to exceed $30 million;

(c)    awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)    granting the Trustee such other and further relief as the Court deems just and proper.

## COUNT IV
### Aiding and Abetting Breach of Fiduciary Duties
### (Against Cathy Hershcopf, Jeffrey Shrader, and Frank Marrs)

148.    The Trustee repeats, realleges, and incorporates all allegations contained in Paragraphs 1 through 147 of the Complaint as if fully set forth herein.

149.    Weinshanker committed multiple breaches of his fiduciary duties of obedience, care, good faith and loyalty to Hastings, its stakeholders and creditors, from the Buyout Date through the Petition Date.

150.    Hershcopf, a licensed attorney, knew or should have known that Weinshanker owed fiduciary duties of obedience, care, loyalty, good faith and fair dealing to Hastings, its stakeholders, and subsequently its creditors, based on her extensive experience representing corporate entities, officers and directors in restructuring and bankruptcy matters.

151.    Hershcopf knew or should have known that Weinshanker breached his fiduciary duties by failing to obtain proper Board approvals and consents for the transactions and transfers he directed, violating the TBOC by failing to present interested transactions to independent Board members for consideration, and failing to maintain any of the formalities that are customary – and required by law – for a corporate board of directors of a large company.

152.    Hershcopf knew or should have known that her failure to request, conduct or participate in Board meetings or deliberations, question Hastings' lack of independent directors, and question the outflow of funds to SPI, MovieStop, the Elvis Exhibition, NECA, or other ventures aided and abetted Weinshanker's breaches of his fiduciary duties of obedience, care, loyalty, good faith and fair dealing.

153.    Shrader and Marrs were members of the Board from November 30, 2014 through December 9, 2015.

154.    During their tenure as Board members, Shrader, a licensed attorney and Hastings' outside counsel, and Marrs, a management consultant and audit professional who *advises corporations on proper corporate governance practices*, both knew or should have known that Weinshanker owed fiduciary duties of obedience, care, loyalty, good faith and fair dealing to Hastings, its stakeholders, and subsequently its creditors.

155.    During their tenure as Board members, Shrader and Marrs knew or should have known that Weinshanker was breaching his fiduciary duties by failing to obtain proper Board

approvals and consents for the transactions and transfers he directed, violating the TBOC by failing to present interested transactions to independent Board members for consideration, and failing to maintain any of the formalities that are customary – and required by law – for a corporate board of directors.

156.   Shrader and Marrs knew or should have known that their failure to request, conduct or participate in Board meetings or deliberations, question Hastings' lack of independent directors, and question the outflow of funds to SPI, MovieStop, the Elvis Exhibition, NECA, or other ventures, aided and abetted Weinshanker's breaches of fiduciary duties.

157.   Hershcopf, Shrader and Marrs, in their respective capacities as Board members and outside professionals to Hastings, were knowledgeable of, and involved in, the negotiation, execution and funding of substantially all of the transactions and transfers included in this Complaint.

158.   Hershcopf, Shrader and Marrs knew, or should have known, that the outflow of over $30 million in cash and inventory from Hastings, a distressed entity, would cause substantial harm to the enterprise and its creditors, yet not only took no action to prevent such transfers, but actively facilitated such transfers.  In particular, Hershcopf and Shrader provided legal advice and business counsel to Hastings and Weinshanker on these transfers, and the structuring of the transactions pursuant to which these transfers were made.

159.   Hershcopf's, Shrader's, and Marrs' aiding and abetting of Weinshanker's repeated breaches of his fiduciary duties of obedience, care, loyalty, good faith and fair dealing to Hastings, its stakeholders and creditors caused in excess of $30 million of damages to Hastings and its creditors, represented by, *inter alia*, the SPI and MovieStop transactions,

millions of dollars in transfers of cash and inventory to those entities, the NECA Transfer, transfers to the Elvis Exhibition, and the Pathlight Paydown.

WHEREFORE, the Trustee respectfully requests that the Court enter judgment:

(a)    finding that Hershcopf, Shrader and Marrs aided and abetted Weinshanker in his breaches of fiduciary duties of obedience, care, loyalty, good faith and fair dealing to Hastings and its stakeholders, and once Hastings was in the zone of insolvency and subsequently insolvent, to its creditors;

(b)    in favor of the Trustee and against Hershcopf, Shrader and Marrs, jointly and severally, in the amount of all transfers of money or other property of Hastings resulting from their aiding and abetting, in an amount to be determined at trial, but is believed to exceed $30 million;

(c)    awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)    granting the Trustee such other and further relief as the Court deems just and proper.

