# EXHIBIT J

1                         UNITED STATES BANKRUPTCY COURT
                          FOR THE DISTRICT OF DELAWARE
2                         CASE NO.  16-11452(KJC)
                          CHAPTER 11
3
   IN RE:                    :      DEPOSITION OF:
4
   DRAW ANOTHER CIRCLE,      :      JOEL WEINSHANKER
5  LLC, ET AL,
                             :
6          Debtors.
   - - - - - - - - - - - - -
7

8  B E F O R E:

9        TRANSCRIPT of testimony as taken by and before

10 LAURIE A. LANDRIGAN, a Certified Shorthand Reporter

11 and Notary Public of the State of New Jersey, at the

12 offices of NECA COMPANY, 595 Sweetland Avenue,

13 Hillside, New Jersey, on Friday, December 9, 2016,

14 commencing at 9:00 a.m., pursuant to Notice.

15

16

17

18

19

20

21

22

23            ESQUIRE DEPOSITION SOLUTIONS
24       33 Wood Avenue South,  Suite 445
                Iselin, New Jersey  08830
25      (732) 283-1060  or  (800) 211-DEPO



```
1   A P P E A R A N C E S:

2

    LOWENSTEIN SANDLER, ESQS.
3   By:  DAVID A. VAN GROUW, ESQ.
    65 LIVINGSTON AVENUE
4   ROSELAND, NEW JERSEY  07068
    (973) 597-2500
5   Counsel for the Unsecured Creditors Committee

6

    DRINKER, BIDDLE & REATH, ESQS.
7   By:  JOSEPH C. SCHOELL, ESQ.
    222 DELAWARE AVENUE
8   WILMINGTON, DELAWARE  19801
    (302) 467-4245
9   Counsel for the Deponent

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                      I N D E X

 2
    WITNESS        DIRECT   CROSS   REDIRECT   RECROSS
 3

 4  JOEL WEINSHANKER

 5  By:  Mr. Van Grouw 4

 6

 7

 8

 9                   E X H I B I T S

10
    EXHIBITS       DESCRIPTION            IDENT.
11
    JW-1           Subpoena in a case under  4
12                 the bankruptcy code

13  JW-2           The official committee    4
                   of unsecured creditors'
14                 document and information
                   request to Joel
15                 Weinshanker and
                   affiliated entities
16
    JW-3           Series of e-mails         4
17
    JW-4           Asset purchase            39
18                 agreement

19  JW-5           E-mail from Jeff          76
                   Twait to Andre Nel
20                 dated 10/7/14

21

22

23

24

25
```



```
 1                   (Exhibit Nos. JW-1 through JW-3 are
 2              received and marked for Identification by
 3              the Reporter.)
 4
 5    J O E L    W E I N S H A N K E R,
 6         2600 West Harmon Avenue, Las Vegas, is sworn.
 7
 8    DIRECT EXAMINATION BY MR. VAN GROUW:
 9         Q.    Good morning, Mr. Weinshanker.  My name
10    is David Van Grouw.  I represent the Unsecured
11    Creditors Committee.
12         You're here for a deposition today; you
13    understand that, correct?
14    A.    Correct.
15         Q.    Have you ever been deposed before?
16    A.    Yes.
17         Q.    Can you tell me how many times,
18    approximately?
19    A.    A couple.
20         Q.    When was the last time you were
21    deposed?
22    A.    It's been several years.
23         Q.    Throughout the course of today, I'm
24    going to be asking you various questions, to which I
25    would expect you to respond.   If you don't
```



1  understand any of my questions, will you agree to

2  tell me that you don't understand them?

3  A.    Yes.

4        Q.    If you answer a question, I'm going to

5  assume that you understood the question; do you

6  understand that?

7  A.    Yes.

8        Q.    I don't want you to guess, but I may

9  ask you at times to approximate, but if you don't

10  know an answer, just tell me you don't know and we'll

11  deal with that.

12        What did you do to prepare for the deposition

13  today?

14  A.    I had brief conversations with attorneys.

15        Q.    When you say "with attorneys", what

16  attorneys?

17  A.    Joseph and Steven.

18        Q.    When did you have that conversation?

19  A.    A five- or ten-minute conversation on Tuesday

20  and then a little bit longer yesterday.

21        Q.    Did you speak with anybody else in

22  preparation for today's deposition?

23  A.    No.

24        Q.    Did you review any documents in

25  connection with today's deposition?



1    A.      No.

2            Q.      Are you aware that you're appearing

3    today pursuant to a subpoena?

4    A.      I wasn't.

5            Q.      In front of you is a document that's

6    been marked as JW-1, and it's identified as a

7    subpoena in a case under the bankruptcy code; do you

8    see that?

9    A.      I do.

10           Q.      It's addressed to you, do you see that,

11   care of your attorneys?

12   A.      Care of my attorneys, yes.

13           Q.      Did you ever see a copy of JW-1 before

14   today?

15   A.      I don't believe so.

16           Q.      Are you aware that prior to the

17   issuance of the subpoena compelling your deposition,

18   that my client, the committee, provided your counsel

19   with a list of documents that the committee requested

20   you to produce?

21   A.      I'm not sure.

22           Q.      Do you recall having any conversations,

23   and I'm not asking you to tell me what you talked

24   about, but do you recall having any conversations

25   with your counsel about a document request by the



1   committee?

2   A.     I'm not sure.

3          Q.     You've been handed a document that's

4   been marked as JW-2; do you see that?

5   A.     Yes.

6          Q.     Just take a moment and review that.    I

7   don't necessarily want you to read the document, but

8   just let me know after you've read it.

9   A.     I've read it.

10         Q.     Have you seen JW-2 before today?

11  A.     I don't recall.

12         Q.     Did you say earlier you don't recall

13  receiving a list of documents requesting you to

14  produce certain documents?

15  A.     I don't recall.

16         Q.     Turn to page four of JW-2.  You see a

17  little bit below halfway down the page "document

18  requests"?  Do you see that?

19  A.     Yes.

20         Q.     After that, under "the Hastings

21  transactions", there's 3.1, 3.2, and so on?

22  A.     Yes.

23         Q.     On pages four, five and six, take as

24  much time as you need to review those requests, and

25  then let me know when you're done.



1    A.      Okay.

2           Q.      I know you testified that you can't

3    recall receiving JW-2, but having read the requests

4    on pages four, five and six, does that refresh your

5    recollection about being asked to look for or produce

6    documents that are requested there?

7    A.      It doesn't.

8           Q.      Did you ever undertake an effort to

9    locate documents in response to a request by the

10   committee?

11   A.      I know our company did.

12          Q.      When you say your company, can you be

13   more specific by what you mean by that?

14   A.      We have an inhouse attorney who's working with

15   our law firm to gather all the documents.

16          Q.      Is it your understanding they were

17   working in connection with a request by the committee

18   for documents?

19   A.      I believe so.

20          Q.      What was done to locate documents

21   responsive to the committees request?

22   A.      I believe there was a search of our server,

23   which all the documents are on, with all of the key

24   words that were requested by or agreed to.  I'm not

25   exactly sure.



1           Q.      Who conducted that search of the
2    server?
3    A.      It would have been our counsel and probably in
4    conjunction with a few other people.
5           Q.      Did you ever review any documents that
6    were gathered in response to, as you say, the search
7    terms that were used?
8    A.      No.
9           Q.      Who from your company did?
10   A.      It would probably be our counsel, our inhouse
11   counsel.
12          Q.      Do you know for sure?
13   A.      No.
14          Q.      When you say your company, can you be
15   more specific and identify the name of the company
16   that you're referring to?
17   A.      There are multiple companies, multiple.  There
18   are people who work on multiple companies.  So when
19   I'm speaking of company, I'm speaking of my entities.
20          Q.      When you say your entities, what do you
21   mean by that?  What are the identities of those
22   entities?
23   A.      National Entertainment Collectibles
24   Association, Draw A Circle, I think the corporate
25   structure, and then there are entities within those



 1    entities.

 2           Q.     We're going to get to that in a little

 3    bit.  In terms of the corporate structure, we'll come

 4    back to that.

 5           Do you know the process that was followed to

 6    try to identify responsive documents?

 7    A.     No.

 8           Q.     Who would know that?

 9    A.     Our inhouse counsel.

10           Q.     What's the name of the inhouse counsel?

11    A.     Alexis Mueller.

12           Q.     Is Alexis Mueller still employed by the

13    company?

14    A.     Yes.

15           Q.     Who is her employer?

16    A.     His.

17           Q.     Who's his employer?

18    A.     He's a corporate employee.  I think there's an

19    allocation as to what parts are paid by different

20    parts.

21           Q.     Is he a W2 employee?

22    A.     I don't really deal with that.

23           Q.     Do you know whether all responsive

24    documents to the committee's request have been

25    produced pursuant to the request that was addressed



1  to you?

2  A.     I couldn't answer that question.

3         Q.     Who could answer?

4  A.     Most likely, the counsel.

5         Q.     Would that be Alexis?

6  A.     Correct.

7         Q.     Based upon your responses so far, JW-3

8  has been marked.  Just take a look at that for me,

9  please, and let me know when you're done.

10  A.     Done.

11         Q.     You see at the top of the page it's an

12  e-mail from Joseph Argentina to Eric Chafetz?  Do you

13  see that?

14  A.     Yes.

15         Q.     You're not copied on this e-mail,

16  correct?

17  A.     Not based upon what it says here.

18         Q.     Have you seen this?  You haven't seen

19  this document before today, I assume?

20  A.     No.

21         Q.     The e-mail up at the top identifies

22  various search terms that were used; do you see that?

23  A.     Yes.

24         Q.     Are those search terms that you

25  provided to Alexis to be run against the server?



1   A.     No.

2          Q.     Do you know who picked those search

3   terms?

4   A.     No.

5          Q.     Did anybody ever speak with you about

6   what search terms to use?

7   A.     No.

8          Q.     Other than using search terms that were

9   run in the server of what you've identified as the

10  company, were hard files searched as well in response

11  to the committee's request?

12  A.     There are no hard files.

13         Q.     Can you describe for me what your

14  initial involvement was with Hastings Entertainment?

15  A.     We were a vendor for well over a decade, I

16  believe.  We sold them products.

17         Q.     When you say "we were a vendor", who is

18  the "we"?

19  A.     One of our companies, National Entertainment.

20  I'm going to call it NECA from now on.

21         Q.     So NECA provided product to Hastings

22  Entertainment?

23  A.     Correct.

24         Q.     Approximately, just sort of to frame

25  the time frames for me or the timeline, when are we



1   talking about in terms of when did NECA become a

2   vendor of Hastings?  Do you know?

3   A.      More than 10 years, I believe.

4          Q.      At some point, did NECA acquire an

5   ownership interest in Hastings?

6   A.      I bought stock, I believe, through a NECA

7   account, multiple times, bought and sold, bought and

8   sold.

9          Q.      Again, what time period are we talking

10  about?  Are we talking about back when you first

11  started doing business with --

12  A.      It would have been -- I'm unsure.  I think

13  several years.

14         Q.      What was the largest amount of stock

15  that was purchased at any one time by NECA?

16  A.      I don't believe it was very much, but I'm

17  unsure.

18         Q.      While NECA was a vendor to Hastings,

19  did you have any other involvement with Hastings

20  Entertainment?

21  A.      No.

22         Q.      In 2014, that changed, correct?

23  A.      Correct.

24         Q.      Can you tell me how that came about,

25  that the relationship between NECA and Hastings



1   changed?  Just give me the background of how that

2   arose.

3   A.     I was buying and selling stocks of companies

4   that I understood, and I believe the Hastings stock

5   was so cheap that I kept on buying it, and then it

6   got to a point where we had to make an announcement

7   over a certain percentage, I guess, but obviously I

8   was counting on counsel to be informed of that.

9        Q.     Did that occur in 2014?

10  A.     I'm not sure.

11       Q.     Did you testify earlier that you're not

12  sure how much in total the stock ownership was in

13  Hastings by NECA?

14  A.     I'm not sure.

15       Q.     In 2014, do you recall a transaction

16  whereby Hastings was -- there was a buyout of

17  Hastings?

18  A.     Yes.

19       Q.     Do you recall when those discussions

20  about a buyout started to occur?

21  A.     No.  It would have been after, though.  I

22  think we had to send in a form to, I believe, the

23  SEC, but it would have been after that, but I'm not

24  sure exactly when.

25       Q.     So prior to the buyout of Hastings by



 1  NECA, were you a member of the board of Hastings?

 2  A.    No.

 3        Q.    Again, all these questions are all

 4  prior to the buyout.  Were you an officer of

 5  Hastings?

 6  A.    No.

 7        Q.    Were you ever consulted on any

 8  decisions or issues involving Hastings' business?

 9  A.    No.

10        Q.    Did you make any decisions on behalf of

11  Hastings?

12  A.    No.

13        Q.    Were you aware of who the directors of

14  the board of Hastings were at that time?

15  A.    No.  Prior to?

16        Q.    Yes, prior to.

17  A.    No.

18        Q.    Other than the sale of product by NECA

19  to Hastings, did you personally receive any

20  compensation from Hastings?

21  A.    No.

22        Q.    Can you describe for me, again, sort of

23  by way of background, were you the one or someone on

24  your behalf reached out to somebody at Hastings

25  regarding acquisition of Hastings, or was it Hastings



1   or someone from Hastings reaching out to you?

2   A.     I don't recall.

3         Q.     Was there anything in particular, any

4   particular reason, why NECA decided to acquire

5   Hastings?

6   A.     We thought that they were a customer that

7   always had great integrity and very honest people in

8   a very, very difficult business and felt that we

9   might be able to be added to their business, and NECA

10  did not acquire Hastings.

11        Q.     Who did acquire Hastings?

12  A.     A separate entity, Draw Another Circle.

13        Q.     Is Draw Another Circle a limited

14  liability company?

15  A.     I'm not sure.

16        Q.     I believe earlier you mentioned another

17  entity, and I just want to be clear that it's a

18  separate entity.  Is there another entity called Draw

19  A Circle?

20  A.     Correct.

21        Q.     Is Draw A Circle also one of the

22  entities that you have an interest in?

23  A.     Yes.

24        Q.     Do you know whether there is an

25  organizational chart that exists today that sets



1   forth all of the entities in which you have an

2   interest?

3   A.      I don't know.

4           Q.      Is Draw A Circle a limited liability

5   company?

6   A.      I'm not sure.

7           Q.      Are you a member of Draw A Circle?

8   A.      I don't understand the question.

9           Q.      Do you understand the corporate

10  structure of a limited liability company compared to,

11  for instance, an S corp. or partnership?

12  A.      Yes.

13          Q.      Are you aware that limited liability

14  companies have members as opposed to shareholders or

15  partners?

16  A.      I wasn't.

17          Q.      So is your answer still the same, you

18  don't know whether you're a member of Draw A Circle?

19  A.      If a member is the same as a shareholder and

20  it's semantics, then I would be a member because I'm

21  a shareholder.

22          Q.      To be clear, because you're not a

23  hundred percent sure, and I don't want to confuse

24  you, or it's not a trick question, do you know

25  whether you're the sole member/shareholder of Draw A



1  Circle?

2  A.     I'm not a hundred percent sure.

3          Q.     What about with regard to Draw Another

4  Circle?  I know you testified you're not sure if

5  that's an LLC and you're not sure whether membership

6  pertains to an LLC.  So, again, not a trick question,

7  but do you know whether you're the sole member or

8  owner, let's say, of Draw Another Circle?

9  A.     I believe, if not the sole, the majority.

10         Q.     So back to earlier, you testified or

11  you clarified that it wasn't NECA that acquired

12  Hastings; it was Draw Another Circle, correct?

13  A.     I believe so.

14         Q.     With regard to the acquisition by Draw

15  Another Circle of Hastings, do you recall that funds

16  were paid in connection with that transaction?

17  A.     Yes.

18         Q.     Do you know where the source of those

19  funds came from in order to consummate that

20  transaction?

21  A.     Not exactly.

22         Q.     Have you heard of the name Pathlight

23  before?

24  A.     Yes.

25         Q.     What's your understanding of



1   Pathlight's involvement?

2   A.    They loaned some of the funds.

3         Q.    Prior to Pathlight's involvement in the

4   acquisition of Hastings, did you have any prior

5   relationship with Pathlight?

6   A.    I think you asked if Pathlight acquired

7   Hastings, which I don't think is correct, or did I

8   misunderstand?

9         Q.    It should have been Draw Another

10  Circle's acquisition of Hastings.

11              MR. SCHOELL:  Do you want to rephrase?

12              MR. VAN GROUW:  Yes.

13        Q.    Prior to Draw Another Circle's

14  acquisition of Hastings, did you have any prior

15  involvement with Pathlight?

16  A.    No.

17        Q.    How did Pathlight become involved in

18  the acquisition of Hastings?

19  A.    I probably asked a few people if they knew who

20  did this type of financing or loan or whatever you

21  want to call it.

22        Q.    Do you know how much Pathlight

23  contributed to the acquisition or loan?

24  A.    Initially, I believe it was 15 million

25  dollars.



1          Q.      Were you involved in the discussions

2    with Pathlight regarding the loaning of that money?

3    A.      Yes.

4          Q.      Who at Pathlight did you have

5    discussions with?

6    A.      Dan rings a bell, but I'm not a hundred

7    percent sure.

8          Q.      Anybody else?

9    A.      No.

10         Q.      Do you know how the 15 million dollar

11   loan was arrived at in terms of the amount?