## COUNT V
## Aiding and Abetting Breach of Fiduciary Duty
## (Against Alan Van Ongevalle)

160.    The Trustee repeats, realleges, and incorporates all allegations contained in Paragraphs 1 through 159 of the Complaint as if fully set forth herein.

161.    Weinshanker committed multiple breaches of his fiduciary duties of obedience, care, good faith and loyalty to Hastings, its stakeholders and creditors, from the Buyout Date through the Petition Date.

46

162.    Van Ongevalle was a member of the Board from November 30, 2014 through and including December 9, 2015.

163.    Van Ongevalle was the President and Chief Operating Officer of Hastings from the Buyout Date through and including December 9, 2015.

164.    Van Ongevalle, as an officer and director of Hastings and a corporate executive with over 20 years of experience, knew or should have known that Weinshanker owed Hastings, its stakeholders, and subsequently its creditors, fiduciary duties of obedience, care, loyalty, good faith and fair dealing.

165.    Van Ongevalle knew or should have known that Weinshanker was breaching his fiduciary duties of obedience, care, loyalty, good faith and fair dealing by failing to obtain proper Board approvals and consents for the transactions and transfers he directed, violating the TBOC by failing to present interested transactions to independent Board members for consideration, and failing to maintain any of the formalities that are customary – and required by law – for a corporate board of directors.

166.    Van Ongevalle knew or should have known that his failure to request, conduct, or participate in Board meetings or deliberations, question Hastings' lack of independent directors, and question the outflow of funds to SPI, MovieStop, the Elvis Exhibition, NECA, or other ventures, aided and abetted Weinshanker's breaches of fiduciary duties of obedience, care, loyalty, good faith and fair dealing.

167.    Van Ongevalle, as President and Chief Operating Officer of Hastings, as well as a Board member, was knowledgeable of, and involved in the negotiation and execution of, substantially all of the transactions and transfers complained of in this Complaint.

168.     Van Ongevalle knew, or should have known, that the outflow of over $30 million in cash and inventory from Hastings, a distressed entity, would cause substantial harm to the enterprise and its creditors, yet not only took no action to prevent such transfers, but actively facilitated such transfers.

169.     Van Ongevalle's aiding and abetting of Weinshanker's repeated breaches of his fiduciary duties of obedience, care, loyalty, good faith and fair dealing to Hastings, its stakeholders and creditors caused in excess of $30 million of damages to Hastings and its creditors, represented by, *inter alia*, the SPI and MovieStop transactions, millions of dollars in transfers of cash and inventory to those entities, the NECA Transfer, transfers to the Elvis Exhibition and the Pathlight Paydown.

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment:

(a)     finding that Van Ongevalle aided and abetted Weinshanker in his breaches of fiduciary duties of obedience, care, loyalty, good faith and fair dealing to Hastings and its stakeholders, and once Hastings was in the zone of insolvency and subsequently insolvent, to its creditors;

(b)     in favor of the Trustee and against Van Ongevalle, in the amount of all transfers of money or other property of Hastings resulting from his aiding and abetting, in an amount to be determined at trial, but is believed to exceed $30 million;

(c)     awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(d)     granting the Trustee such other and further relief as the Court deems just and proper.

## COUNT VI
### Alter Ego/Piercing the Corporate Veil
### (Against Joel Weinshanker)

170.    The Trustee repeats, realleges, and incorporates all allegations contained in Paragraphs 1 through 169 of the Complaint as if fully set forth herein.

171.    DAC is a limited liability company organized under the laws of the state of Delaware.

172.    Under Delaware law, to state a claim for piercing the corporate veil, the court may consider the following:  (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder.

173.    At all relevant times, Weinshanker, through his direct ownership of DAC and indirect ownership of Hastings and its affiliated Debtors, controlled and dominated the Debtors and interfered with and supplanted their corporate governance.

174.    Weinshanker's domination and control of the Debtors resulted in improper transactions whereby he directed substantial value to be extracted from Hastings for the benefit of other entities under his ownership and control, and/or caused Hastings to incur obligations to them, all at the expense of the Debtors' non-insider creditors.  Hastings was not adequately capitalized to absorb the burdens of these transactions.

175.    Weinshanker, either directly or indirectly, took millions of dollars out of Hastings, with no reasonable expectation or intention that they would be repaid, including while Hastings was insolvent.