12   A.      No.

13         Q.      Do you know whether you asked for more

14   but Pathlight refused to provide more?

15   A.      I don't remember.

16         Q.      Are you aware of the conditions of

17   Pathlight's loan in terms of what requirements they

18   had when they made the loan?

19   A.      I don't have a recollection.

20         Q.      Do you recall whether Pathlight

21   requested that there be a five million dollar

22   repayment?

23   A.      I don't have any recollection of any of the

24   terms.

25         Q.      Do you have any recollection that there



1  was a five million dollar repayment to Pathlight at

2  some point after the transaction closed?

3  A.     I understood after it happened.

4        Q.     What's your understanding of the five

5  million dollar repayment?

6  A.     I was told afterwards that the vendors wanted

7  the loan paid down when they looked at the balance

8  sheet and that Dan Crow, who is the CFO, was with

9  Alan Van Ongevalle, who was the president, were sure

10  that there was adequate cash flow.

11        Q.     You said you found out after the fact?

12  A.     Correct.

13        Q.     Let's be clear.  Did you know about

14  this before the loan was booked?  Let me be clear.

15  Did you know prior to the loan being booked that

16  there was a requirement of a five million dollar

17  paydown?

18  A.     I'm still not aware that there is one.  You

19  asked me if it happened.  I don't know if it was a

20  requirement or not.  I don't know.

21        Q.     Do you know whether it happened?

22  A.     I understand it happened.

23        Q.     Just to be clear or just so I

24  understand your testimony, you testified that it was

25  the vendors who required the paydown?



1   A.     I was told it was the vendors who requested

2   that Hastings get rid, as fast as they could, get rid

3   of that part of the loan from a balance sheet

4   perspective.

5          Q.     Do you know which vendors or which

6   vendor?

7   A.     No.

8          Q.     Do you know if it was more than one?

9   A.     I was told it was vendors, plural.

10         Q.     Who told you that?

11  A.     It would either have been Dan Crow or Alan Van

12  Ongevalle.

13         Q.     Did they tell you the name of the

14  vendors that made that request?

15  A.     No, I don't remember.

16         Q.     Did you also personally contribute

17  money to the acquisition?

18  A.     I did.

19         Q.     Did that money come in personally

20  through you or through one of your entities?

21  A.     I'm not sure.

22         Q.     Who would know?

23  A.     Either counsel, Alexis Mueller or CFO, Mike

24  Sosidka.

25         Q.     Do you know how much money was



1 contributed by you personally?

2 A.     Not exactly.

3       Q.     Do you know approximately?

4 A.     I'd rather not guess.  I'm sure it's very easy

5 to find out.

6       Q.     Do you know whether anyone ever

7 conducted any investigation or analysis about whether

8 Hastings could take on an additional 15 million

9 dollars in debt?

10 A.     I'm not sure.

11      Q.     Do you know whether if someone did do

12 that investigation, who it would have been?

13 A.     I'm not sure.

14      Q.     Just to go back to what we were talking

15 about earlier about Pathlight, your testimony was

16 that it was your understanding that vendors requested

17 that there be a paydown of the Pathlight loan from a

18 balance sheet perspective, correct?

19 A.     That was my understanding.

20      Q.     Do you know whether Pathlight requested

21 that there be a paydown?

22 A.     No idea.

23      Q.     Did you approve of the paydown?

24 A.     It's not a question I can answer.

25      Q.     Why not?



1    A.    I don't remember, and I think, thinking about

2    it today, it would come from much hindsight, so it

3    wouldn't be the same answer I would have when it

4    happened.

5         Q.    Is it your testimony that you don't

6    recall when the five million dollar paydown occurred?

7    A.    I don't recall.

8         Q.    Do you have an approximate estimation

9    of when it occurred?  In other words, was it a month

10   after the loan was booked?  Was it six months after

11   the loan was booked?  A year?

12   A.    I don't recall, and it's something that's

13   easily findable.

14        Q.    Just for ease of reference for the

15   deposition, will you agree with me that when I refer

16   to the July 2014 buyout transaction, I'm referring to

17   the transaction we've been talking about whereby Draw

18   Another Circle acquired Hastings?

19   A.    As long as those are the correct dates, yes.

20        Q.    So prior to the July 2014 buyout, who

21   were the board members?  Do you know who were the

22   board members of Hastings?

23   A.    Not beyond John Marmaduke, no.  I believe,

24   though, Jeff Shrader and Frank Marrs, because they

25   were board members after the fact as well.



1        Q.      You anticipated my next question, which

2    was, after the July 2014 buyout transaction closed,

3    who were the board members of Hastings?

4    A.      I can't speak to timing or if there was a

5    dissolution of one board and a new board, but the

6    intent was for Frank Marrs and Jeff Shrader to stay.

7        Q.      When you say "the intent was", what do

8    you mean by that?

9    A.      I'm not a lawyer, so I don't know how that

10   works when there's a transaction, if there's one

11   dissolution and you have to put together another one.

12   All I can talk about is the intent or my perception.

13   I can't talk about the legality, what has to happen,

14   and if there's a gap, I don't know.

15        Q.      After the transaction, and that's Draw

16   Another Circle is now the owner of Hastings, correct?

17   A.      That's my understanding.

18        Q.      I'm just not clear from your testimony.

19   Is it your testimony that Frank Marrs and Jeff

20   Shrader were board members of Hastings?

21   A.      I had spoken to them about staying and they

22   had agreed, so from a perception standpoint, yes.

23   You're asking me a legal question, and I'm not going

24   to guess at something I don't know.

25        Q.      I'm asking you whether they were



1  members of the board.  I don't know that that's a

2  legal question.

3  A.     I think it is.

4      Q.     Were you a board member of Hastings

5  after the July 2014 buyout transaction?

6  A.     Yes.  The intent was for me to be a member.

7      Q.     So just to be clear, to use your words,

8  after the July 2014 buyout transaction closed, the

9  intent was for you, Jeff Shrader, and Frank Marrs to

10  be the board members of Hastings?

11  A.     To be among the board members, because there

12  were also a conversation about adding.

13      Q.     My question is, after the transaction,

14  right after the transaction closed, who were the

15  board members?

16  A.     I don't know timing.  I can't speak to timing.

17      Q.     After the July 2014 buyout transaction

18  closed, did you receive any compensation as a board

19  member?

20  A.     No.

21      Q.     After the July 2014 buyout transaction

22  closed, did you hold any meetings of the board?

23  A.     I'm not exactly sure.

24      Q.     Did you ever attend any meetings of the

25  board?



1  A.      Via telephone, I believe so.

2          Q.      When you say you believe so, during

3  what time period are we talking about?

4  A.      I'm not sure.

5          Q.      Would there be records of these

6  telephone calls?

7  A.      I'm not sure.

8          Q.      Who were the telephone calls with?

9  A.      Various people.  I don't recall with what

10 specificity.  I know I spoke to Frank.  I know I

11 spoke to Jeff.  I obviously spoke to Alan, who was

12 made a member of the board at one time, almost daily.

13 I spoke with Cathy Hershcopf with great frequency.

14         Q.      Do you have, or did you maintain any

15 records of the phone calls that you said you had?

16 A.      No.

17         Q.      Did you communicate with them via

18 e-mail?

19 A.      I'm sure I communicated with Alan via e-mail,

20 and we would have supplied those.  We would have

21 supplied those, but mostly phone calls.  I received a

22 lot of e-mails from Alan, a lot of data and such.

23         Q.      Do you know whether there was a person

24 that was designated as chair of the board?

25 A.      I don't know.



1          Q.      Were you chair of the board?

2     A.      I don't know.

3          Q.      Do you know whether you were a member

4     of the board after the transaction closed, the July

5     2014 transaction?

6     A.      To my understanding, that was the intent, but

7     if it's a legal structure or something like that, I

8     wouldn't have done the legal work for it.  I'm just

9     unsure on the process, if it's a legal question, how

10    you do that.

11         Q.      Regardless of whether it was, I guess,

12    the intent, did you have an understanding that you

13    were a board member of Hastings?

14    A.      I believe I acted in the capacity.

15         Q.      Can you describe what you mean by you

16    acted in that capacity?  What did you do as a board

17    member?

18    A.      Consulted with others and made decisions.

19         Q.      When you say you consulted with others,

20    let's be specific about what you consulted about.

21    A.      Different dealings with the business.

22         Q.      Who were the others that you consulted

23    with?

24    A.      Alan Van Ongevalle.  Dan Crow initially was

25    the CFO, and then there's was a second CFO.  Cathy



1   Hershcopf.  On occasion, John Marmaduke and to a

2   lesser extent, Frank and Jeff.

3          Q.    When you consulted with these

4   individuals, did you do it as one on one?  Did you do

5   it in a group setting?

6   A.    Mostly, one on one.

7          Q.    What did you consult with them about?

8   Issues having to do with the business of Hastings?

9   A.    Yes.

10          Q.    Do you recall what any of those issues

11  were that you consulted about?

12  A.    They were numerous, so it would have been A to

13  Z.

14          Q.    Do you recall ever meeting in person

15  with any of these individuals to discuss matters

16  having to do with Hastings?

17  A.    Yes.

18          Q.    When did those meetings occur?

19  A.    I'm not sure.

20          Q.    Would there be a record of those

21  meetings that you have?

22  A.    I'm not sure.

23          Q.    Were minutes of any of the meetings

24  that you say you had taken?

25  A.    I'm not sure.



1    Q.    Did the board ever pass any resolutions

2  regarding any of the business that it met about?

3  A.    I'm not sure.

4    Q.    Do you recall that the committee has

5  asked for the minutes of meetings to be produced?

6  Did anybody ever tell you that?

7  A.    Not to my recollection.

8    Q.    If the meetings did exist, who would

9  have taken the minutes of the meetings?

10    MR. SCHOELL:   Object to the form of the

11  question.

12  A.    Someone from Hastings.

13    Q.    Did you ever take minutes of meetings?

14  A.    No.

15    Q.    When you had conversations with, you

16  mentioned, Alan, Dan Crow, Cathy, John Marmaduke, and

17  to some extent Jeff Shrader and Frank Marrs, was

18  there anybody else in attendance during those

19  conversations that you recall?

20  A.    Sometimes there were multiple people.  It was

21  not just one on one.  Sometimes there were two or

22  three of those people in the same group.

23    Q.    Do you recall in any of those instances

24  anybody taking notes of what was discussed?

25  A.    No.



1        Q.     Again, I just want to be clear I

2   understand your testimony.  I think we established

3   that it was your understanding that it was the intent

4   that you would be a board member after the July 2014

5   merger transaction closed, correct?

6   A.      I guess.

7        Q.      Why do you guess?

8   A.      Again, to me, it's semantical.  I was the

9   owner of the company.  Major decisions were supposed

10  to go through me.   I don't put labels.  I don't put

11  labels on things, so I'm here trying to label

12  something that I'm not very familiar with.

13       Q.     So is it your testimony that other than

14  what you say the intent was, are you sure, sitting

15  here today, whether or not you were a member of the

16  board of Hastings at that time, again, at that time

17  meaning right after the closing of the July 2014

18  merger?

19  A.      To me, that's a legal question and I'm unable

20  to answer it.

21       Q.      Why do you feel that that's a legal

22  question?  What about that is something that's not

23  factual, that is only legal, that you can't answer?

24  A.      Because it's a definition.  You're asking me

25  if I was something that has a definition, a



1  definition that has a legal definition in this

2  instance, and I'm unfamiliar with the legal

3  definition and unaware if paperwork or anything else

4  that had to be filed or whatever had to be done to be

5  that definition, so I'm unsure.

6          Q.     Do you recall seeing ever any documents

7  that identified you as a board member of Hastings?

8  A.     I do not remember.

9          Q.     Do you ever remember seeing any

10  documentation that identified Jeff Shrader as a board

11  member of Hastings?

12  A.     I do not remember anyone, any document

13  regarding any person regarding that question.

14          Q.     Do you have any recollection of whether

15  the composition of the board changed over time?  In

16  other words, were there members added?  Were there

17  members deleted?

18  A.     I remember Jeff had multiple heart surgeries,

19  so he wasn't able to continue on the board or, again,

20  was unable to continue to offer advice, et cetera.

21          Q.     Do you recall when that occurred in

22  terms of you becoming aware of these medical issues

23  for Jeff?

24  A.     I do not.

25          Q.     Was it in the context of him saying to



1  you that he's no longer able to serve as a board

2  member?  Did he use those words?

3  A.     I do not recall.

4        Q.     Do you recall anything he said other

5  than identifying medical issues?

6  A.     I was just sad for him.  I don't recall.  That

7  was my only recollection.

8        Q.     Just to try to put it in some sort of

9  timeline, would that conversation have occurred prior

10  to the July 2014 merger?

11  A.     I do not believe so.

12        Q.     You mentioned earlier Cathy Hershcopf;

13  she's an attorney, correct?

14  A.     It's my understanding, yes.

15        Q.     How do you know Cathy?

16  A.     I've worked with her on a couple of deals.

17        Q.     Did you know Cathy prior to the July

18  2014 merger?

19  A.     Yes.

20        Q.     Had you worked on any deals with Cathy

21  prior to the July 2014 merger?

22  A.     Yes.

23        Q.     Were you Cathy's client or one of your

24  entities Cathy's client or both?

25  A.     I'm unsure.



1       Q.      Did Cathy or her firm represent you in

2    connection with the July 2014 buyout?

3    A.      I believe so.

4       Q.      Did you say earlier that at some point

5    Cathy Hershcopf became a board member of Hastings?

6    A.      I know it was the intent.

7       Q.      When you say "it was the intent", what

8    do you mean by that?

9    A.      Again, I'm not an attorney.  I'm understanding

10   that the questions that you're asking have a legal

11   understanding that I'm not aware of.

12       Q.      Did you see any documents ever that

13   reflected Cathy Hershcopf becoming a board member of

14   Hastings?

15   A.      I don't recall.

16       Q.      Do you have an understanding of what

17   role a chair of the board of directors serves?

18   A.      Not entirely.

19       Q.      What is your understanding?

20   A.      I don't have a legal understanding.

21       Q.      I'm not asking for a legal

22   understanding.  I'm asking for what your

23   understanding is?

24   A.      Chairman of anything would be the person who I

25   would guess calls the meetings and coordinates.



1        Q.      After the July 2014 buyout, do you have

2    an understanding, again, not a legal understanding,

3    but do you otherwise have an understanding of who the

4    chair of the Hastings board was?

5    A.      I don't have an understanding.  Specifically,

6    logic would dictate that I would be in charge, but

7    again I believe it to be a question I can't answer.

8        Q.      Again, just to sort of understand your

9    answer, you say logic would dictate that you would be

10   the chair?

11   A.      I did not say that.

12       Q.      You said logic would dictate that what?

13   A.      That I would be coordinating and in charge.

14       Q.      From a board of directors standpoint?

15   A.      No, from a company's standpoint.

16       Q.      So from a board of directors

17   standpoint, do you have any --

18   A.      You can ask me about board of directors 50

19   different ways.  I'm going to just tell you I

20   honestly don't know the legal.  I don't have a legal

21   understanding or an understanding of what needs to

22   happen to formally put something together.  That's

23   not what I do, so I just don't know.

24       Q.      Who represented Hastings at the time,

25   or who would have represented Hastings at the time



1   with regard to providing advice about what corporate

2   activities it needed to conduct as a corporation?

3                MR. SCHOELL:  Object to the form of the

4   question.

5   A.      I'm not sure I understand it.

6           Q.      After the buyout, did Hastings have

7   legal counsel?

8   A.      I believe so.

9           Q.      Did it have legal counsel that advised

10  it as to matters such as holding board of director

11  meetings?

12  A.      I don't know.

13          Q.      You say you don't know.  You don't know

14  whether there was legal counsel?

15  A.      I believe there was legal counsel.  You're

16  asking me a very specific question going back to the

17  same question.  I don't know if there was legal

18  counsel whose responsibility it was to give us

19  direction on a board.  It's my understanding that we

20  kept the same legal counsel, but I don't know what

21  their duties were.

22          Q.      As the person who, as you say,

23  logically was leading the company, did you ever

24  receive any legal guidance or counseling about what a

25  board of directors should do?



1  A.     I don't believe so.

2         Q.     After the July 2014 buyout transaction,

3  did you obtain any title, meaning officer title, or

4  any other title within the company?

5  A.     I'm unsure.

6         Q.     After the July 2014 buyout, do you know

7  who the officers of Hastings were?

8  A.     The president was Alan Van Ongevalle, and the

9  CFO was -- I just lost his name.  It was the same

10 CFO.

11        Q.     Dan Crow?

12 A.     Dan Crow.

13        Q.     Any other officers that you know of at

14 the time?

15 A.     I'm not sure.

16        Q.     Just so I'm clear, Alan and Dan

17 continued.  Alan continued as president, Dan as CFO

18 after the 2014 buyout transaction?

19 A.     I believe so, yes.

20        Q.     Do you have an understanding whether

21 that was contemplated in the original transaction?

22 A.     Yes.

23        Q.     It was contemplated?

24 A.     Yes.

25        Q.     Did each of them resign as part of the



1   buyout transaction?

2   A.     I don't know.

3          Q.     Have you heard of SP Images before?

4   A.     Yes.

5          Q.     I want you to take me back to the

6   acquisition of SP Images; do you recall approximately

7   when that happened?

8   A.     I don't recall the approximate dates.

9          Q.     Just to put it in a little bit of

10  perspective or context, it occurred after the July

11  2014 merger transaction, correct?