176.    Due to the lack of adequate capitalization of DAC, Weinshanker directed or otherwise caused Hastings to fund the operations of other entities owned by DAC, including MovieStop and SPI, as well as entities owned by Weinshanker but not under the DAC umbrella, including EAC.

177.    DAC and its subsidiaries, including Hastings, were insolvent, or became insolvent, during the period relevant to this Complaint.

178.    Neither DAC nor any of its subsidiaries, including Hastings, observed corporate formalities during all times relevant to this Complaint.  Among other things, Weinshanker failed to:  (i) conduct Board meetings, or maintain minutes of those meetings; (ii) seek appropriate Board or other corporate consents for the interested transactions that he shepherded; (iii) consult with Board members, or obtain Board approvals, regarding transactions that would have a material effect on Hastings' liquidity and borrowing availability; and (iv) properly document insider transactions involving Hastings, including its advances of funds and inventory to other Weinshanker-owned entities.

179.    By virtue of Weinshanker's sole ownership of DAC, Hastings, SPI, MovieStop and NECA, coupled with the complete ineffectiveness of the Board, Weinshanker was able to direct at will the transfer of over $20 million of Hastings' assets for his sole benefit.  This siphoning of funds from Hastings caused substantial damage to the corporate enterprise, imperiled its ability to operate as a going concern, and ultimately contributed to the chapter 11 filing and liquidation of Hastings.

180.    Weinshanker, in ignoring all corporate formalities and forcing substantial intercompany transfers among the various entities under his ownership and control, including

Hastings, SPI, MovieStop, NECA and EAC, treated these entities as a mere instrumentality, and as a façade for himself.

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment:

(a)      finding that DAC and the other Debtors are the alter-egos of Hastings;

(b)      finding that equity requires that the corporate veil be pierced;

(c)      piercing the corporate veil for Weinshanker and deeming Weinshanker to be liable for all debts and obligations of the Debtors;

(d)      for monetary damages in favor of the Trustee and against Weinshanker in the amount of all liabilities of the Debtors incurred under Weinshanker's ownership or control of the Debtors, in an amount to be determined at trial;

(e)      awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees to the fullest extent permitted by law, through trial and any subsequent appeals; and

(f)      granting the Trustee such other and further relief as the Court deems just and proper.

**COUNT VII**
**Attorneys' Fees and Costs**
**(Against All Defendants)**

181.     The Trustee repeats, realleges, and incorporates all allegations contained in Paragraphs 1 through 180 of the Complaint as if fully set forth herein.

182.     The acts and omissions of each of the Defendants, as set forth in this Complaint, have caused tens of millions of dollars of damage to the Debtors' estates and their creditors.

183.     The Trustee, on behalf of the Liquidating Trust and its beneficiaries (the Debtors' unsecured creditors) has incurred, and will continue to incur, substantial attorneys' fees and costs in the prosecution of his claims against the Defendants.

184.    In the event that the Trustee obtains a judgment in his favor on the claims and causes of action set forth in this Complaint, he should, as a matter of equity, be awarded his reasonable attorneys' fees and costs against the Defendants.

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment:

(a)     requiring the Defendants to pay the Trustee's reasonable attorneys' fees and costs associated with this adversary proceeding, in an amount to be determined at trial; and

(b)     granting the Trustee such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Trustee demands a trial by jury as to all issues and claims raised in the Complaint, to which the Trustee has the right to have tried by a jury, and consents to such trial being conducted by the Bankruptcy Court Judge.

Dated:  June 7, 2018                              Respectfully submitted,

                                              **GOLDSTEIN & MCCLINTOCK LLLP**

                                              By:_____/s/ Maria Aprile Sawczuk_____
                                              Maria Aprile Sawczuk (No. 3320)
                                              501 Silverside Road, Suite 65
                                              Wilmington, Delaware 19809
                                              Telephone:  302.444.6710
                                              Facsimile:  302.444.6709
                                              e-mail: marias@restructuringshop.com

                                              and

Thomas R. Fawkes, Esq.
Brian J. Jackiw, Esq.
GOLDSTEIN & MCCLINTOCK LLLP
111 W. Washington St., Suite 1221
Chicago, Illinois 60602
Telephone:  312.337.7700
Facsimile:   312.277.2305

*Special Litigation Counsel to Curtis R.
Smith, Solely as Trustee of the Hastings
Creditors' Liquidating Trust*