12  A.     Correct.

13         Q.     Do you know what entity acquired SP

14  Images?

15  A.     I'm not sure.

16         Q.     Prior to SP Images' acquisition, are

17  you familiar with an entity by the name of Sports

18  Images, Inc.?

19  A.     Yes.

20         Q.     What involvement, if any, did you have

21  with Sports Images, Inc.?

22  A.     None.  I mean, NECA had done a little, little

23  bit of business with them, but very, very small

24  amount of business over a few years.

25         Q.     When you say NECA had done some



```
 1   business --
 2   A.     Sold a small amount of product.
 3          Q.     But NECA sold product to Sports Images?
 4   A.     A small amount.
 5          Q.     Did you have any ownership interest in
 6   Sports Images, Inc.?
 7   A.     No.
 8          Q.     Did any of the entities that you have
 9   an interest in have an ownership interest in Sports
10   Images, Inc.?
11   A.     No.
12                 MR. VAN GROUW:  Mark this.
13
14                 (Exhibit No. JW-4 is received and
15          marked for Identification by the
16          Reporter.)
17
18          Q.     Mr. Weinshanker, I'm showing you a
19   document that's been marked JW-4, and for the record,
20   it's Bates stamped WR004436 through 4439.  Take as
21   much time as you want to review the document.  You
22   can let me know when you're done.
23   A.     I'm done.
24          Q.     Can you identify this document for me,
25   please.
```



1  A.     It appears to be a document associated with

2  the purchase of the assets of Sports Images by SP

3  Images.

4         Q.     This is a document that reflects an

5  acquisition of assets by SP Images, Inc. of Sports

6  Images, Inc.?

7  A.     It appears to be.

8         Q.     On the page that's marked WR004438, is

9  that your signature that appears there?

10 A.     Yes, it looks like that.

11        Q.     In two places, right?

12 A.     It looks like that, yes.

13        Q.     You signed as president of Sports

14 Images, Inc., correct?

15 A.     Yes, it looks that way.

16        Q.     You signed as president of SP Images,

17 Inc.?

18 A.     It looks that way, yes.

19        Q.     As part of this transaction, this

20 purchase of assets, what was your involvement with

21 Sports Images, Inc.?

22 A.     It was probably a two-step transaction.  I am

23 unsure, but it's probably a two-step transaction

24 where we purchased Sports Images and then changed the

25 entity, but I'm not a hundred percent sure of that.



1      Q.     I thought you said earlier that you had

2   no involvement or interest or ownership interest in

3   Sports Images, Inc.?

4   A.     Prior to the acquisition.  So this was a

5   two-step.  This looks like a two-step where we

6   purchased Sports Images at the same exact time and

7   put the assets into another company, and it's an

8   assumption, but prior to us having a conversation

9   with Sports Images, I had nothing to do with Sports

10  Images.

11     Q.     Who owned Sports Images prior to this

12  acquisition?

13  A.     It was an elderly gentleman.  I would have to

14  look.  It's an elderly gentleman in Massachusetts who

15  had owned it for a long period of time.

16     Q.     But as of this document, this JW-4, you

17  were already an owner of Sports Images, Inc.?

18  A.     I think it happened at the exact same time.

19          MR. SCHOELL:  Object to the form of the

20  question.

21     Q.     Who did you purchase Sports Images,

22  Inc. from?

23  A.     The gentleman who had owned it for a long

24  period of time.

25     Q.     Do you know the consideration that was



1 | paid for the acquisition?

2 | A.     I don't recall.   Most of it was to pay down

3 | their vendors.   Almost all of the money was actually

4 | used to pay down their vendors.

5 |         Q.     Where did that money come from to pay

6 | down the vendors?

7 | A.     It was a purchase of the inventory that they

8 | had.

9 |         Q.     To be clear, who's the "they"?

10 | A.     I'm unsure exactly how it happened.

11 |        Q.     When you acquired Sports Images, Inc.,

12 | was that the name of the company that you acquired or

13 | is that the acquisition company's name?

14 | A.     I'm not sure.

15 |        Q.     Did you use your own personal funds to

16 | acquire Sports Images, Inc.?

17 | A.     I'm not sure.

18 |        Q.     Why was it done as a multi-step

19 | purchase?

20 |             MR. SCHOELL:   Object to the form of the

21 | question.

22 | A.     I'm not a lawyer.   I don't understand.   I

23 | don't have an understanding for that.

24 |        Q.     Did you have counsel involved in the

25 | transaction?



1   A.      I'm sure we did.

2          Q.     Do you know for sure?

3   A.      I'm sure we did.  I don't know who the counsel

4   was, but I'm sure we did.

5          Q.      Would there have been counsel that

6   represented your interests in connection with your

7   acquisition of Sports Images, Inc.?

8   A.      I don't understand the question.

9          Q.      Would you have had counsel representing

10  your interests in connection with the acquisition of

11  Sports Images, Inc.?

12  A.      I don't understand the question.

13         Q.      What don't you understand?

14  A.      There would have been counsel to counsel on

15  the acquisition.  If you're asking my interest, I

16  don't know if you're asking me personally because I

17  had no personal interest.

18         Q.      I asked you earlier, did you personally

19  contribute any funds to the acquisition, and I think

20  you said you weren't sure.

21  A.      So I don't believe so.

22         Q.      Would it have been one of your entities

23  that would have contributed the funds necessary to

24  acquire the company?

25  A.      I'm unsure.



1      Q.    Do you know whether SP Images, Inc. was

2   represented by counsel in connection with the APA or

3   the asset purchase agreement between Sports Images,

4   Inc. and SP Images, Inc.?

5   A.    It would have been the same counsel as Sports

6   Images because it was just a process.

7      Q.    So you assume SP Images, Inc. and

8   Sports Images, Inc. had the same counsel?

9   A.    I would assume as it relates to the flipping

10  of it, so when the asset was purchased and then it

11  was just changed to a different entity.

12     Q.    Prior to the acquisition of Sports

13  Images, Inc., was any due diligence conducted about

14  the business of Sports Images, Inc.?

15  A.    It was an asset purchase, so Gordon Brothers,

16  which I believe is the same entity that valued

17  Hastings' inventory for Bank of America, and I

18  believe they were the company that actually

19  liquidated the inventory, came in, since it was an

20  asset purchase, to value the asset.

21     Q.    So the only thing that was ever

22  purchased by way of the Sports Images, Inc. company

23  were the assets or certain assets of that company?

24  A.    That's my understanding.

25     Q.    What were those assets?



1    A.       Inventory.

2            Q.      What kind of inventory?

3    A.       They were a sports distributor, so sports

4    merchandise.

5            Q.      It's your understanding that Gordon

6    Brothers would have went in and did a valuation of

7    that inventory?

8    A.       It's my understanding, and it's what's stated

9    in the asset purchase agreement.

10           Q.      Do you know how much that valuation

11   was?

12   A.       I don't remember.

13           Q.      Do you know what the consideration was

14   that was paid for the acquisition of the assets of

15   Sports Images?

16   A.       I'm unsure, but I believe it was less than the

17   valuation.

18           Q.      When you say you believe it was less,

19   why do you say that?

20   A.       Because it happened, according to this, two

21   years ago and I just don't remember.

22           Q.      Do you know whose idea it was to

23   structure the transaction such that it would be a

24   multi-step transaction?

25   A.       If it were, it would be counsel.



1        Q.     It wasn't you?

2   A.     No.

3        Q.     You don't know who the counsel is,

4   sitting here today; is that right?

5   A.     I'm unsure.

6        Q.     At some point in this transaction,

7   Hastings was involved as well, correct?

8   A.     It was Hastings.  The transaction was purely

9   to the benefit of Hastings.  So if Hastings

10  identified a need to own a distributor, Hastings was

11  then brought the opportunity.  It was Hastings that

12  recommended, someone from Hastings, that Gordon

13  Brothers do the analysis and everything was to the

14  benefit of Hastings.

15       Q.     You said that someone from Hastings

16  recommended; who would that have been?  You?

17  A.     No.

18       Q.     Who?

19  A.     It would have recommended which?  I said

20  several things.

21       Q.     Recommended that they acquire these

22  assets, or I think you described it as you wanted to

23  own a distributor.

24  A.     So in numerous meetings, numerous people

25  identified a desire, because what Hastings morphed



1   into, something that turned into Hastings used to be

2   a distributor, and as a distributor, they got better

3   pricing than a retailer could get, and that if

4   Hastings were to own a distributor, they could go

5   back to several large vendors, especially on the

6   media side, to get better pricing, which is my

7   understanding they were able to do.

8          Q.    If the acquisition was just of the

9   assets of Sports Images, how was Hastings acquiring a

10  distributor by this acquisition?

11  A.    It also acquired the people, and the vendors

12  allowed them, almost all the vendors allowed SP

13  Images to continue to buy under the same terms.

14         Q.    Where ultimately did the funds come

15  from to close this transaction involving Sports

16  Images/SP Images?

17  A.    I'm not sure.

18         Q.    Did they come from Hastings?

19  A.    I'm not sure.

20         Q.    Did you provide any of the funds?

21  A.    I'm not sure.

22         Q.    Was a board meeting held or convened to

23  consider the acquisition of these assets?

24  A.    I'm not sure.

25         Q.    At the time of the acquisition of these



1  assets involving Sports Images/SP Images, do you know

2  who the members of the board were other than you?

3  A.    I'm not sure.  I'm not sure, again, to the

4  whole concept of the board, I'm unsure.

5        Q.    After the SP Images acquisition, did SP

6  Images have a board?

7  A.    I'm not sure.

8        Q.    Do you know whether SP Images ever had

9  a board?

10 A.    I'm not sure.

11       Q.    Do you know who the shareholders of

12 Sports Images, Inc. were?

13 A.    You're asking for a legal entity.  So I'm

14 unsure if you're asking for the company that was

15 purchased or the company as part of the two-step.

16       Q.    Let's take both.

17 A.    There's an elderly gentleman, who I don't

18 recall his name, who owned Sports Images for a long,

19 long period of time, and then I'm unsure how it was

20 structured in the two-step, and, again, I'm not even

21 sure there was a two-step.  It's just what it looked

22 like.

23       Q.    Do you know who the shareholders were

24 of SP Images, Inc.?

25 A.    I'm unsure.



1        Q.      Is it your testimony that you don't

2   recall what the acquisition cost or price was for SP

3   Images?

4   A.      Correct.

5        Q.      Or where those funds came from to

6   acquire those assets, correct?

7   A.      Correct.

8        Q.      Did you receive any consideration in

9   connection with the sale of Sports Images to SP

10  Images?

11  A.      Did I personally?

12       Q.      Yes.

13  A.      No.

14       Q.      After the Sports Images acquisition and

15  then the subsequent acquisition of SP Images by

16  Hastings, did SP Images have any officers?

17  A.      I don't know.

18       Q.      Prior to the SP Images acquisition, was

19  SP Images' cash flow positive?

20  A.      SP Images was created.  There was no SP Images

21  before the SP Images.  SP Images was a created

22  company.

23       Q.      The company that you acquired, and I

24  say "you", the company that the assets of Sports

25  Images was acquired from, was that company's cash



1   flow positive?

2   A.      I'm unsure.

3          Q.     I understand it was an asset purchase.

4   Do you know whether there was any analysis or due

5   diligence done concerning the operations of that

6   business prior to the asset purchase?

7   A.      I'm not sure.

8          Q.     Would due diligence about the

9   operations of the company be something that you would

10  have asked for to be done prior to an acquisition

11  like this?

12          MR. SCHOELL:   Object to the form of the

13  question.

14  A.      If you're purchasing assets, I think you look

15  at the value of the assets.   If you're purchasing

16  assets without any further obligation, I think you

17  just identify the value of the assets.

18          Q.     Did you say earlier that you not only

19  purchased assets, but you also purchased personnel or

20  personnel were part of the transaction?

21  A.      My understanding is, you can't buy people.

22          Q.     Did people come along with the

23  transaction?

24  A.      There were people who came to the new company

25  of their own free will, and they weren't obligated,



1  nor did they have employment contracts or anything

2  like that, but there were certain people identified

3  to come along.

4          Q.     Let me just try to understand.

5  Identify what the assets were that were purchased.

6  A.     The majority was inventory.  I mean, I'm sure

7  there was $10,000 in office equipment or something

8  like that, but a huge majority was inventory.

9          Q.     Was anything else purchased?  Accounts

10 receivable, for example?

11 A.     I believe so.

12         Q.     What about liabilities?  Were

13 liabilities part of the purchase?

14 A.     I know that we were able to get a huge

15 majority of the vendors to accept a pay greatly

16 reduced, as part of the deal, get their vendors to

17 accept a very, very reduced payment on their

18 receivables, on the vendors' receivables, and that

19 was part of the way that the deal was able to work.

20         Q.     What was the source of the funds that

21 were used to pay these vendors?

22 A.     I don't know.  I don't know.

23         Q.     Who would know?

24 A.     I think the CFO of Hastings would probably

25 have a good idea, as well as our counsel, Alexis



 1  Mueller.

 2        Q.    As part of the acquisition, again,

 3  still talking about SP Images and Sports Images, with

 4  regard to the acquisition of the assets of Sports

 5  Images, can you identify for me what exactly

 6  comprised, what was acquired by way of both assets

 7  and liabilities?  You talked about inventory.  You

 8  believe there was some accounts receivable.  You

 9  talked about payables.  Do you know what else was

10  part of that transaction?

11              MR. SCHOELL:  Object to the form of the

12  question.

13  A.    Inventory, receivables, payments.  I don't

14  believe there was any other thing that was

15  substantive that amounted to anything.  Customer list

16  also.

17        Q.    Did SP Images operate as a separate

18  entity after the acquisition?

19  A.    I don't believe I can answer that.

20        Q.    After the acquisition of SP Images, did

21  SP Images operate cash flow positive?

22  A.    I'm unable to answer that.

23        Q.    Who would know?

24  A.    Hastings' CFO.

25        Q.    Was cash from Hastings used to support



1    the business of SP Images?

2    A.     I'm unable to answer that.

3          Q.     Were projections of SP Images' business

4    ever prepared?

5    A.     I'm unsure.

6          Q.     Would you agree with me that SP Images

7    required the financial support of Hastings in order

8    to operate after the acquisition?

9    A.     I'm unsure.

10         Q.     Do you have any idea what occurred with

11   regard to SP Images after the acquisition in terms of

12   its ability to operate profitably?

13                MR. SCHOELL:   Object to the form of the

14   question.

15   A.     Can you rephrase it.

16         Q.     Do you have any understanding of the

17   operations of SP Images after the acquisition in

18   terms of whether it was making money, losing money?

19   A.     I'm unsure.

20         Q.     Do you recall ever inquiring?

21   A.     I'm sure it came up.  I'm unsure what the

22   answer was.

23         Q.     Was the board of Hastings ever

24   consulted with regard to the operation of SP Images

25   after the acquisition?



1    A.     Again, I'm uncomfortable and unsure when

2    you're talking about a board because of the legal

3    manner of my understanding, if there's a legal

4    concept of a board.

5           Q.     Did you ever personally receive

6    information regarding the operations of SP Images

7    after the acquisition?

8    A.     I'm sure I did.

9           Q.     When you say you're sure you did, do

10   you know for sure if you did?

11   A.     I'm sure I would have because I received

12   updates, financial updates.

13          Q.     You don't even know if you were a board

14   member, right?

15   A.     I'm unsure.

16          Q.     Would you agree today that SP Images

17   turned out to be a poor investment?

18                 MR. SCHOELL:   Object to form of the

19   question.

20   A.     I wouldn't agree.

21          Q.     Why not?

22   A.     I'm unsure if it was, and I know that the

23   benefits to Hastings and better pricing that it was

24   able to get from several large vendors, including at

25   least one studio, I believe, you can't account for on



1   a small P&L.

2         Q.     Did you ever quantify the benefit that

3   SP Images provided to Hastings?

4   A.     That would have been for Alan and the CFO to

5   do.

6         Q.     So the answer is you never did that?

7   A.     No.

8         Q.     Did you ever see any documents or

9   analysis that provided that information?

10  A.     There were discussions, but I don't recall any

11  documents.

12        Q.     What were the nature of the

13  discussions?

14  A.     Talking about another vendor who gave us a

15  discount because they could now consider us a

16  distributor or buying product or Hastings being able

17  to buy the product that they were buying directly

18  from a vendor now through SP Images, which had a

19  better price because there was a pass along.

20              MR. VAN GROUW:  Let's take a break.

21

22              (At this point in the proceeding, a

23        brief recess is taken.)

24

25        Q.     I'm going to ask questions about



1   MovieStop; are you familiar with that entity?

2   A.      Correct.

3           Q.      Are you familiar at some point there

4   was acquisition of MovieStop?

5   A.      Correct.

6           Q.      Who acquired MovieStop?

7   A.      I'm unsure.

8           Q.      Can you describe for me the business of

9   MovieStop prior to the acquisition?

10  A.      Movie sales and, I believe, rentals.

11          Q.      Sales and, you believe, rentals, to

12  state the obvious, of movies, correct?

13  A.      Yes.

14          Q.      Did you or any entity that you were

15  involved in or had an interest in have any ownership

16  interest in MovieStop prior to the acquisition?

17  A.      No.

18          Q.      Was MovieStop owned as a separate

19  entity, or was it owned by some other entity?

20              MR. SCHOELL:   Objection to the form.

21  A.      I'm not sure.

22          Q.      GameStop, is that a company that you're

23  familiar with?

24  A.      Yes.

25          Q.      Did GameStop have any ownership



1  interest in MovieStop?

2  A.    At one time, I know they did.  I'm unsure at

3  the end.

4       Q.    Did you ever have an interest in

5  GameStop?

6  A.    No.  I may have owned a few shares many years

7  ago, but I don't recall, but no.

8       Q.    That would have been either you

9  personally or an entity that you had interest in?

10 A.    And I'm even unsure if that ever happened.  It

11 could have been in a fund somewhere or something.

12      Q.    When did the MovieStop acquisition

13 occur?

14 A.    I'm unsure of the time.

15      Q.    Who was MovieStop acquired from?

16 A.    I believe that MovieStop was a separate

17 entity, but I'm not a hundred percent sure.

18      Q.    Was the acquisition of MovieStop of the

19 business, or was it just the assets, or do you

20 recall?

21 A.    I believe it was of the business, but I'm not

22 a hundred percent sure.

23      Q.    Do you know what year the MovieStop

24 acquisition occurred in?

25 A.    I'm not a hundred percent sure.  '14 or '15.



1         Q.     How much was MovieStop acquired for?

2    A.     I'm not sure.

3         Q.     Was any due diligence done in

4    connection with the acquisition of MovieStop?

5    A.     By Hastings.

6         Q.     Due diligence was done by Hastings?

7    A.     By Hastings.

8         Q.     Who at Hastings did the due diligence?

9    A.     Alan Van Ongevalle would have led the due

10   diligence.

11        Q.     Do you know what was done by way of due

12   diligence?

13   A.     I'm unsure of everything that was done.  I

14   know that Hastings understood and had the great

15   ability to analyze their own store-by-store business,

16   and they asked for and requested and got the same

17   type of information for MovieStop.

18        Q.     Were you consulted in connection with

19   the due diligence that was done on MovieStop's

20   business?

21   A.     I asked what they thought what their numbers

22   were, and they thought that by adding trend, which

23   Hastings had a great expertise in that, it would be a

24   very, very creative acquisition.

25        Q.     Was that something that was told to



1 | you, what you just testified about?

2 | A.     It was certainly told to me.

3 |        Q.     Were there documents that you were

4 | provided that supported what you were told?

5 | A.     I don't remember.

6 |        Q.     Did you ask for documents that

7 | supported the due diligence?

8 | A.     I don't remember.

9 |        Q.     You mentioned that by adding trend, and

10 | I don't remember exactly what your words were, but by

11 | adding trend to the MovieStop business, it was an

12 | acquisition that, again, not to put words in your

13 | mouth, you decided to go forward with the

14 | acquisition?

15 | A.     Management, yeah, that Alan and the CFO and a

16 | number of other people thought would be, and Alan

17 | informed me that he brought the buyers into the

18 | conversation, and that everyone believed it would be

19 | a good acquisition.

20 |        Q.     What do you mean by "the buyers"?

21 | A.     At Hastings, people who buy merchandise are

22 | the buyers.

23 |        Q.     What does it mean by adding trend?

24 | A.     Adding toys and games and accessories and

25 | items that are movie related but not the actual



1  media.

2       Q.     After the MovieStop acquisition closed,

3  did MovieStop have its own board of directors?

4  A.     I'm unsure.

5       Q.     After the acquisition, did MovieStop

6  have its own officers?

7  A.     I'm unsure.

8       Q.     Prior to the MovieStop acquisition, was

9  MovieStop cash flow positive?

10 A.     I'm unsure.

11      Q.     Do you recall ever asking whether the

12 business was cash flow positive prior to the

13 acquisition?

14 A.     I'm unsure.

15      Q.     Would understanding whether the

16 business was cash flow positive something you would

17 have been interested in knowing before the

18 acquisition?

19 A.     I think it would have been more important to

20 understand where the team felt that the business

21 would be after because there was something that

22 MovieStop wasn't able to do and add trend themselves

23 for a number of different reasons, and it's my

24 understanding that the team did some really

25 substantial analysis of what the business would be



 1   afterwards.

 2          Q.      After the acquisition of MovieStop, did

 3   Hastings provide any goods or services to MovieStop?

 4   A.      They endeavored to change the business and

 5   they added trend.

 6          Q.      Was that pursuant to any sort of

 7   written agreement?

 8   A.      I'm not sure.

 9          Q.      Who would know?

10   A.      Someone at Hastings.  I'm not sure who.

11          Q.      After the acquisition, did MovieStop's

12   business depend on the cash from operations that

13   Hastings generated in order to operate?

14   A.      It shouldn't have, but to some extent I

15   believe it did.

16          Q.      So the answer is, yes, it did?

17   A.      I believe it did.

18          Q.      Do you know to what extent?

19   A.      I do not.

20          Q.      Do you know whether it increased over

21   time?

22   A.      I'm not sure.

23          Q.      Do you know whether it decreased over

24   time?

25   A.      I'm not sure.



1        Q.    In exchange for the cash to support

2    MovieStop's operation that it received from Hastings,

3    what, if anything, did MovieStop provide to Hastings?

4    A.    I believe all the upside, all the potential

5    upside.

6        Q.    What's the potential upside?

7    A.    Profits.

8        Q.    Potential profits is not actual

9    profits; is that right?

10   A.    Potential profits.

11       Q.    I'm sorry?

12   A.    Yeah, potential profits.

13       Q.    Did it provide anything else?  Let me

14   be clear.  Did MovieStop provide anything else to

15   Hastings in exchange for the cash and for funds that

16   Hastings provided to MovieStop to operate?

17   A.    It provided them with more leverage because

18   they were buying more product.

19       Q.    Who was buying more product?

20   A.    Hastings.

21       Q.    When you say "leverage", what do you

22   mean by that?

23   A.    If you buy more product, you get better

24   pricing from a vendor.

25       Q.    Is it your testimony that that occurred



1  as a result of the MovieStop acquisition?

2  A.    I believe it did.

3         Q.    Can you describe for me those

4  instances?

5  A.    Not specifically.

6         Q.    How about generally?

7  A.    If Hastings was buying 2400 of an item and now

8  they can by 3200 of an item, they can go to the

9  vendor and get back an additional two or three

10 percent for the entire order.

11        Q.    Is what you said a hypothetical or

12 something you know for sure what happened?

13 A.    I told you I can't give you a specific.  I'm

14 sure it happened.  It happens at NECA all the time.

15 If someone says if I order 800 more pieces, can I get

16 a couple percent more, you always want to do that.

17        Q.    You said that happens at NECA, but

18 we're talking about Hastings.

19 A.    Hastings is buying from people like NECA, so

20 it's a fair comparison.  You asked me if I have a

21 specific example and I said no.  You asked me if I

22 believe it happened.  I strongly believe it happened.

23        Q.    Why do you strongly believe that it

24 happened?  What's that based on?

25 A.    Part of the sell in saying, yes, we think this



1    is a good acquisition, was that, that not only adding

2    trend would be better, but it would also give them

3    more gravitas with the vendors.  So the team, prior

4    to, that was one of their arguments for doing it.

5            Q.     Any other examples that you can give as

6    to what MovieStop provided to Hastings in exchange

7    for the cash that Hastings provided to MovieStop to

8    operate?

9    A.     Also potentially to provide insight.  The

10   major vendors of Hastings, their business models were

11   basically to destroy a retailer like Hastings.  As

12   that was happening, what was obvious to everyone was

13   that the store needed to get smaller, and since

14   MovieStop's stores were smaller, they became the

15   laboratory for trying to see what a smaller format

16   Hastings would look like, which was needed, because

17   as the media vendors, basically, their business

18   models were basically to get rid of people like

19   Hastings.

20           Q.     Is that an example of something not

21   financial, but maybe have financial consequences, but

22   it was more of a model of what a store could be or

23   could produce?

24   A.      If you did not have it, you would have to open

25   up several stores and it would cost you several



1    million dollars to figure it out.

2         Q.    Do you know whether there were

3    projections prepared prior to the acquisition of

4    MovieStop?

5    A.    I'm unsure.

6         Q.    Do you know whether there were

7    projections that were prepared after the acquisition

8    of MovieStop?

9    A.    I'm not sure.

10        Q.    Why did MovieStop turn out to be a poor

11   investment?

12             MR. SCHOELL:  Object to the form.

13   A.    The same reason that Hastings turned out to be

14   a poor investment.  The main vendors' business models

15   were to destroy physical retail.  They did not want

16   to sell physical media anymore.  So in a time frame

17   that no one could have imagined, they went to

18   spending millions of dollars, tens of millions of

19   dollars in marketing and advertising telling people

20   not to buy physical retail, and no one could have

21   predicted that.

22        Q.    I thought you said earlier that what

23   differentiated MovieStop from Hastings was the

24   different model that MovieStop had by way of -- not

25   model, probably the wrong word, but the composition



1  of the MovieStop business in terms of the size of the

2  store --

3  A.      Size of the store.

4          Q.      -- made it an asset or successful?

5  A.      Until the studios decided to tell people not

6  to buy physical media.  Anyone who was a true

7  hardcore fan who wanted to see the movie, after they

8  had seen it in the theater, the studios decided and

9  continued to extend the amount of time that if you

10 want to see it, you've got to buy it digitally.  I've

11 seen a dozen commercials in the last two weeks for

12 Scully, which is the movie with Tom Hanks, and now, I

13 forget which studio, probably Warner Brothers, if you

14 want to see it, you can buy it online, digital copy,

15 two weeks before you can buy the Blu-ray.  So anyone

16 who loved that movie is now going to buy it digitally

17 and not by a physical copy.  Nobody really could have

18 predicted the studios were going to be that

19 aggressive that quickly, nor the book publishers who

20 basically had fought Amazon and then just decided to

21 lay down to Amazon.  So it's cheaper to buy, not only

22 is it easier to buy a digital book, it's now cheaper.

23 They also allowed Amazon early access to product so

24 that the person can get the book at their home the

25 day the book comes out.  So there's no reason for



1    anyone to go to a store, and nobody could have

2    predicted how aggressive the vendors were, but I sat

3    in a number of meetings, and they said the same thing

4    to us, "We don't want to sell physical media anymore.

5    We have a much better business model selling

6    digital."  No one understood how fast that would

7    come, not even the best and brightest minds of

8    retail, Walmart or Target, anticipated that they

9    would be doing it that quick.

10         Q.    Was it something that was on the

11   horizon, just not expected to occur that quickly?

12   A.    It was something that was on the horizon, but

13   what no one predicted was the early access, so no one

14   understood.  People thought that some people would

15   want a digital product but that there was always

16   going to be, especially in the lower socioeconomic

17   ranges, that there's a desire when you own something

18   to have it physical, and even to the extent where if

19   you have 20 DVDs at the end of the month and you

20   can't pay your rent, you can sell them to somebody

21   and make a little bit of money, where you can't do

22   that digitally, but what really unhinged movies was

23   when they had early access.  So if you were a big fan

24   and didn't want to wait, the only thing you could do

25   was buy it digital.



1       Q.    Do you know who was consulted in

2   connection, if anybody, with the acquisition of

3   MovieStop, meaning prior to the acquisition?

4   A.    It was internal discussion.  I don't know that

5   there's any outside consultants.

6       Q.    When you say "internal", who internally

7   was involved in those discussions?

8   A.    Dozens of people, from the president on down.

9   If somebody else were to have wanted to come and

10  analyze the business, they would go to someone like

11  Hastings.  So whereas Hastings didn't have an

12  expertise with sports merchandise, they went to

13  Gordon Brothers, who are, my understanding, one of

14  two biggest and most respected firms in analyzing

15  inventory, Hastings was in a good position to make

16  the determination internally because they would know

17  more than outside consultants.  They have

18  up-to-the-minute information based upon their stores.

19      Q.    You're quite sure there were a lot of

20  internal discussions with regard to the acquisition

21  or prior to the acquisition of MovieStop, correct?

22  A.    Yes, including store visits.

23      Q.    Was there consultation with the board

24  of Hastings regarding the acquisition?

25  A.    I'm not able to answer that question.



1          Q.      Why?

2     A.      For the same reason of there actually being a

3     board and what constitutes a board and my lack of

4     knowledge from a legal standpoint.

5          Q.      Is it fair to say you're not a lawyer?

6     A.      I'm not a lawyer, thank God.

7          Q.      I take exception to that.

8     A.      I'll play back the six hours we're wasting

9     today and you can let me know.

10          Q.      Why don't you tell me what your

11    educational background is?

12    A.      I didn't even graduate college.

13          Q.      Did you go to high school?

14    A.      I went to high school.  I was in the military,

15    and I took a number of college classes while I was

16    being an entrepreneur.

17          Q.      Where did you graduate high school?

18    A.      Clark, New Jersey.

19          Q.      Did you go into the military as an

20    enlisted person?

21    A.      I did.  The National Guard, just for a year.

22          Q.      Did you acquire any rank?

23    A.      I was just a level private, and I was

24    honorably discharged.

25          Q.      After the honorable discharge, then you



1  went into business?

2  A.    I was taking college classes, and I went into

3  business.

4       Q.    What kind of college classes did you

5  take?

6  A.    Just all different types of college classes,

7  arts, some business, nothing specific.

8       Q.    Where were you taking those classes?

9  A.    I took some classes at Union County College,

10  and I took some classes at NYU.

11       Q.    How many credits did acquire in total?

12  A.    I don't remember.

13       Q.    Did you get an associate's degree?

14  A.    I did not.

15       Q.    Do you know whether you had enough

16  credits to acquire an associate's degree?

17  A.    I'm unsure.

18       Q.    You went to Union County Community

19  College first and then NYU?

20  A.    Yes.

21       Q.    Did you take any business classes?

22  A.    I may have taken one or two.

23       Q.    Do you know what they were?

24  A.    Business ethics, I remember I wanted to take,

25  and probably a business administration class and



1  maybe one accounting class.  I remember LIFO, FIFO,

2  and cost averaging.  Those are just three methods of

3  valuing inventory.

4      Q.    We referred to early on NECA.  NECA is

5  an entity owned and/or controlled by you; is that

6  right?

7  A.    Correct.

8      Q.    What is NECA in terms of an LLC, a

9  corporation?  Do you know?

10 A.    I want to say it's and S corp.

11     Q.    Are you the sole shareholder?

12 A.    I own all of NECA.

13     Q.    Are you also a member of the board?

14 A.    I don't know.  I don't have any context.  I

15 don't have any understanding of what that means in

16 the legal sense.

17     Q.    How long have you owned NECA?

18 A.    20 years.

19     Q.    In the course of the 20 years, has NECA

20 held any board meetings?

21 A.    Not to my knowledge.  Again, not understanding

22 the legal but I haven't held meetings with other

23 people.

24     Q.    You have not?

25 A.    No.



1    Q.    Do you know whether there are other

2  individuals who are board members of NECA?

3  A.    Again, I'm not understanding the legality of

4  it.  I'm not aware of any.

5    Q.    Are you a familiar with in March of

6  2015 NECA providing SP Images with approximately 1.6

7  million dollars to purchase inventory?

8  A.    Not specifically.

9    Q.    Do you have any recollection of that?

10 A.    I have a recollection of us just needing to

11 lend them some money in the short term to buy some

12 inventory.

13    Q.    When you say "us", the "us" is NECA?

14 A.    Yes.

15    Q.    Was SP Images unable to purchase or

16 acquire the inventory on its own without the lending?

17 A.    I'm sure there was a necessity.  I don't

18 remember why.

19    Q.    Was NECA repaid for the money that it

20 loaned to allow SP Images to acquire the inventory?

21 A.    I believe so, but I'm not a hundred percent

22 sure.

23    Q.    Did the funds to repay NECA ultimately

24 come from Hastings?

25 A.    I don't know.



1        Q.      Did you approve on behalf of Hastings
2   giving 1.6 million dollars to SP Images in order to
3   repay NECA?
4   A.      I don't believe I approved any monies going
5   out ever.
6        Q.      Who would have, if they did?
7   A.      It would have been the CFO or the president.
8        Q.      Why wouldn't they have sought your
9   approval to do that?
10  A.      They had the ability to do it in the normal
11  course of business.
12       Q.      When you say "in the normal course of
13  business", was lending 1.6 million dollars to
14  purchase inventory something that would be done in
15  the ordinary course of business?
16  A.      I mean what, hundreds of millions of dollars
17  worth of inventory?
18       Q.      Well, over time, right?
19  A.      On a good week, they could spend 10 million
20  dollars in inventory, especially close to Christmas.
21  So it wasn't irrational.  It wasn't an amount of
22  money that would even raise a red flag.
23       Q.      The fact that it was money that was
24  being used intercompany to acquire inventory, was
25  that something that would have required your



1  involvement or your approval?

2  A.     No.

3           MR. SCHOELL:  Object to the form.

4      Q.     If there was a board of directors of

5  Hastings at the time, is it true that the board of

6  directors would not have been notified then of this

7  1.6 million dollar payment?

8           MR. SCHOELL:  Object to the form.

9  A.     This is supposition on top.  I don't have an

10  answer for that.

11      Q.     Do you know whether approval of the

12  payment of 1.6 million dollars to repay SP Images in

13  order to pay back NECA was ever brought to the board

14  of Hastings to consider or to approve?

15           MR. SCHOELL:  Object to the form of the

16  question.

17  A.     I'm unable to answer that question.

18      Q.     What, if anything, did Hastings receive

19  in exchange for making the payment of 1.6 million

20  dollars to SP Images in order for SP Images to repay

21  NECA?

22  A.     So MovieStop and SP Images, their inventory

23  was tied to the Bank of America line.  So Hastings'

24  line would have been increased for that inventory

25  because that inventory was at some point pledged to



1  the Bank of America line.

2       Q.    When the inventory was sold by either

3  SP Images or MovieStop, was that money then given to

4  Hastings?

5  A.    That's a Hastings question.  That's a CFO of

6  Hastings question.

7       Q.    You don't know the answer to that?

8  A.    I don't know the answer.

9       Q.    Did you ever have an office at Hastings

10 in Amarillo, Texas?

11 A.    They gave me an office, yes.

12       Q.    In 2014, can you tell me how many times

13 you were at the office in Amarillo?

14 A.    I don't know.  Most of the time I met with

15 them were at third-party locations.  So we went to

16 trade shows together.  We went to meetings with

17 studios together.  So the majority of time I was with

18 the key people were at third-party locations.

19       Q.    In any particular year, whether it be

20 2014 or '15 or '16, can you give me an idea of how

21 many times you were in Amarillo, Texas?

22 A.    I couldn't, but I'm sure it's findable.

23       Q.    How would it be findable?

24 A.    Alan Van Ongevalle's assistant would know.

25       Q.    Why would he or she know that?



1 | A.    Because she would prepare and we would make

2 | sure there was a full day of meetings and sit with

3 | all the key people.

4 |        Q.    At or about the time of the July 2014

5 | merger transaction, were you involved in other

6 | business transactions at the time or other businesses

7 | at the time?

8 | A.    Involved in other businesses at the time.

9 |        Q.    What were those businesses?

10 | A.    NECA, and then I believe my interest in

11 | Graceland and the Estate of Elvis Presley.

12 |        Q.    What, if anything, was going on with

13 | regard to those other interests at the time?

14 |            MR. SCHOELL:   Objection.

15 | A.    Normal course of business.

16 |        Q.    Did that change at any point in time

17 | after the July 2014 acquisition?

18 | A.    No.

19 |            MR. VAN GROUW:   Mark this.

20 |

21 |            (Exhibit No. JW-5 is received and

22 |             marked for Identification by the

23 |             Reporter.)

24 |

25 |        Q.    Mr. Weinshanker, you've been handed a



1   document marked JW-5, and for further identification,

2   it's Bates stamped DAC0000204502 through 503.  Take a

3   moment or take as much time as you want to look at it

4   and then let me know when you're done.

5   A.    Okay.

6          Q.    JW-5 is an e-mail from Jeff Twait to

7   Andre Nel dated October 7, 2014.  You're not copied

8   or cc'd on this, correct?

9   A.    Correct.

10          Q.    Other than looking at this e-mail

11   today, have you ever seen the e-mail before?

12   A.    I don't believe so.

13          Q.    Who is Jeff Twait?

14   A.    It was always the original CFO's --

15          Q.    Dan Crow?

16   A.    -- Dan Crow's intent, because he was getting

17   up there in years, to retire and Jeff was Dan's

18   handpicked replacement.

19          Q.    At the time of this e-mail dated

20   October 7, 2014, was Jeff Twait the CFO of Hastings?

21   A.    I'm reading the same thing you are.  I don't

22   have a separate recollection of that date and time.

23          Q.    Were you involved in the hiring of Jeff

24   Twait as the CFO?

25   A.    Superfluously.  I talked with him, interviewed



1  him, but I took the recommendations from both Alan

2  Van Ongevalle and Dan Crow, as well as, I believe,

3  John Marmaduke interviewed him.

4          Q.    Do you know when Jeff Twait was hired?

5  A.    I don't.

6          Q.    Based upon the date of this e-mail, it

7  was obviously sometime prior to October 7, 2014,

8  correct?

9              MR. SCHOELL:  Object to the form.

10  A.    You know as much as I do.

11          Q.    I'm just trying to find out whether you

12  have a recollection based upon this e-mail as to a

13  closer point in time when he was hired.

14  A.    I don't.

15          Q.    How would you assess Jeff Twait's

16  performance as CFO of Hastings?

17  A.    I'm not an expert, so I'll refrain from having

18  an opinion.

19          Q.    I'm not asking for an expert opinion.

20  I'm asking for just your opinion.

21  A.    I wasn't able to get information in a way from

22  Jeff as I was from Dan.  That is the breadth of my

23  opinion.

24          Q.    Was he a capable CFO?

25  A.    I don't think I'm in a position to answer



 1  that.

 2          MR. SCHOELL:  Object to form.

 3      Q.    Why not?

 4  A.    I haven't dealt with enough CFOs to have a

 5  comparison.

 6      Q.    Who was Jeff Twait's direct report?

 7  A.    Alan Van Ongevalle.

 8      Q.    Who did Alan report to?

 9  A.    Myself.

10      Q.    Jeff Twait, why did he end up leaving

11  the company?

12  A.    I'm not sure.

13      Q.    Was it voluntary or involuntary?

14  A.    I don't remember.

15      Q.    Did you ever speak with him prior to

16  him leaving?

17  A.    Did I ever once have a conversation with him?

18      Q.    Yes.

19  A.    I'm sure I've had a conversation with him.

20      Q.    Would you describe those instances

21  where you spoke with him to be rare, just

22  occasionally?  How would you describe them?  Was it

23  once a week?  Was it daily?

24  A.    It wasn't daily, but it wasn't rarely either.

25      Q.    Were they in person?



1  A.    I would say most of them would be over the

2  phone.

3       Q.    How about e-mails?  Did you communicate

4  with Jeff Twait via e-mail?

5  A.    I'm sure he probably e-mailed me a few times,

6  but I doubt I e-mailed him very often.

7       Q.    If you read or at least skimmed JW-5, I

8  don't know if you noticed, there was reference in the

9  e-mail to a preferred dividend of 627,000 to GameStop

10 that is referenced in the third paragraph, the very

11 last sentence.  It says, "MovieStop Acquisition, LLC

12 (a/k/a Joel) would get his $627K back from

13 MovieStop;" do you see that?

14 A.    I do.

15      Q.    Can you tell me what that is referring

16 to?

17 A.    I don't know how you define it as a preferred

18 dividend.  It appears there was money laid out from

19 MovieStop Acquisition, and then as being able to lay

20 it out and then get it back, so it was a loan in

21 essence.

22      Q.    MovieStop Acquisition, LLC, is that

23 your entity, or was it your entity?

24 A.    I would imagine it was under Draw Another

25 Circle, but I'm not sure.



1        Q.    So what was the nature of MovieStop

2   Acquisition, LLC providing funds to GameStop?  Is

3   that your understanding of what occurred here?

4   A.    I don't recall.  I'm sure it's easily find

5   outable.

6        Q.    Do you recall receiving, you or

7   MovieStop Acquisition, receiving $627,000?

8   A.    I don't recall, nor would I have.

9        Q.    Do you recall, or do you know whether

10  those funds would have come from Hastings?

11  A.    I don't know.

12             MR. SCHOELL:  Object to form.

13       Q.    This e-mail also references that funds

14  would come from Hastings to pay outstanding

15  merchandise accounts payables of around 2.8 million.

16  I'm referring to what's referenced in the third

17  paragraph.  Do you see that?

18  A.    I do.

19       Q.    Were you involved in anything having to

20  do with the funds coming from Hastings to pay these

21  merchandise accounts payables?

22             MR. SCHOELL:  Object to the form of the

23  question.

24  A.    No.

25       Q.    Who would have been involved in that?



1  A.    Most likely, Jeff Twait and Alan Van

2  Ongevalle.

3         Q.    Is it fair to say that based upon your

4  prior testimony that the transaction, meaning the

5  funds coming from Hastings to pay these outstanding

6  merchandise accounts payable, would have not been

7  something the board would have considered?

8  A.    No, especially when it looks like they

9  received 7.2 million dollars worth of inventory

10 further down, of which based upon this letter it

11 looks like they were going to be able to get credit

12 for on the Bank of America loan.  So it would

13 actually be created based upon what I'm reading here.

14        Q.    Do you know for sure that's what

15 occurred?

16 A.    As I said, I'm not, and you asked me a

17 question and I'm trying to give you an intelligent

18 answer.

19        Q.    Do you have an understanding of what's

20 referenced, again, I'm looking at the third

21 paragraph, they talk about a 60/40 or a 70/30

22 Hastings to MovieStop revenue split?  Do you know

23 what that refers to?

24 A.    I'd be guessing.  It's probably just how they

25 keep it on the books.



1        Q.    Do you recall how much in funds was

2    used from Hastings to support MovieStop's business?

3    A.    No.

4        Q.    Are you aware that at least there were

5    funds from Hastings used to support MovieStop's

6    business?

7              MR. SCHOELL:  Object to the form of the

8    question.

9    A.    I'm aware that there were funds to buy

10   merchandise that I believe was still owned by

11   Hastings to put into stores and that Hastings was

12   compensated for that, was at least compensated for

13   that merchandise.

14       Q.    Was that acquisition of merchandise in

15   connection with the acquisition of MovieStop, or was

16   it after the fact?

17   A.    There was obviously acquisition of merchandise

18   during the transaction.  Again, I'm not sure exactly

19   who owned the merchandise and when, but most of the

20   monies that went from Hastings were to buy

21   merchandise to put it in the MovieStop stores.

22       Q.    Do you know what, if anything, flowed

23   back by way of value to Hastings as a result of

24   purchasing that inventory that was used in

25   MovieStop's stores?



1    A.    The intent was for the money to come back in

2    some sort of split.

3         Q.    Aside from the intent, do you know

4    whether that actually occurred?

5    A.    I don't know.

6         Q.    I may have asked you this, so I

7    apologize.  Do you ever recall seeing any projections

8    concerning MovieStop's business prior to the

9    acquisition?

10   A.    I don't recall.

11        Q.    Do you know whether MovieStop's

12   business was projected to make any money after the

13   acquisition?

14   A.    I don't recall.

15        Q.    Should I assume you don't know whether

16   MovieStop was making money prior to the acquisition?

17             MR. SCHOELL:  Object to the form of the

18   question.

19   A.    I don't recall.

20             MR. VAN GROUW:  Let's just take a

21   five-minute break.

22

23             (At this point in the proceeding, a

24        brief recess is taken.)

25



1              MR. VAN GROUW:  Back on the record.

2        Q.    Mr. Weinshanker, do you know Jim

3   Litwack?

4   A.    Yes.

5        Q.    How do you know Jim Litwack?

6   A.    He became the president of the company.

7        Q.    When?

8   A.    Late '16, early '17.

9        Q.    Did Jim Litwack replace somebody?

10  A.    Alan Van Ongevalle.

11       Q.    Did you hire Jim Litwack?

12  A.    I was part of the process, yes.

13       Q.    Who else was part of the process?

14  A.    I know I asked John Marmaduke's opinion, and

15  then I believe Cathy Hershcopf was consulted as well,

16  and as well as, I believe, at that time, Ken Simon

17  might have been consulted as well.

18       Q.    Ken Simon, was he on the board of

19  Hastings?

20  A.    He was someone who was brought in to assist to

21  be of consultation.

22       Q.    Was the consultation with Ken Simon

23  specific to his approval or seeking his input with

24  regard to whether Jim Litwack should be retained?

25  A.    I don't recall.



1        Q.      Did you go to Ken Simon with Jim

2   Litwack's hiring?

3   A.      I don't recall.

4        Q.      John Marmaduke, was he a board member

5   of Hastings at the time?

6   A.      Again, I think John was just in a casual

7   advisory role.

8        Q.      Do you know who constituted the board

9   of directors at the time that Jim Litwack was hired?

10  A.      Can I say asked and answered?  I don't have

11  the expertise to comment back on specifics as it

12  relates to a board.

13       Q.      That's been your answer throughout the

14  morning because you don't understand what a board

15  member is?

16  A.      Legally, no.

17       Q.      You understand that I'm not asking you

18  for a legal opinion about what a board member is; you

19  understand that, correct?

20  A.      I believe the only answer is a legal answer.

21  I don't believe there is another answer.

22       Q.      Why do you think there's no other

23  answer other than a legal response to whether a

24  person is a board member?

25                  MR. SCHOELL:  Object to the form of the



1  question.

2  A.     Because I think there's a legal definition as

3  it relates to this, and besides Frank Sinatra, people

4  don't talk about chairman of the board or board

5  members.

6          Q.     Do you have an understanding yourself

7  as to whether you're a board member, or it goes back

8  to your answer that you have no clue?

9  A.     No.

10         MR. SCHOELL:   Object to the form.

11         Q.     You do know what a board of directors

12 is supposed to do, though, correct?

13 A.     For a private company, no.

14         Q.     What about for a public company?

15 A.     No.  They're both no.

16         Q.     Why did you say "for a private

17 company"?  Is there some type of company you do know?

18 A.     I think it would be different for both.

19         Q.     Do you have any understanding of what a

20 board member does in any capacity?

21         MR. SCHOELL:   Object to the form of the

22 question.

23 A.     I would think advises, advises the company.

24         Q.     Is it fair to say that with regard to

25 Hastings, the board never advised the company?



1                MR. SCHOELL:  Objection to the form of

2    the question.

3    A.     Again, I can't answer that question because

4    it's the concept of what the board is.

5           Q.     On a nonboard level, you were at the

6    top of the food chain in terms of Hastings, correct?

7    A.     I was majority owner.

8           Q.     Were you ultimately responsible for the

9    decision making of Hastings?

10               MR. SCHOELL:  Object to the form of the

11   question.

12          Q.     Just to be clear, after the July 2014

13   merger.

14   A.     I don't know the answer to that.

15          Q.     Why?

16   A.     Again, I believe it comes into a legal

17   definition.   I know that I lost more money than

18   anyone else did, that I'm sure of, exponentially, in

19   multiple ways, but I don't know the answer to that.

20          Q.     What was your title at Hastings after

21   the merger?

22   A.     I'm not sure.

23          Q.     So you don't even know what your title

24   was?

25   A.     No.



1       Q.      Do you have any understanding that you

2   were ultimately responsible for the decision making

3   of Hastings after the merger?

4               MR. SCHOELL:  Object to the form of the

5   question.

6   A.      I think on a very high level I was, but I

7   purchased Hastings with the understanding that they

8   had seasoned management who understood the small

9   points of the business much better than I did, and I

10  allowed them to continue to make those decisions.

11      Q.      After Jim Litwack was hired, did he

12  ever identify to you or to anyone, to your knowledge,

13  issues or problems with the operations of the

14  business?

15  A.      I think Jim was brought on to make changes.

16  So, of course, he felt that there were changes that

17  needed to be made.

18      Q.      Did he identify to you or, to your

19  knowledge, anyone else issues that he identified with

20  the business that needed to be changed or fixed or

21  remedied or whatever?

22  A.      I just said, yes, there are things that he

23  wanted to change.  So if he wanted to change them,

24  it's because he felt they needed to be changed, and

25  he was given the ability to do that.



1          Q.     What were the issues that he identified

2     that needed to be changed?

3     A.     All across the businesses, what was bought,

4     how it was bought, how it was merchandised, all

5     across the business.

6          Q.     Anything else?  Did he identify

7     anything else?

8     A.     I'm sure multiple things were identified.

9     Those are the things that come to mind.

10          Q.     Did he provide to you in writing

11     anything that he identified that was a problem with

12     the business?

13     A.     I don't recall.

14          Q.     Do you know whether Jim Litwack had an

15     opinion or a view as to the money that was flowing

16     out of Hastings to support the businesses of SP

17     Images and MovieStop?

18                 MR. SCHOELL:  Object to the form of the

19     question.

20     A.     I don't know.

21          Q.     You don't know?

22     A.     I don't know.

23                 MR. VAN GROUW:  I have no further

24     questions.

25                 MR. SCHOELL:  I don't have any



1   questions for witness.

2                   THE COURT REPORTER:  Mr. Schoell, are

3   you ordering a copy of the transcript?

4                   MR. SCHOELL:  Yes.

5

6                   (Whereupon the deposition is then

7            concluded at 12:00 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2

3        I, LAURIE A. LANDRIGAN, License

4    Number XIO1683, a Certified Shorthand

5    Reporter and Notary Public of the State of

6    New Jersey, certify that the foregoing is

7    a true and accurate transcript of the

8    deposition of JOEL WEINSHANKER, who was

9    first duly sworn by me at the place and on

10   the date hereinbefore set forth.

11        I further certify that I am neither

12   attorney nor counsel for, nor related to

13   or employed by, any of the parties to the

14   action in which this deposition was taken,

15   and further that I am not a relative or

16   employee of any attorney or counsel

17   employed in this case, nor am I

18   financially interested in the action.

19

20   A Notary Public of the State of New Jersey

21

22

23

24

25



1            S I G N A T U R E    P A G E

2

3

4

5

6

7

8

9   JOEL WEINSHANKER

10

11

12

13

14   Sworn to and subscribed before

15   me this                day of

16             , 20

17

18

19   A Notary Public

20

21

22

23

24

25



1                       E R R A T A   S H E E T

2

3    PAGE    LINE    CHANGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**Exhibits**

**483606 WEIN SANKER. JOEL. EXIBIT2**
3:11

**483606 WEIN SANKER. JOEL. EXIBIT3**
3:16

**483606 WEIN SANKER. JOEL. EXIBIT4**
3:17

**483606 WEIN SANKER. JOEL. EXIBIT5**
3:19

**483606 WEIN SANKER. JOEL. EXIBIT1**
3:11

_____

**$**

**$10,000**
51:7

**$627,000**
81:7

**$627K**
80:12

_____

**1**

**1.6**
72:6

73:2,13
74:7,12,
19

**10**
13:3
73:19

**12:00**
91:7

**14**
57:25

**15**
19:24
20:10
23:8
57:25
75:20

**16**
75:20
85:8

**17**
85:8

_____

**2**

**2.8**
81:15

**20**
67:19
71:18,19

**2014**
13:22
14:9,15
24:16,20
25:2
26:5,8,
17,21
28:5
31:4,17
33:10,18,
21 34:2
35:1
37:2,6,18

38:11
75:12,20
76:4,17
77:7,20
78:7
88:12

**2015**
72:6

**2400**
63:7

**2600**
4:6

_____

**3**

**3.1**
7:21

**3.2**
7:21

**3200**
63:8

_____

**4**

**4439**
39:20

_____

**5**

**50**
35:18

**503**
77:2

_____

**6**

**60/40**
82:21

**627,000**
80:9

_____

**7**

**7**
77:7,20
78:7

**7.2**
82:9

**70/30**
82:21

_____

**8**

**800**
63:15

_____

**A**

**a/k/a**
80:12

**ability**
53:12
58:15
73:10
89:25

**accept**
51:15,17

**access**
66:23
67:13,23

**accessories**
59:24

**account**
13:7
54:25

**accounting**
71:1

**accounts**
51:9 52:8
81:15,21

82:6

**acquire**
13:4
16:4,10,
11 42:16
43:24
46:21
49:6
69:22
70:11,16
72:16,20
73:24

**acquired**
18:11
19:6
24:18
38:13
42:11,12
47:11
49:23,25
52:6 56:6
57:15
58:1

**acquiring**
47:9

**acquisition**
15:25
18:14
19:4,10,
14,18,23
22:17
38:6,16
40:5
41:4,12
42:1,13
43:7,10,
15,19
44:12
45:14
47:8,10,
23,25
48:5
49:2,14,
15,18
50:10



52:2,4,
18,20
53:8,11,
17,25
54:7
56:4,9,16
57:12,18,
24 58:4,
24 59:12,
14,19
60:2,5,8,
13,18
61:2,11
63:1 64:1
65:3,7
68:2,3,
20,21,24
76:17
80:11,19,
22 81:2,7
83:14,15,
17 84:9,
13,16

acted
28:14,16

activities
36:2

actual
59:25
62:8

add
60:22

added
16:9
32:16
61:5

adding
26:12
58:22
59:9,11,
23,24
64:1

additional
23:8 63:9

addressed
6:10
10:25

adequate
21:10

administrat
ion
70:25

advertising
65:19

advice
32:20
36:1

advised
36:9
87:25

advises
87:23

advisory
86:7

aggressive
66:19
67:2

agree
5:1 24:15
53:6
54:16,20

agreed
8:24
25:22

agreement
44:3 45:9
61:7

Alan
21:9
22:11
27:11,19,
22 28:24
30:16
37:8,16,
17 55:4

58:9
59:15,16
75:24
78:1
79:7,8
82:1
85:10

Alexis
10:11,12
11:5,25
22:23
51:25

allocation
10:19

allowed
47:12
66:23
89:10

Amarillo
75:10,13,
21

Amazon
66:20,21,
23

America
44:17
74:23
75:1
82:12

amount
13:14
20:11
38:24
39:2,4
66:9
73:21

amounted
52:15

analysis
23:7
46:13
50:4 55:9
60:25

analyze
58:15
68:10

analyzing
68:14

and/or
71:5

Andre
77:7

announcemen
t
14:6

anticipated
25:1 67:8

anymore
65:16
67:4

APA
44:2

apologize
84:7

appearing
6:2

appears
40:1,7,9
80:18

approval
73:9
74:1,11
85:23

approve
23:23
73:1
74:14

approved
73:4

approximate
5:9 24:8
38:8

approximate
ly
4:18
12:24
23:3 38:6
72:6

Argentina
11:12

arguments
64:4

arose
14:2

arrived
20:11

arts
70:7

assess
78:15

asset
44:3,10,
15,20
45:9
50:3,6
66:4

assets
40:2,5,20
41:7
44:23,25
45:14
46:22
47:9,23
48:1
49:6,24
50:14,15,
16,17,19
51:5
52:4,6
57:19

assist
85:20

assistant
75:24



**associate's**
70:13,16

**Association**
9:24

**assume**
5:5 11:19
44:7,9
84:15

**assumption**
41:8

**attend**
26:24

**attendance**
30:18

**attorney**
8:14
33:13
34:9

**attorneys**
5:14,15,
16 6:11,
12

**Avenue**
4:6

**averaging**
71:2

**aware**
6:2,16
15:13
17:13
20:16
21:18
32:22
34:11
72:4
83:4,9

_____

**B**
_____

**back**
10:4

13:10
18:10
23:14
36:16
38:5 47:5
63:9 69:8
74:13
80:12,20
83:23
84:1 85:1
86:11
87:7

**background**
14:1
15:23
69:11

**balance**
21:7 22:3
23:18

**Bank**
44:17
74:23
75:1
82:12

**bankruptcy**
6:7

**based**
11:7,17
63:24
68:18
78:6,12
82:3,10,
13

**basically**
64:11,17,
18 66:20

**Bates**
39:20
77:2

**behalf**
15:10,24
73:1

**believed**
59:18

**bell**
20:6

**benefit**
46:9,14
55:2

**benefits**
54:23

**big**
67:23

**biggest**
68:14

**bit**
5:20 7:17
10:3
38:9,23
67:21

**Blu-ray**
66:15

**board**
15:1,14
24:21,22,
25 25:3,
5,20
26:1,4,
10,11,15,
18,22,25
27:12,24
28:1,4,
13,16
30:1
31:4,16
32:7,10,
15,19
33:1
34:5,13,
17 35:4,
14,16,18
36:10,19,
25 47:22
48:2,4,6,
9 53:23

54:2,4,13
60:3
68:23
69:3
71:13,20
72:2
74:4,5,13
82:7
85:18
86:4,8,
12,14,18,
24 87:4,
7,11,20,
25 88:4

**book**
66:19,22,
24,25

**booked**
21:14,15
24:10,11

**books**
82:25

**bought**
13:6,7
90:3,4

**breadth**
78:22

**break**
55:20
84:21

**brightest**
67:7

**Brothers**
44:15
45:6
46:13
66:13
68:13

**brought**
46:11
59:17
74:13
85:20

89:15

**business**
13:11
15:8
16:8,9
28:21
29:8 30:2
38:23,24
39:1
44:14
50:6
53:1,3
56:8
57:19,21
58:15,20
59:11
60:12,16,
20,25
61:4,12
64:10,17
65:14
66:1 67:5
68:10
70:1,3,7,
21,24,25
73:11,13,
15 76:6,
15 83:2,6
84:8,12
89:9,14,
20 90:5,
12

**businesses**
76:6,8,9
90:3,16

**buy**
47:13
50:21
55:17
59:21
62:23
65:20
66:6,10,
14,15,16,
21,22



67:25
72:11
83:9,20

**buyers**
59:17,20,
22

**buying**
14:3,5
55:16,17
62:18,19
63:7,19

**buyout**
14:16,20,
25 15:4
24:16,20
25:2
26:5,8,
17,21
34:2 35:1
36:6
37:2,6,18
38:1

———————

**C**

———————

**call**
12:20
19:21

**called**
16:18

**calls**
27:6,8,
15,21
34:25

**capable**
78:24

**capacity**
28:14,16
87:20

**care**
6:11,12

**case**
6:7

**cash**
21:10
49:19,25
52:21,25
60:9,12,
16 61:12
62:1,15
64:7

**casual**
86:6

**Cathy**
27:13
28:25
30:16
33:12,15,
17,20
34:1,5,13
85:15

**Cathy's**
33:23,24

**cc'd**
77:8

**cetera**
32:20

**CFO**
21:8
22:23
28:25
37:9,10,
17 51:24
52:24
55:4
59:15
73:7 75:5
77:20,24
78:16,24

**CFO's**
77:14

**CFOS**
79:4

**Chafetz**
11:12

**chain**
88:6

**chair**
27:24
28:1
34:17
35:4,10

**chairman**
34:24
87:4

**change**
61:4
76:16
89:23

**changed**
13:22
14:1
32:15
40:24
44:11
89:20,24
90:2

**charge**
35:6,13

**chart**
16:25

**cheap**
14:5

**cheaper**
66:21,22

**Christmas**
73:20

**Circle**
9:24
16:12,13,
19,21
17:4,7,18
18:1,4,8,
12,15
24:18

25:16
80:25

**Circle's**
19:10,13

**clarified**
18:11

**Clark**
69:18

**class**
70:25
71:1

**classes**
69:15
70:2,4,6,
8,9,10,21

**clear**
16:17
17:22
21:13,14,
23 25:18
26:7 31:1
37:16
42:9
62:14
88:12

**client**
6:18
33:23,24

**close**
47:15
73:20

**closed**
21:2 25:2
26:8,14,
18,22
28:4 31:5
60:2

**closer**
78:13

**closing**
31:17

**clue**
87:8

**code**
6:7

**Collectible
s**
9:23

**college**
69:12,15
70:2,4,6,
9,19

**comment**
86:11

**commercials**
66:11

**committee**
4:11
6:18,19
7:1 8:10,
17 30:4

**committee's**
10:24
12:11

**committees**
8:21

**communicate**
27:17
80:3

**communicate
d**
27:19

**Community**
70:18

**companies**
9:17,18
12:19
14:3
17:14

**company**
8:11,12
9:9,14,



15,19
10:13
12:10
16:14
17:5,10
31:9
36:23
37:4 41:7
42:12
43:24
44:18,22,
23 48:14,
15 49:22,
23,24
50:9,24
56:22
79:11
85:6
87:13,14,
17,23,25

**company's**
35:15
42:13
49:25

**compared**
17:10

**comparison**
63:20
79:5

**compelling**
6:17

**compensated**
83:12

**compensation**
15:20
26:18

**composition**
32:15
65:25

**comprised**
52:6

**concept**
48:4 54:4
88:4

**concluded**
91:7

**conditions**
20:16

**conduct**
36:2

**conducted**
9:1 23:7
44:13

**confuse**
17:23

**conjunction**
9:4

**connection**
5:25 8:17
18:16
34:2
43:6,10
44:2 49:9
58:4,18
68:2
83:15

**consequences**
64:21

**consideration**
41:25
45:13
49:8

**considered**
82:7

**constituted**
86:8

**constitutes**
69:3

**consult**
29:7

**consultants**
68:5,17

**consultation**
68:23
85:21,22

**consulted**
15:7
28:18,19,
20,22
29:3,11
53:24
58:18
68:1
85:15,17

**consummate**
18:19

**contemplated**
37:21,23

**context**
32:25
38:10
71:14

**continue**
32:19,20
47:13
89:10

**continued**
37:17
66:9

**contracts**
51:1

**contribute**
22:16
43:19

**contributed**
19:23
23:1
43:23

**controlled**
71:5

**convened**
47:22

**conversation**
5:18,19
26:12
33:9 41:8
59:18
79:17,19

**conversations**
5:14
6:22,24
30:15,19

**coordinates**
34:25

**coordinating**
35:13

**copied**
11:15
77:7

**copy**
6:13
66:14,17
91:3

**corp**
17:11
71:10

**corporate**
9:24
10:3,18
17:9 36:1

**corporation**
36:2 71:9

**correct**
4:13,14
11:6,16
12:23
13:22,23
16:20
18:12

19:7
21:12
23:18
24:19
25:16
31:5
33:13
38:11,12
40:14
46:7
49:4,6,7
56:2,5,12
68:21
71:7
77:8,9
78:8
86:19
87:12
88:6

**cost**
49:2
64:25
71:2

**counsel**
6:18,25
9:3,10,11
10:9,10
11:4 14:8
22:23
36:7,9,
14,15,18,
20 42:24
43:3,5,9,
14 44:2,
5,8 45:25
46:3
51:25

**counseling**
36:24

**counting**
14:8

**County**
70:9,18

**couple**



4:19
33:16
63:16

**COURT**
91:2

**created**
49:20,21
82:13

**creative**
58:24

**credit**
82:11

**Creditors**
4:11

**credits**
70:11,16

**Crow**
21:8
22:11
28:24
30:16
37:11,12
77:15
78:2

**Crow's**
77:16

**customer**
16:6
52:15

——————————

**D**

——————————

**DAC00002045
02**
77:2

**daily**
27:12
79:23,24

**Dan**
20:6 21:8
22:11

28:24
30:16
37:11,12,
16,17
77:15,16
78:2,22

**Dan's**
77:17

**data**
27:22

**date**
77:22
78:6

**dated**
77:7,19

**dates**
24:19
38:8

**David**
4:10

**day**
66:25
76:2

**deal**
5:11
10:22
51:16,19

**dealings**
28:21

**deals**
33:16,20

**dealt**
79:4

**debt**
23:9

**decade**
12:15

**decided**
16:4
59:13

66:5,8,20

**decision**
88:9 89:2

**decisions**
15:8,10
28:18
31:9
89:10

**decreased**
61:23

**define**
80:17

**definition**
31:24,25
32:1,3,5
87:2
88:17

**degree**
70:13,16

**deleted**
32:17

**depend**
61:12

**deposed**
4:15,21

**deposition**
4:12
5:12,22,
25 6:17
24:15
91:6

**describe**
12:13
15:22
28:15
56:8 63:3
79:20,22

**designated**
27:24

**desire**
46:25

67:17

**destroy**
64:11
65:15

**determinati
on**
68:16

**dictate**
35:6,9,12

**differentia
ted**
65:23

**difficult**
16:8

**digital**
66:14,22
67:6,15,
25

**digitally**
66:10,16
67:22

**diligence**
44:13
50:5,8
58:3,6,8,
10,12,19
59:7

**direct**
4:8 79:6

**direction**
36:19

**directly**
55:17

**director**
36:10

**directors**
15:13
34:17
35:14,16,
18 36:25
60:3

74:4,6
86:9
87:11

**discharge**
69:25

**discharged**
69:24

**discount**
55:15

**discuss**
29:15

**discussed**
30:24

**discussion**
68:4

**discussions**
14:19
20:1,5
55:10,13
68:7,20

**dissolution**
25:5,11

**distributor**
45:3
46:10,23
47:2,4,10
55:16

**dividend**
80:9,18

**document**
6:5,25
7:3,7,17
11:19
32:12
39:19,21,
24 40:1,4
41:16
77:1

**documentati
on**
32:10



documents
  5:24 6:19
  7:13,14
  8:6,9,15,
  18,20,23
  9:5 10:6,
  24 32:6
  34:12
  55:8,11
  59:3,6
dollar
  20:10,21
  21:1,5,16
  24:6 74:7
dollars
  19:25
  23:9
  65:1,18,
  19 72:7
  73:2,13,
  16,20
  74:12,20
  82:9
doubt
  80:6
dozen
  66:11
Dozens
  68:8
Draw
  9:24
  16:12,13,
  18,21
  17:4,7,
  18,25
  18:3,8,
  12,14
  19:9,13
  24:17
  25:15
  80:24
due
  44:13
  50:4,8

58:3,6,8,
9,11,19
59:7
duties
  36:21
DVDS
  67:19

——————

E

e-mail
  11:12,15,
  21 27:18,
  19 77:6,
  10,11,19
  78:6,12
  80:4,9
  81:13
e-mailed
  80:5,6
e-mails
  27:22
  80:3
earlier
  7:12
  14:11
  16:16
  18:10
  23:15
  33:12
  34:4 41:1
  43:18
  50:18
  65:22
early
  66:23
  67:13,23
  71:4 85:8
ease
  24:14
easier
  66:22

easily
  24:13
  81:4
easy
  23:4
educational
  69:11
effort
  8:8
elderly
  41:13,14
  48:17
Elvis
  76:11
employed
  10:12
employee
  10:18,21
employer
  10:15,17
employment
  51:1
end
  57:3
  67:19
  79:10
endeavored
  61:4
enlisted
  69:20
Entertainme
nt
  9:23
  12:14,19,
  22 13:20
entire
  63:10
entities
  9:19,20,
  22,25

10:1
16:22
17:1
22:20
33:24
39:8
43:22
entity
  16:12,17,
  18 38:13,
  17 40:25
  44:11,16
  48:13
  52:18
  56:1,14,
  19 57:9,
  17 71:5
  80:23
entrepreneu
r
  69:16
equipment
  51:7
Eric
  11:12
essence
  80:21
established
  31:2
Estate
  76:11
estimation
  24:8
ethics
  70:24
exact
  41:6,18
EXAMINATION
  4:8
examples
  64:5

exception
  69:7
exchange
  62:1,15
  64:6
  74:19
exhibit
  4:1 39:14
  76:21
exist
  30:8
exists
  16:25
expect
  4:25
expected
  67:11
expert
  78:17,19
expertise
  58:23
  68:12
  86:11
exponential
ly
  88:18
extend
  66:9
extent
  29:2
  30:17
  61:14,18
  67:18

——————

F

fact
  21:11
  24:25
  73:23
  83:16



**factual**
   31:23

**fair**
   63:20
   69:5 82:3
   87:24

**familiar**
   31:12
   38:17
   56:1,3,23
   72:5

**fan**
   66:7
   67:23

**fast**
   22:2 67:6

**feel**
   31:21

**felt**
   16:8
   60:20
   89:16,24

**FIFO**
   71:1

**figure**
   65:1

**filed**
   32:4

**files**
   12:10,12

**financial**
   53:7
   54:12
   64:21

**financing**
   19:20

**find**
   23:5
   78:11
   81:4

**findable**
   24:13
   75:22,23

**firm**
   8:15 34:1

**firms**
   68:14

**five-**
   5:19

**five-minute**
   84:21

**fixed**
   89:20

**flag**
   73:22

**flipping**
   44:9

**flow**
   21:10
   49:19
   50:1
   52:21
   60:9,12,
   16

**flowed**
   83:22

**flowing**
   90:15

**food**
   88:6

**forget**
   66:13

**form**
   14:22
   30:10
   36:3
   41:19
   42:20
   50:12
   52:11
   53:13

**54:18**
   56:20
   65:12
   74:3,8,15
   78:9 79:2
   81:12,22
   83:7
   84:17
   86:25
   87:10,21
   88:1,10
   89:4
   90:18

**formally**
   35:22

**format**
   64:15

**forward**
   59:13

**fought**
   66:20

**found**
   21:11

**frame**
   12:24
   65:16

**frames**
   12:25

**Frank**
   24:24
   25:6,19
   26:9
   27:10
   29:2
   30:17
   87:3

**free**
   50:25

**frequency**
   27:13

**front**
   6:5

**full**
   76:2

**fund**
   57:11

**funds**
   18:15,19
   19:2
   42:15
   43:19,23
   47:14,20
   49:5
   51:20
   62:15
   72:23
   81:2,10,
   13,20
   82:5
   83:1,5,9

————————

**G**

————————

**games**
   59:24

**Gamestop**
   56:22,25
   57:5 80:9
   81:2

**gap**
   25:14

**gather**
   8:15

**gathered**
   9:6

**gave**
   55:14
   75:11

**generally**
   63:6

**generated**
   61:13

**gentleman**

   41:13,14,
   23 48:17

**give**
   14:1
   36:18
   63:13
   64:2,5
   75:20
   82:17

**giving**
   73:2

**God**
   69:6

**good**
   4:9 51:25
   59:19
   64:1
   68:15
   73:19

**goods**
   61:3

**Gordon**
   44:15
   45:5
   46:12
   68:13

**Graceland**
   76:11

**graduate**
   69:12,17

**gravitas**
   64:3

**great**
   16:7
   27:13
   58:14,23

**greatly**
   51:15

**group**
   29:5
   30:22



**Grouw**
4:8,10
19:12
39:12
55:20
76:19
84:20
85:1
90:23

**Guard**
69:21

**guess**
5:8 14:7
23:4
25:24
28:11
31:6,7
34:25

**guessing**
82:24

**guidance**
36:24

——————

**H**

**halfway**
7:17

**handed**
7:3 76:25

**handpicked**
77:18

**Hanks**
66:12

**happen**
25:13
35:22

**happened**
21:3,19,
21,22
24:4 38:7
41:18
42:10

45:20
57:10
63:12,14,
22,24

**happening**
64:12

**hard**
12:10,12

**hardcore**
66:7

**Harmon**
4:6

**Hastings**
7:20
12:14,21
13:2,5,
18,19,25
14:4,13,
16,17,25
15:1,5,
11,14,19,
20,24,25
16:1,5,
10,11
18:12,15
19:4,7,
10,14,18
22:2 23:8
24:18,22
25:3,16,
20 26:4,
10 28:13
29:8,16
30:12
31:16
32:7,11
34:5,14
35:4,24,
25 36:6
37:7
46:7,8,9,
10,11,12,
14,15,25
47:1,4,9,

18 49:16
51:24
52:25
53:7,23
54:23
55:3,16
58:5,6,7,
8,14,23
59:21
61:3,10,
13 62:2,
3,15,16,
20 63:7,
18,19
64:6,7,
10,11,16,
19 65:13,
23 68:11,
15,24
72:24
73:1
74:5,14,
18 75:4,
5,6,9
77:20
78:16
81:10,14,
20 82:5,
22 83:2,
5,11,20,
23 85:19
86:5
87:25
88:6,9,20
89:3,7
90:16

**Hastings'**
15:8
44:17
52:24
74:23

**heard**
18:22
38:3

**heart**

32:18

**held**
47:22
71:20,22

**Hershcopf**
27:13
29:1
33:12
34:5,13
85:15

**high**
69:13,14,
17 89:6

**hindsight**
24:2

**hire**
85:11

**hired**
78:4,13
86:9
89:11

**hiring**
77:23
86:2

**hold**
26:22

**holding**
36:10

**home**
66:24

**honest**
16:7

**honestly**
35:20

**honorable**
69:25

**honorably**
69:24

**horizon**
67:11,12

**hours**
69:8

**huge**
51:8,14

**hundred**
17:23
18:2 20:6
40:25
57:17,22,
25 72:21

**hundreds**
73:16

**hypothetica
l**
63:11

——————

**I**

**idea**
23:22
45:22
51:25
53:10
75:20

**identificat
ion**
4:2 39:15
76:22
77:1

**identified**
6:6 12:9
32:7,10
46:10,25
51:2
89:19
90:1,8,11

**identifies**
11:21

**identify**
9:15 10:6
39:24
50:17



51:5 52:5
89:12,18
90:6

**identifying**
33:5

**identities**
9:21

**Images**
38:3,6,
14,18,21
39:3,6,10
40:2,3,5,
6,14,16,
21,24
41:3,6,9,
10,11,17,
21 42:11,
16 43:7,
11 44:1,
3,4,6,7,
8,13,14,
22 45:15
47:9,13,
16 48:1,
5,6,8,12,
18,24
49:3,9,
10,14,15,
16,18,20,
21,25
52:3,5,
17,20,21
53:1,6,
11,17,24
54:6,16
55:3,18
72:6,15,
20 73:2
74:12,20,
22 75:3
90:17

**Images'**
38:16
49:19
53:3

**Images/sp**
47:16
48:1

**imagine**
80:24

**imagined**
65:17

**important**
60:19

**including**
54:24
68:22

**increased**
61:20
74:24

**individuals**
29:4,15
72:2

**information**
54:6 55:9
58:17
68:18
78:21

**informed**
14:8
59:17

**inhouse**
8:14 9:10
10:9,10

**initial**
12:14

**initially**
19:24
28:24

**input**
85:23

**inquiring**
53:20

**insight**
64:9

**instance**
17:11
32:2

**instances**
30:23
63:4
79:20

**integrity**
16:7

**intelligent**
82:17

**intent**
25:6,7,12
26:6,9
28:6,12
31:3,14
34:6,7
77:16
84:1,3

**intercompany**
73:24

**interest**
13:5
16:22
17:2
39:5,9
41:2
43:15,17
56:15,16
57:1,4,9
76:10

**interested**
60:17

**interests**
43:6,10
76:13

**internal**
68:4,6,20

**internally**
68:6,16

**interviewed**
77:25
78:3

**inventory**
42:7
44:17,19
45:1,2,7
51:6,8
52:7,13
68:15
71:3
72:7,12,
16,20
73:14,17,
20,24
74:22,24,
25 75:2
82:9
83:24

**investigation**
23:7,12

**investment**
54:17
65:11,14

**involuntary**
79:13

**involved**
19:17
20:1
42:24
46:7
56:15
68:7
76:5,8
77:23
81:19,25

**involvement**
12:14
13:19
19:1,3,15
38:20
40:20
41:2 74:1

**involving**
15:8
47:15
48:1

**irrational**
73:21

**issuance**
6:17

**issues**
15:8
29:8,10
32:22
33:5
89:13,19
90:1

**item**
63:7,8

**items**
59:25

———————

**J**

———————

**Jeff**
24:24
25:6,19
26:9
27:11
29:2
30:17
32:10,18,
23 77:6,
13,17,20,
23 78:4,
15,22
79:6,10
80:4 82:1

**Jersey**
69:18

**Jim**
85:2,5,9,
11,24
86:1,9
89:11,15



90:14

**Joel**
80:12

**John**
24:23
29:1
30:16
78:3
85:14
86:4,6

**Joseph**
5:17
11:12

**July**
24:16,20
25:2
26:5,8,
17,21
28:4
31:4,17
33:10,17,
21 34:2
35:1
37:2,6
38:10
76:4,17
88:12

**JW-1**
4:1 6:6,
13

**JW-2**
7:4,10,16
8:3

**JW-3**
4:1 11:7

**JW-4**
39:14,19
41:16

**JW-5**
76:21
77:1,6
80:7

————————

**K**

————————

**Ken**
85:16,18,
22 86:1

**key**
8:23
75:18
76:3

**kind**
45:2 70:4

**knew**
19:19

**knowing**
60:17

**knowledge**
69:4
71:21
89:12,19

————————

**L**

————————

**label**
31:11

**labels**
31:10,11

**laboratory**
64:15

**lack**
69:3

**laid**
80:18

**large**
47:5
54:24

**largest**
13:14

**Las**
4:6

**Late**
85:8

**law**
8:15

**lawyer**
25:9
42:22
69:5,6

**lay**
66:21
80:19

**leading**
36:23

**leaving**
79:10,16

**led**
58:9

**legal**
25:23
26:2
28:7,8,9
31:19,21,
23 32:1,2
34:10,20,
21 35:2,
20 36:7,
9,14,15,
17,20,24
48:13
54:2,3
69:4
71:16,22
86:18,20,
23 87:2
88:16

**legality**
25:13
72:3

**Legally**
86:16

**lend**
72:11

**lending**
72:16
73:13

**lesser**
29:2

**letter**
82:10

**level**
69:23
88:5 89:6

**leverage**
62:17,21

**liabilities**
51:12,13
52:7

**liability**
16:14
17:4,10,
13

**LIFO**
71:1

**limited**
16:13
17:4,10,
13

**liquidated**
44:19

**list**
6:19 7:13
52:15

**Litwack**
85:3,5,9,
11,24
86:9
89:11
90:14

**Litwack's**
86:2

**LLC**
18:5,6
71:8

**lending**
80:11,22
81:2

**loan**
19:20,23
20:11,17,
18 21:7,
14,15
22:3
23:17
24:10,11
80:20
82:12

**loaned**
19:2
72:20

**loaning**
20:2

**locate**
8:9,20

**locations**
75:15,18

**logic**
35:6,9,12

**logically**
36:23

**long**
24:19
41:15,23
48:18,19
71:17

**longer**
5:20 33:1

**looked**
21:7
48:21

**losing**
53:18

**lost**
37:9
88:17

**lot**



27:22
68:19

**loved**
66:16

**lower**
67:16

——————————

**M**

——————————

**made**
20:18
22:14
27:12
28:18
66:4
89:17

**main**
65:14

**maintain**
27:14

**major**
31:9
64:10

**majority**
18:9
51:6,8,15
75:17
88:7

**make**
14:6
15:10
67:21
68:15
76:1
84:12
89:10,15

**making**
53:18
74:19
84:16
88:9 89:2

**management**
59:15
89:8

**manner**
54:3

**March**
72:5

**Mark**
39:12
76:19

**marked**
4:2 6:6
7:4 11:8
39:15,19
40:8
76:22
77:1

**marketing**
65:19

**Marmaduke**
24:23
29:1
30:16
78:3 86:4

**Marmaduke's**
85:14

**Marrs**
24:24
25:6,19
26:9
30:17

**Massachusetts**
41:14

**matters**
29:15
36:10

**meaning**
31:17
37:3 68:3
82:4

**means**
71:15

**media**
47:6 60:1
64:17
65:16
66:6 67:4

**medical**
32:22
33:5

**meeting**
29:14
47:22

**meetings**
26:22,24
29:18,21,
23 30:5,
8,9,13
34:25
36:11
46:24
67:3
71:20,22
75:16
76:2

**member**
15:1
17:7,18,
19,20
18:7
26:4,6,19
27:12
28:3,13,
17 31:4,
15 32:7,
11 33:2
34:5,13
54:14
71:13
86:4,15,
18,24
87:7,20

**member/
shareholder**

17:25

**members**
17:14
24:21,22,
25 25:3,
20 26:1,
10,11,15
32:16,17
48:2 72:2
87:5

**membership**
18:5

**mentioned**
16:16
30:16
33:12
59:9

**merchandise**
45:4
59:21
68:12
81:15,21
82:6
83:10,13,
14,17,19,
21

**merchandised**
90:4

**merger**
31:5,18
33:10,18,
21 38:11
76:5
88:13,21
89:3

**met**
30:2
75:14

**methods**
71:2

**Mike**
22:23

**military**
69:14,19

**million**
19:24
20:10,21
21:1,5,16
23:8 24:6
65:1 72:7
73:2,13,
19 74:7,
12,19
81:15
82:9

**millions**
65:18
73:16

**mind**
90:9

**minds**
67:7

**minutes**
29:23
30:5,9,13

**misunderstand**
19:8

**model**
64:22
65:24,25
67:5

**models**
64:10,18
65:14

**moment**
7:6 77:3

**money**
20:2
22:17,19,
25 42:3,5
53:18
67:21
72:11,19



73:22,23
75:3
80:18
84:1,12,
16 88:17
90:15

monies
73:4
83:20

month
24:9
67:19

months
24:10

morning
4:9 86:14

morphed
46:25

mouth
59:13

movie
56:10
59:25
66:7,12,
16

movies
56:12
67:22

Moviestop
56:1,4,6,
9,16,18
57:1,12,
15,16,18,
23 58:1,
4,17
59:11
60:2,3,5,
8,9,22
61:2,3
62:3,14,
16 63:1
64:6,7
65:4,8,

10,23,24
66:1
68:3,21
74:22
75:3
80:11,13,
19,22
81:1,7
82:22
83:15,21
84:16
90:17

Moviestop's
58:19
61:11
62:2
64:14
83:2,5,25
84:8,11

Mueller
10:11,12
22:23
52:1

multi-step
42:18
45:24

multiple
9:17,18
13:7
30:20
32:18
88:19
90:8

———————————

N

———————————

National
9:23
12:19
69:21

nature
55:12
81:1

NECA
12:20,21
13:1,4,6,
15,18,25
14:13
15:1,18
16:4,9
18:11
38:22,25
39:3
63:14,17,
19 71:4,
8,12,17,
19 72:2,
6,13,19,
23 73:3
74:13,21
76:10

necessarily
7:7

necessity
72:17

needed
36:2
64:13,16
89:17,20,
24 90:2

needing
72:10

Nel
77:7

nonboard
88:5

normal
73:10,12
76:15

Nos
4:1

notes
30:24

noticed
80:8

notified
74:6

number
59:16
60:23
67:3
69:15

numbers
58:21

numerous
29:12
46:24

NYU
70:10,19

———————————

O

———————————

Object
30:10
36:3
41:19
42:20
50:12
52:11
53:13
54:18
65:12
74:3,8,15
78:9 79:2
81:12,22
83:7
84:17
86:25
87:10,21
88:10
89:4
90:18

Objection
56:20
76:14
88:1

obligated
50:25

obligation
50:16

obtain
37:3

obvious
56:12
64:12

occasion
29:1

occasionally
79:22

occur
14:9,20
29:18
57:13
67:11

occurred
24:6,9
32:21
33:9
38:10
53:10
57:24
62:25
81:3
82:15
84:4

October
77:7,20
78:7

offer
32:20

office
51:7
75:9,11,
13

officer
15:4 37:3

officers
37:7,13
49:16



60:6

**Ongevalle**
  21:9
  22:12
  28:24
  37:8  58:9
  78:2  79:7
  82:2
  85:10

**Ongevalle's**
  75:24

**online**
  66:14

**open**
  64:24

**operate**
  52:17,21
  53:8,12
  61:13
  62:16
  64:8

**operation**
  53:24
  62:2

**operations**
  50:5,9
  53:17
  54:6
  61:12
  89:13

**opinion**
  78:18,19,
  20,23
  85:14
  86:18
  90:15

**opportunity**
  46:11

**opposed**
  17:14

**order**
  18:19

53:7
61:13
63:10,15
73:2
74:13,20

**ordering**
  91:3

**ordinary**
  73:15

**organizatio
nal**
  16:25

**original**
  37:21
  77:14

**outable**
  81:5

**outstanding**
  81:14
  82:5

**owned**
  41:11,15,
  23  48:18
  56:18,19
  57:6
  71:5,17
  83:10,19

**owner**
  18:8
  25:16
  31:9
  41:17
  88:7

**ownership**
  13:5
  14:12
  39:5,9
  41:2
  56:15,25

———————

          **P**

———————

**P&l**
  55:1

**p.m.**
  91:7

**pages**
  7:23  8:4

**paid**
  10:19
  18:16
  21:7  42:1
  45:14

**paperwork**
  32:3

**paragraph**
  80:10
  81:17
  82:21

**part**
  22:3
  37:25
  40:19
  48:15
  50:20
  51:13,16,
  19  52:2,
  10  63:25
  85:12,13

**partners**
  17:15

**partnership**
  17:11

**parts**
  10:19,20

**pass**
  30:1
  55:19

**Pathlight**
  18:22

19:5,6,
15,17,22
20:2,4,
14,20
21:1
23:15,17,
20

**Pathlight's**
  19:1,3
  20:17

**pay**
  42:2,4,5
  51:15,21
  67:20
  74:13
  81:14,20
  82:5

**payable**
  82:6

**payables**
  52:9
  81:15,21

**paydown**
  21:17,25
  23:17,21,
  23  24:6

**payment**
  51:17
  74:7,12,
  19

**payments**
  52:13

**people**
  9:4,18
  16:7
  19:19
  27:9
  30:20,22
  46:24
  47:11
  50:21,22,
  24  51:2
  59:16,21

63:19
64:18
65:19
66:5
67:14
68:8
71:23
75:18
76:3  87:3

**percent**
  17:23
  18:2  20:7
  40:25
  57:17,22,
  25  63:10,
  16  72:21

**percentage**
  14:7

**perception**
  25:12,22

**performance**
  78:16

**period**
  13:9  27:3
  41:15,24
  48:19

**person**
  27:23
  29:14
  32:13
  34:24
  36:22
  66:24
  69:20
  79:25
  86:24

**personal**
  42:15
  43:17

**personally**
  15:19
  22:16,19
  23:1



43:16,18
49:11
54:5 57:9

**personnel**
50:19,20

**perspective**
22:4
23:18
38:10

**pertains**
18:6

**phone**
27:15,21
80:2

**physical**
65:15,16,
20 66:6,
17 67:4,
18

**picked**
12:2

**pieces**
63:15

**places**
40:11

**play**
69:8

**pledged**
74:25

**plural**
22:9

**point**
13:4 14:6
21:2 34:4
46:6
55:22
56:3
74:25
76:16
78:13
84:23

**points**
89:9

**poor**
54:17
65:10,14

**position**
68:15
78:25

**positive**
49:19
50:1
52:21
60:9,12,
16

**potential**
62:4,6,8,
10,12

**potentially**
64:9

**predicted**
65:21
66:18
67:2,13

**preferred**
80:9,17

**preparation**
5:22

**prepare**
5:12 76:1

**prepared**
53:4
65:3,7

**president**
21:9
37:8,17
40:13,16
68:8 73:7
85:6

**Presley**
76:11

**price**

49:2
55:19

**pricing**
47:3,6
54:23
62:24

**prior**
6:16
14:25
15:4,15,
16 19:3,
4,13,14
21:15
24:20
33:9,17,
21 38:16
41:4,8,11
44:12
49:18
50:6,10
56:9,16
60:8,12
64:3 65:3
68:3,21
78:7
79:15
82:4
84:8,16

**private**
69:23
87:13,16

**problem**
90:11

**problems**
89:13

**proceeding**
55:22
84:23

**process**
10:5 28:9
44:6
85:12,13

**produce**

6:20 7:14
8:5 64:23

**produced**
10:25
30:5

**product**
12:21
15:18
39:2,3
55:16,17
62:18,19,
23 66:23
67:15

**products**
12:16

**profitably**
53:12

**profits**
62:7,8,9,
10,12

**projected**
84:12

**projections**
53:3
65:3,7
84:7

**provide**
20:14
47:20
61:3
62:3,13,
14 64:9
90:10

**provided**
6:18
11:25
12:21
55:3,9
59:4
62:16,17
64:6,7

**providing**

36:1 72:6
81:2

**public**
87:14

**publishers**
66:19

**purchase**
40:2,20
41:21
42:7,19
44:3,15,
20 45:9
50:3,6
51:13
72:7,15
73:14

**purchased**
13:15
40:24
41:6
44:10,22
48:15
50:19
51:5,9
89:7

**purchasing**
50:14,15
83:24

**purely**
46:8

**pursuant**
6:3 10:25
61:6

**put**
25:11
31:10
33:8
35:22
38:9 41:7
59:12
83:11,21



JOEL WEINSHANKER
IN RE DRAW ANOTHER CIRCLE

December 09, 2016
Index: quantify..remedied

**Q**

**quantify**
55:2

**question**
5:4,5
11:2
17:8,24
18:6
23:24
25:1,23
26:2,13
28:9
30:11
31:19,22
32:13
35:7
36:4,16,
17 41:20
42:21
43:8,12
50:13
52:12
53:14
54:19
68:25
74:16,17
75:5,6
81:23
82:17
83:8
84:18
87:1,22
88:2,3,11
89:5
90:19

**questions**
4:24 5:1
15:3
34:10
55:25
90:24
91:1

**quick**
67:9

**quickly**
66:19
67:11

**R**

**raise**
73:22

**ranges**
67:17

**rank**
69:22

**rare**
79:21

**rarely**
79:24

**reached**
15:24

**reaching**
16:1

**read**
7:7,8,9
8:3 80:7

**reading**
77:21
82:13

**reason**
16:4
65:13
66:25
69:2

**reasons**
60:23

**recall**
6:22,24
7:11,12,
15 8:3
14:15,19

16:2
18:15
20:20
24:6,7,12
27:9
29:10,14
23 32:6,
21 33:3,
4,6 34:15
38:6,8
42:2
48:18
49:2
53:20
55:10
57:7,20
60:11
81:4,6,8,
9 83:1
84:7,10,
14,19
85:25
86:3
90:13

**receivable**
51:10
52:8

**receivables**
51:18
52:13

**receive**
15:19
26:18
36:24
49:8 54:5
74:18

**received**
4:2 27:21
39:14
54:11
62:2
76:21
82:9

**receiving**
7:13 8:3
81:6,7

**recess**
55:23
84:24

**recollectio
n**
8:5
20:19,23,
25 30:7
32:14
33:7
72:9,10
77:22
78:12

**recommendat
ions**
78:1

**recommended**
46:12,16,
19,21

**record**
29:20
39:19
85:1

**records**
27:5,15

**red**
73:22

**reduced**
51:16,17

**refer**
24:15

**reference**
24:14
80:8

**referenced**
80:10
81:16
82:20

**references**
81:13

**referred**
71:4

**referring**
9:16
24:16
80:15
81:16

**refers**
82:23

**reflected**
34:13

**reflects**
40:4

**refrain**
78:17

**refresh**
8:4

**refused**
20:14

**regard**
18:3,14
36:1 52:4
53:11,24
68:20
76:13
85:24
87:24

**related**
59:25

**relates**
44:9
86:12
87:3

**relationshi
p**
13:25
19:5

**remedied**
89:21



**remember**
20:15
22:15
24:1
32:8,9,
12,18
45:12,21
59:5,8,10
70:12,24
71:1
72:18
79:14

**rent**
67:20

**rentals**
56:10,11

**repaid**
72:19

**repay**
72:23
73:3
74:12,20

**repayment**
20:22
21:1,5

**rephrase**
19:11
53:15

**replace**
85:9

**replacement**
77:18

**report**
79:6,8

**Reporter**
4:3 39:16
76:23
91:2

**represent**
4:10 34:1

**represented**

35:24,25
43:6 44:2

**representin
g**
43:9

**request**
6:25 8:9,
17,21
10:24,25
12:11
22:14

**requested**
6:19 8:6,
24 20:21
22:1
23:16,20
58:16

**requesting**
7:13

**requests**
7:18,24
8:3

**required**
21:25
53:7
73:25

**requirement**
21:16,20

**requirement
s**
20:17

**resign**
37:25

**resolutions**
30:1

**respected**
68:14

**respond**
4:25

**response**
8:9 9:6

12:10
86:23

**responses**
11:7

**responsibil
ity**
36:18

**responsible**
88:8 89:2

**responsive**
8:21
10:6,23

**result**
63:1
83:23

**retail**
65:15,20
67:8

**retailer**
47:3
64:11

**retained**
85:24

**retire**
77:17

**revenue**
82:22

**review**
5:24 7:6,
24 9:5
39:21

**rid**
22:2
64:18

**rings**
20:6

**role**
34:17
86:7

**run**

11:25
12:9

———————

**S**

———————

**sad**
33:6

**sale**
15:18
49:9

**sales**
56:10,11

**sat**
67:2

**Schoell**
19:11
30:10
36:3
41:19
42:20
50:12
52:11
53:13
54:18
56:20
65:12
74:3,8,15
76:14
78:9 79:2
81:12,22
83:7
84:17
86:25
87:10,21
88:1,10
89:4
90:18,25
91:2,4

**school**
69:13,14,
17

**Scully**
66:12

**search**
8:22 9:1,
6 11:22,
24 12:2,
6,8

**searched**
12:10

**seasoned**
89:8

**SEC**
14:23

**seeking**
85:23

**sell**
63:25
65:16
67:4,20

**selling**
14:3 67:5

**semantical**
31:8

**semantics**
17:20

**send**
14:22

**sense**
71:16

**sentence**
80:11

**separate**
16:12,18
52:17
56:18
57:16
77:22

**serve**
33:1

**server**
8:22 9:2
11:25



12:9

**serves**
   34:17

**services**
   61:3

**sets**
   16:25

**setting**
   29:5

**shareholder**
   17:19,21
   71:11

**shareholders**
   17:14
   48:11,23

**shares**
   57:6

**sheet**
   21:8 22:3
   23:18

**short**
   72:11

**showing**
   39:18

**shows**
   75:16

**Shrader**
   24:24
   25:6,20
   26:9
   30:17
   32:10

**side**
   47:6

**signature**
   40:9

**signed**
   40:13,16

**Simon**
   85:16,18,
   22 86:1

**Sinatra**
   87:3

**sit**
   76:2

**sitting**
   31:14
   46:4

**size**
   66:1,3

**skimmed**
   80:7

**small**
   38:23
   39:2,4
   55:1 89:8

**smaller**
   64:13,14,
   15

**socioeconomic**
   67:16

**sold**
   12:16
   13:7,8
   39:2,3
   75:2

**sole**
   17:25
   18:7,9
   71:11

**sort**
   12:24
   15:22
   33:8 35:8
   61:6 84:2

**Sosidka**
   22:24

**sought**

73:8

**source**
   18:18
   51:20

**SP**
   38:3,6,
   13,16
   40:2,5,16
   44:1,4,7
   47:12
   48:5,8,24
   49:2,9,
   15,16,18,
   19,20,21
   52:3,17,
   20,21
   53:1,3,6,
   11,17,24
   54:6,16
   55:3,18
   72:6,15,
   20 73:2
   74:12,20,
   22 75:3
   90:16

**speak**
   5:21 12:5
   25:4
   26:16
   79:15

**speaking**
   9:19

**specific**
   8:13 9:15
   28:20
   36:16
   63:13,21
   70:7
   85:23

**specifically**
   35:5 63:5
   72:8

**specificity**
   27:10

**specifics**
   86:11

**spend**
   73:19

**spending**
   65:18

**split**
   82:22
   84:2

**spoke**
   27:10,11,
   13 79:21

**spoken**
   25:21

**sports**
   38:17,21
   39:3,6,9
   40:2,5,
   13,21,24
   41:3,6,9,
   11,17,21
   42:11,16
   43:7,11
   44:3,5,8,
   12,14,22
   45:3,15
   47:9,15
   48:1,12,
   18 49:9,
   14,24
   52:3,4
   68:12

**stamped**
   39:20
   77:2

**standpoint**
   25:22
   35:14,15,
   17 69:4

**started**

13:11
14:20

**state**
   56:12

**stated**
   45:8

**stay**
   25:6

**staying**
   25:21

**Steven**
   5:17

**stock**
   13:6,14
   14:4,12

**stocks**
   14:3

**store**
   64:13,22
   66:2,3
   67:1
   68:22

**store-by-store**
   58:15

**stores**
   64:14,25
   68:18
   83:11,21,
   25

**strongly**
   63:22,23

**structure**
   9:25 10:3
   17:10
   28:7
   45:23

**structured**
   48:20

**studio**



54:25
66:13

**studios**
66:5,8,18
75:17

**subpoena**
6:3,7,17

**subsequent**
49:15

**substantial**
60:25

**substantive**
52:15

**successful**
66:4

**Superfluous
ly**
77:25

**supplied**
27:20,21

**support**
52:25
53:7 62:1
83:2,5
90:16

**supported**
59:4,7

**supposed**
31:9
87:12

**supposition**
74:9

**surgeries**
32:18

**sworn**
4:6

————————

**T**

**taking**

30:24
70:2,8

**talk**
25:12,13
82:21
87:4

**talked**
6:23
52:7,9
77:25

**talking**
13:1,9,10
23:14
24:17
27:3 52:3
54:2
55:14
63:18

**Target**
67:8

**team**
60:20,24
64:3

**telephone**
27:1,6,8

**telling**
65:19

**ten-minute**
5:19

**tens**
65:18

**term**
72:11

**terms**
9:7 10:3
11:22,24
12:3,6,8
13:1
20:11,17,
24 32:22
47:13
53:11,18

66:1 71:8
88:6

**testified**
8:2 18:4,
10 21:24
59:1

**testify**
14:11

**testimony**
21:24
23:15
24:5
25:18,19
31:2,13
49:1
62:25
82:4

**Texas**
75:10,21

**theater**
66:8

**thing**
44:21
52:14
67:3,24
77:21

**things**
31:11
46:20
89:22
90:8,9

**thinking**
24:1

**third-party**
75:15,18

**thought**
16:6 41:1
58:21,22
59:16
65:22
67:14

**tied**
74:23

**time**
4:20 7:24
12:25
13:9,15
15:14
27:3,12
31:16
32:15
35:24,25
37:14
39:21
41:6,15,
18,24
47:25
48:19
57:2,14
61:21,24
63:14
65:16
66:9
73:18
74:5
75:14,17
76:4,6,7,
8,13,16
77:3,19,
22 78:13
85:16
86:5,9

**timeline**
12:25
33:9

**times**
4:17 5:9
13:7
75:12,21
80:5

**timing**
25:4
26:16

**title**
37:3,4

88:20,23

**today**
4:12,23
5:13 6:3,
14 7:10
11:19
16:25
24:2
31:15
46:4
54:16
69:9
77:11

**today's**
5:22,25

**told**
21:6
22:1,9,10
58:25
59:2,4
63:13

**Tom**
66:12

**top**
11:11,21
74:9 88:6

**total**
14:12
70:11

**toys**
59:24

**trade**
75:16

**transaction**
14:15
18:16,20
21:2
24:16,17
25:2,10,
15 26:5,
8,13,14,
17,21
28:4,5



31:5
37:2,18,
21 38:1,
11 40:19,
22,23
42:25
45:23,24
46:6,8
47:15
50:20,23
52:10
76:5 82:4
83:18

**transactions**
7:21 76:6

**transcript**
91:3

**trend**
58:22
59:9,11,
23 60:22
61:5 64:2

**trick**
17:24
18:6

**true**
66:6 74:5

**Tuesday**
5:19

**turn**
7:16
65:10

**turned**
47:1
54:17
65:13

**Twait**
77:6,13,
20,24
78:4
79:10
80:4 82:1

**Twait's**
78:15
79:6

**two-step**
40:22,23
41:5
48:15,20,
21

**type**
19:20
58:17
87:17

**types**
70:6

———————

**U**

———————

**ultimately**
47:14
72:23
88:8 89:2

**unable**
31:19
32:20
52:22
53:2
72:15
74:17

**unaware**
32:3

**uncomfortable**
54:1

**understand**
4:13 5:1,
2,6 17:8,
9 21:22,
24 31:2
35:8 36:5
42:22
43:8,12,
13 50:3
51:4

60:20
86:14,17,
19

**understanding**
8:16
18:25
21:4
23:16,19
25:17
28:6,12
31:3
33:14
34:9,11,
16,19,20,
22,23
35:2,3,5,
21 36:19
37:20
42:23
44:24
45:5,8
47:7
50:21
53:16
54:3
60:15,24
68:13
71:15,21
72:3 81:3
82:19
87:6,19
89:1,7

**understood**
5:5 14:4
21:3
58:14
67:6,14
89:8

**undertake**
8:8

**unfamiliar**
32:2

**unhinged**

67:22

**Union**
70:9,18

**Unsecured**
4:10

**unsure**
13:12,17
28:9 32:5
33:25
37:5
40:23
42:10
43:25
45:16
46:5
48:4,14,
19,25
50:2
53:5,9,
19,21
54:1,15,
22 56:7
57:2,10,
14 58:13
60:4,7,
10,14
65:5
70:17

**up-to-the-minute**
68:18

**updates**
54:12

**upside**
62:4,5,6

———————

**V**

———————

**valuation**
45:6,10,
17

**valued**
44:16

**valuing**
71:3

**Van**
4:8,10
19:12
21:9
22:11
28:24
37:8
39:12
55:20
58:9
75:24
76:19
78:2 79:7
82:1
84:20
85:1,10
90:23

**Vegas**
4:6

**vendor**
12:15,17
13:2,18
22:6
55:14,18
62:24
63:9

**vendors**
21:6,25
22:1,5,9,
14 23:16
42:3,4,6
47:5,11,
12 51:15,
16,21
54:24
64:3,10,
17 67:2

**vendors'**
51:18
65:14

**view**
90:15



**visits**
  68:22

**voluntary**
  79:13

---

**W**

**W2**
  10:21

**wait**
  67:24

**Walmart**
  67:8

**wanted**
  21:6
  46:22
  66:7 68:9
  70:24
  89:23

**Warner**
  66:13

**wasting**
  69:8

**ways**
  35:19
  88:19

**week**
  73:19
  79:23

**weeks**
  66:11,15

**Weinshanker**
  4:9 39:18
  76:25
  85:2

**West**
  4:6

**word**
  65:25

**words**

  8:24 24:9
  26:7
  32:16
  33:2
  59:10,12

**work**
  9:18 28:8
  51:19

**worked**
  33:16,20

**working**
  8:14,17

**works**
  25:10

**worth**
  73:17
  82:9

**WR004436**
  39:20

**WR004438**
  40:8

**writing**
  90:10

**written**
  61:7

**wrong**
  65:25

---

**Y**

**year**
  24:11
  57:23
  69:21
  75:19

**years**
  4:22
  13:3,13
  38:24
  45:21
  57:6

  71:18,19
  77:17

**yesterday**
  5:20

